**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

<table>
<tr>
<td valign="top">

**JENNELL BLACK**, individually and
as Personal Representative of the
ESTATE OF ANTON BLACK
27999 Old Morgnec Road
Chestertown, MD 21620

**ANTONE BLACK**, individually and
as Personal Representative of the
ESTATE OF ANTON BLACK
27999 Old Morgnec Road
Chestertown, MD 21620

**KATYRA BOYCE**, as mother and
next friend of W. B.
201 Church Street
P.O. Box 201
Greensboro, MD 21639

and

**COALITION FOR JUSTICE FOR
ANTON BLACK,**
1712 Blue Heron Drive
Denton, MD 21229

              Plaintiffs,

v.

**THOMAS WEBSTER IV**, individually,
and in his official capacity as a
Greensboro Police Officer,
493 Amsterdam Road
Felton, DE 19943

**MICHAEL PETYO**, individually,
and in his official capacity as
Greensboro Police Chief,
390 Ashland Avenue
Camden Wyoming, DE 19934

**GARY MANOS**, individually,
and in his official capacity as

</td>
<td valign="top">

 

**Civil Action No.: _____**

**JURY TRIAL DEMANDED**

</td>
</tr>
</table>

Chief of the Ridgley Police Department
2 Central Avenue
Ridgely, MD 21660

**DENNIS LANNON**, individually,
and in his official capacity as an
officer of the Centreville Police Department,
101 Lawyer's Row
Centreville, MD 21617

**TOWN OF GREENSBORO**
113 South Main Street
P.O. Box 340
Greensboro, MD 21639

<u>**SERVE ON:**</u>
**KEVIN REICHART, Mayor**
113 South Main Street
P.O. Box 340
Greensboro, MD 21639

**TOWN OF RIDGELY**
2 Central Avenue
Ridgely, MD 21660

<u>**SERVE ON :**</u>
**ANTHONY CASEY, Commissioner**
2 Central Avenue
Ridgely, MD 21660

**TOWN OF CENTREVILLE**
101 Lawyer's Row
Centreville, MD 21617

<u>**SERVE ON:**</u>
**STEVEN WALLS, Town Manager**
101 Lawyer's Row
Centreville, MD 21617

**RUSSELL ALEXANDER,** individually,
and in his official capacity as
Assistant Medical Examiner for the
State of Maryland,
900 West Baltimore Street
Baltimore, MD 21223

**PAMELA SOUTHALL,** in her official
capacity as Chief Medical Examiner for the
State of Maryland,
900 West Baltimore Street
Baltimore, MD 21223

**DAVID FOWLER,** individually,
and in his official capacity as
Chief Medical Examiner for the State of
Maryland,
224 West 30th Street, Ste. 806
New York, NY 10001

**STATE OF MARYLAND**
Office of the Medical Examiner
900 West Baltimore Street
Baltimore, MD 21223

                        Defendants.

## <u>COMPLAINT AND ELECTION OF JURY TRIAL</u>

Plaintiffs Jennell Black, individually and as Personal Representative of the Estate of Anton

Black; Antone Black, individually and as Personal Representative of the Estate of Anton Black;

Katyra Boyce, as mother and next friend of W.B. (together, "Family Plaintiffs"); and the Coalition

for Justice for Anton Black (collectively "Plaintiffs"), by and through undersigned counsel, bring

this civil action against Defendants State of Maryland; the Town of Greensboro; the Town of

Ridgley; the Town of Centreville; former Greensboro police officer Thomas Webster IV,

individually, and in his official capacity; former Greensboro Police Chief Michael Petyo,

individually and in his official capacity; Gary Manos, individually and in his official capacity as

Chief of the Ridgley Police Department; Dennis Lannon, individually and in his official capacity

as an officer of the Centreville Police Department; Pamela Southall, in her official capacity as

Chief Medical Examiner for the State of Maryland; David Fowler, individually and in his official

capacity as Chief Medical Examiner, State of Maryland; and Russell Alexander, in his official

capacity as Assistant Medical Examiner for the State of Maryland, (collectively "Defendants"), and for cause state:

## INTRODUCTION

1. Two years before George Floyd died after being restrained and pinned down by police, 19-year-old Anton Black ("Anton" or "Decedent") was killed by three white law enforcement officials and a white civilian in a chillingly similar manner on Maryland's Eastern Shore.  This lawsuit arises from the wrongful death of Anton Black at the hands of officers from three different police departments on September 15, 2018, and the ensuing efforts by public officials to protect the officers involved from the consequences of their excessive use of force against a Black teenager.

2. On September 15, 2018, Thomas Webster IV, an officer hired by Defendant Michael Petyo and employed by the Greensboro Police Department (hereafter "Greensboro"), despite a documented history of violence and excessive force against Black residents, confronted Anton while he was in the midst of a mental health crisis. Officer Webster ("Webster") was aware that Anton was a high school athlete experiencing mental health issues. However, instead of attempting to help Anton, Webster, along with Chief Gary Manos of the Ridgley Police Department and Officer Dennis Lannon of the Centreville Police Department, chased Anton to his home, smashed a car window near his head, fired a TASER at him, and then forced him to the ground, pinning his slight frame beneath the collective weight of their bodies. While immobilized in a face-down position on the ground with Chief Manos' body and weight upon his back and the other officers and a civilian assisting in holding him down, Anton's pulmonary ventilation was compromised, resulting in cardiac stress. Even after Anton was handcuffed, the officers ignored the danger they were causing and kept Anton in a prone restraint for approximately six minutes as he struggled to breathe, lost consciousness and suffered cardiac arrest. Anton, 19, while handcuffed and terrified, died from positional asphyxia as a direct and proximate

4

result of the officers' excessive force and racial bias, as well as the Town of Greensboro and Defendant Petyo's knowingly hiring of an officer with a proclivity for violence against Black civilians; the State of Maryland's knowing certification of an officer who had neither the character nor the temperament for employment as a police officer; the failure of all three towns to adequately screen, train and supervise their officers; Officer Webster's unjustified and unconscionable escalation of a mental health crisis into a fatal confrontation; and the excessive force used by the officers, specifically including Chief Manos. Sadly, Anton's mother witnessed her son's death on the front porch of her home.

3. Even as he died, officers began developing the false story they would use to defend their actions—falsely claiming that Anton was high on marijuana laced with another drug and exhibiting "superhuman" strength.  This was the story the officers fed to the Maryland State Police, the state agency charged with investigating Anton's death, which used its authority to hunt for evidence to smear Anton and justify his killing by police.  In the weeks and months that followed, Anton's family and Plaintiff Coalition for Justice for Anton Black were forced to battle public officials to gain basic access to the body camera footage of his death and to the autopsy findings—which were not released until Maryland Governor Larry Hogan personally intervened.[1]  Meanwhile, the State of Maryland, through a Maryland State Police ("MSP") "investigation" and with the Office of the Medical Examiner ("ME"), collaborated with the officers who killed Anton to absolve the officers and the State government of responsibility.  When the State finally released its autopsy findings, officials outrageously contended that Anton's bipolar disorder was a contributing cause of death, as opposed to the law enforcement officers' brutal actions in chasing, tasing, and pinning Anton down under

---

[1]  L. Broadwater, "Anton Black case:  Maryland Governor Larry Hogan wants answers about teen's death in police custody on Eastern Shore," Baltimore Sun, Jan. 22, 2019, available at https://www.baltimoresun.com/news/crime/bs-md-hogan-anton-black-20190121-story.html

hundreds of pounds of weight for six minutes until he lost consciousness and stopped breathing. Both the ME's obfuscation of the obvious cause of death – prolonged restraint that prevented Anton from breathing – as well as the MSP report downplaying the role of police in Anton's killing, were used to justify the State's Attorney's decision *not* to pursue criminal charges against the officers and to decline to convene a grand jury. As a result, Defendants collectively have escaped responsibility for Anton's death, misrepresenting his killing as an "accident" for which no person or entity is accountable.

## JURISIDCTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it is a civil action brought under the United States Constitution and federal laws. The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiffs' claims under federal law.

5. Venue is properly in this District pursuant to 28 U.S.C. § 1391 because all the events giving rise to Plaintiffs' claim occurred in Caroline County, Maryland.

## NOTICE

6. To the extent that certain of Plaintiffs' state law claims are governed by provisions of the Maryland Tort Claims Act and/or the Local Government Tort Claims Act, Plaintiffs provided notice of their claims to Defendants on August 28, 2019.

## PARTIES

7. Plaintiff Jennell Black ("Ms. Black") is a Black adult citizen of the State of Maryland. Ms. Black is the surviving mother of the Decedent, Anton Black. She appears both individually and as the personal representative of the Estate of Anton Black, pursuant to Letters of Administration issued by the Register of Wills for Caroline County, Estate No. 9946.

8.  Plaintiff Antone Black ("Mr. Black") is a Black adult citizen of the State of Maryland. Mr. Black is the surviving father of the Decedent, Anton Black. He appears both individually and as the personal representative of the Estate of Anton Black, pursuant to Letters of Administration issued by the Register of Wills for Caroline County, Estate No. 9946.

9.  Plaintiff Katyra Boyce is a Black adult citizen of the State of Maryland. She sues as mother and next friend of W.B., Anton Black's daughter.

10.     Plaintiff Coalition for Justice for Anton Black ("CJAB" or "the Coalition") is a grassroots membership organization, formed in the immediate aftermath of the 2018 killing of Anton Black, with the mission of promoting accountability for law enforcement misconduct and preventing police violence on the Eastern Shore. CJAB works toward these goals by organizing its members to engage in advocacy for police reform at state and local levels, lodging complaints about police abuse, and supporting families of police abuse survivors, including, specifically, the family of Anton Black. The organization consists of several dozen members living across the Eastern Shore, including individual members of the family of Anton Black. CJAB has very few resources and operates on a volunteer basis. CJAB participates in this action on behalf of itself and its members, seeking only declaratory and injunctive relief addressing Defendants' individual and collective misconduct in causing the death of Anton Black, and in preventing police accountability for that death.

11.     Anton was, at the time of his death, a Black resident and citizen of Caroline County, Maryland. Anton was the father of W.B.. Anton died on September 15, 2018 as a result of the excessive force used by Defendants Thomas Webster IV, Gary Manos, and Dennis Lannon, acting as agents of the Greensboro, Ridgley, and Centreville Police Departments, respectively.

12.     Defendant Thomas Webster IV was, at relevant times, an officer of the Greensboro PD and an agent and employee of the Town of Greensboro. Plaintiffs sue Officer Webster, who is

white, in his individual capacity as well as in his official capacity as a Greensboro Police Officer at the time of the events giving rise to the death of Anton Black. Plaintiffs sue Defendant Webster for monetary damages.

13.     Defendant Michael Petyo was, at relevant times, Police Chief of the Town of Greensboro, an agent, supervisory employee, and policymaking official for the Town.  Plaintiffs sue Chief Petyo, who is white, in his individual capacity as well as in his official capacity as Greensboro Police Chief at the time of the events giving rise to the death of Anton Black. Plaintiffs sue Defendant Petyo for monetary damages.

14.     Defendant Gary Manos is the Chief of the Ridgley PD ("police department") and an agent and policymaking official of the Town of Ridgley. Plaintiffs sue Chief Manos, who is white, in his official and individual capacities. Plaintiffs sue Defendant Manos for declaratory and prospective injunctive relief as well as monetary damages.

15.     Defendant Dennis Lannon is an officer of the Centreville PD and an agent and employee of the Town of Centreville. Plaintiffs sue Officer Lannon, who is white, in his official and individual capacities. Plaintiffs sue Defendant Lannon for declaratory and prospective injunctive relief as well as monetary damages.

16.     Defendant Town of Greensboro is a municipal corporation organized under Article XI of the Maryland Constitution. The Town of Greensboro organizes, operates, and maintains the Greensboro Police Department ("Greensboro PD"), the primary law enforcement agency of the Town of Greensboro.  Plaintiffs aver, on information and belief, that at all times relevant to this action, all officers at the Greensboro Police Department were white men. The Town of Greensboro is a "person" within the meaning of 42 U.S.C §1983, and a "public entity" as defined under Title II of the ADA. 42 U.S.C. §12131. Additionally, Plaintiffs aver, on information and belief, that the Town qualifies as

a program or activity receiving federal financial assistance, covered by the Rehabilitation Act. Plaintiffs sue Defendant Town of Greensboro for declaratory and prospective injunctive relief as well as monetary damages.

17.      Defendant Town of Ridgley is a municipal corporation organized under Article XI of the Maryland Constitution. The Town of Ridgley organizes, operates, and maintains the Ridgley Police Department ("Ridgley PD"), the primary law enforcement agency of the Town of Ridgley. Plaintiffs aver, on information and belief, that at all times relevant to this action, all officers at the Ridgely Police Department have been white men. The Town of Ridgely is a "person" within the meaning of 42 U.S.C §1983, and a "public entity" as defined under Title II of the ADA. 42 U.S.C. §12131. Additionally, Plaintiffs aver, on information and belief, that the Town qualifies as a program or activity receiving federal financial assistance, covered by the Rehabilitation Act.  Plaintiffs sue Defendant Town of Ridgley for declaratory and prospective injunctive relief as well as monetary damages.

18.      Defendant Town of Centreville is a municipal corporation organized under Article XI of the Maryland Constitution. The Town of Centreville organizes, operates, and maintains the Centreville Police Department ("Centreville PD"), the primary law enforcement agency of the Town of Centreville. Plaintiffs aver, on information and belief, that at all times relevant to this action, most officers at the Ridgely Police Department have been white men. The Town of Centreville is a "person" within the meaning of 42 U.S.C §1983, and a "public entity" as defined under Title II of the ADA. 42 U.S.C. §12131. Additionally, Plaintiffs aver, on information and belief, that the Town qualifies as a program or activity receiving federal financial assistance, covered by the Rehabilitation Act.  Plaintiffs sue Defendant Town of Centreville for declaratory and prospective injunctive relief as well as monetary damages.

19.      Russell Alexander, who is white, is Assistant Medical Examiner, and in this capacity is an agent of the State of Maryland.  Dr. Alexander was responsible for conducting the death investigation and certifying the cause of death of Anton Black.  As sued in his official capacity, Dr. Alexander is a "person" within the meaning of 42 U.S.C. §1983 on Plaintiffs' claims for declaratory and prospective injunctive relief. Defendant Alexander is also sued in his individual capacity for monetary damages.

20.      Pamela E. Southall, who is white, is Interim Chief Medical Examiner, and in this capacity is a supervisor, agent and final decision and policy maker for the State of Maryland.  Dr. Southall is responsible for ensuring the accuracy and integrity of all death investigations and certifications of causes of death in Maryland.  As sued in her official capacity, Dr. Southall is a "person" within the meaning of 42 U.S.C. §1983 on Plaintiffs' claims for declaratory and prospective injunctive relief.

21.      David Fowler, who is white, was, during all relevant times, Chief Medical Examiner, and in this capacity is a supervisor, agent, and final policy maker for the State of Maryland. Dr. Fowler was responsible for approving, certifying, and ensuring the accuracy and integrity of all death investigations, including that of Anton Black.  As sued in his official capacity, Dr. Fowler is a "person" within the meaning of 42 U.S.C. §1983 on Plaintiffs' claims for declaratory and prospective injunctive relief. Defendant Fowler is also sued in his individual capacity for monetary damages.

22.      Defendant State of Maryland, through the Office of the Medical Examiner, is responsible for ensuring the accuracy and integrity of all death investigations and certifications of causes of death in Maryland.   The State of Maryland is a "public entity" as defined under Title II of the ADA. 42 U.S.C. §12131, and further, qualifies as a program or activity receiving federal financial assistance, covered by the Rehabilitation Act. The State of Maryland is named as a Defendant on

Plaintiffs' claims seeking declaratory and prospective injunctive relief as a covered entity under the ADA and the Rehabilitation Act, and as the responsible entity for state constitutional violations and torts committed by its agents under the Maryland Tort Claims Act.

## FACTS COMMON TO ALL COUNTS

### The Hiring, Certification, and Retention of Officer Thomas Webster IV

23.      In early 2018, Thomas Webster IV was hired by Defendants Michael Petyo and Town of Greensboro to join the Greensboro Police Department as an officer, pending certification and training by the State of Maryland.

24.      Defendant Petyo filed an application with the State of Maryland's Police Training and Standards Commission (PTSC) to have Webster certified as a police officer.  In April 2018, PTSC granted Petyo's application and certified Officer Webster as a police officer, after which he was moved to active duty with the Greensboro Police Department (hereafter Greensboro PD).

25.      The Greensboro PD was not the first police department to employ Officer Webster. He had previously been an officer with the Dover, Delaware police department.

26.      Officer Webster's employment with the Dover police gained national attention in 2015 when he was criminally charged with second-degree assault against a Black man, stemming from an incident on August 24, 2013 that was captured on a police dashboard camera video.

27.      In the video, Officer Webster can be seen with his gun drawn approaching 29-year-old Lateef Dickerson, a Black man, who had his hands raised. Officer Webster yells at Mr. Dickerson to get on the ground, and Mr. Dickerson begins to comply. When Mr. Dickerson is on his hands and knees, Officer Webster, with his gun still drawn, brutally kicks Mr. Dickerson in the face, shattering his jaw. Mr. Dickerson collapses to the ground, unconscious, and Officer Webster cuffs Mr. Dickerson's hands.

28.     The incident illustrated Officer Webster's misconduct as a member of the Dover police, which began recording issues with Officer Webster as early as 2006. A performance evaluation in August of that year noted that "Officer Webster is very fit and strong. There have been times when he should have [attempted] lesser degrees of force to accomplish an objective," i.e., he was prone to use excessive force.

29.     This evaluation came shortly after Officer Webster punched a Black man in the face several times following a car chase.

30.     Despite the evaluation's note that Officer Webster had been "spoken to regarding this issue," Officer Webster continued to engage in disturbing and violent behavior against Black people he encountered on the job.

31.     In September 2010, for example, Officer Webster punched a Black man in the face during a drunk-driving arrest with such force that it shattered the man's nose and bruised Officer Webster's knuckles.

32.     A few months later, in 2010, Officer Webster punched another Black man four times in the face after shocking him with a TASER electronic control device.

33.     These sorts of actions led Officer Webster's superiors to note in an August 27, 2012 performance evaluation that "[Officer] Webster has made some poor decisions and he obviously does not think of the consequences of his actions."

34.     Officer Webster made another "poor decision" early in 2013, when he took two men, Quinton Henry and Chris Baccoro, one of whom had asked to be brought to a hospital, from a convenience store in Dover, where Webster claimed they were loitering, to Port Mahon, a rural area five miles away and left them there.

35.     For stranding the two men with no reason, Officer Webster received a ten-day suspension and nine months of disciplinary probation. Officer Webster was on probation and in the middle of this disciplinary period when he smashed Mr. Dickerson's jaw.

36.     Officer Webster's assault on Mr. Dickerson was the last of **29** use of force incidents by Officer Webster for which the Dover police department filed a report.

37.     Following a trial in which Officer Webster claimed that he had intended to kick Mr. Dickerson in the upper body rather than the head, and had feared for his safety when he kicked Mr. Dickerson in the face, the jury deliberated for three days before shockingly acquitting Officer Webster of the felony assault charges.

38.     Shortly thereafter, the City of Dover settled a lawsuit filed by the American Civil Liberties Union on behalf of Mr. Dickerson for $300,000. The following year, the City also reached a settlement with Officer Webster, paying him $230,000 over the next six years in exchange for Officer Webster's resignation and agreement never to seek further employment with the City of Dover.

39.     All of the foregoing facts about Officer Webster's background were well-known and publicly available at the time the Town of Greensboro hired him in 2018.

40.     Indeed, the extensive national reporting on Officer Webster's violent conduct led to an outcry when the Town of Greensboro announced his hire, both from residents of Greensboro and from civil rights advocates like La Mar Gunn, the president of the Central Delaware chapter of the NAACP, who reached out to the Greensboro Town Council in an effort to dissuade the Town from hiring Officer Webster.

41.     Among those who expressed concern about Defendant Webster's troubled background at the time of his hiring was Anton Black.  Months before his death, Anton informed his

mother that he was worried about Webster and how he might treat community members, given his abusive background as a police officer in Delaware.

42.     Despite Officer Webster's long and well-documented history of improper, abusive, violent conduct and use of excessive force against Black people, Greensboro Town Manager Jeannette DeLude, who is white, told the Delaware News Journal in February 2018 that Officer Webster "was found innocent of everything, **there is no history**," apparently referring only to the criminal charges brought as a result of Webster's assault on Lateef Dickerson.

43.     Defendants Michael Petyo and the Town of Greensboro apparently agreed that Officer Webster's acquittal meant there was "no history" worth considering. When the Town submitted its application to PTSC to hire Officer Webster, Petyo, acting as the Town's Chief, falsified the certification application by disclosing only information regarding the 2015 trial and acquittal, while intentionally withholding all other information in his possession relating to Officer Webster's numerous infractions, disciplinary measures, and use of excessive force reports – criminal misconduct under Maryland law.

44.      PTSC either did not conduct any further inquiry into Officer Webster's background—despite the fact that some uses of force and disciplinary measures were disclosed during the trial and thus would have been known to PTSC—or determined that the particulars of Officer Webster's time with the Dover police did not preclude certification.

45.     After the Town of Greensboro announced Officer Webster's hiring, concerned Black citizens raised objections at a March 1, 2018 Town Council meeting. Citizens told the Town Council that they were "worried about the message the town was sending . . . especially to people of color," and asked if Webster's hire indicated a shift to a more "militarized" style of policing.

46.    The Town's Commissioners, including Defendant Petyo, responded that Officer Webster was "the strongest applicant" interviewed, and stated that he had passed all background checks and evaluations and was "eager to work with the community."

47.    Then-Mayor of Greensboro, Joseph Noon, admitted that the footage of Officer Webster breaking Mr. Dickerson's jaw "looked bad," but reiterated that Webster had been acquitted and told citizens that the Town was "giving [Officer Webster] a second chance."

48.    The controversy exposed deep racial divisions in the Town, given white officials' dismissal of concerns about police abuse voiced by Black residents.

49.    Defendant Petyo also answered questions about Officer Webster. Then-Chief Petyo stated that he had "personally performed a deep background check" on Webster, including visiting Dover and speaking to Dover residents and police officers.

50.    Petyo told the crowd that he had decided to recommend Officer Webster because "This is someone not afraid to do his job."

51.    When a citizen expressed concern that Officer Webster's conduct demonstrated a failure to implement sufficient training, Chief Petyo responded that after Officer Webster completed the Maryland state certification training, he would get "much more" training, as "training is paramount for everyone in" the Greensboro PD.

52.    The final question regarding Officer Webster came from a citizen who, after noting the settlement amounts paid by the City of Dover to Mr. Dickerson and Officer Webster, asked "who would be responsible" if there were another similar incident while Officer Webster was employed by the Town of Greensboro.

53.    The Town of Greensboro's attorney advised the citizens that Greensboro would be responsible for any future damages arising out of Officer Webster's violent conduct.

15

54.     Officer Webster graduated from the State's certification training on April 13, 2018. Despite Chief Petyo's insistence that Officer Webster would undergo extensive training following his certification, Town Manager DeLude informed the Town Council at a subsequent meeting that, pursuant to Chief Petyo's report to her, Officer Webster was "on his own"—that is, not supervised— by May 12, 2018, less than a month after he was certified by the State.

55.     Moreover, it does not appear that formal policies and procedures, to the extent that they existed at all, were well-established within the Greensboro PD.

56.     At a Town Council meeting on June 7, 2018—the month after Officer Webster was sent out on his own—Defendant Petyo advised the Council that he had "constructed a Rules and Regulations handbook" (the "Handbook") for distribution to Greensboro PD officers.

57.     It is unclear whether any formalized set of rules and regulations existed within the Greensboro PD prior to that time.

58.     Chief Petyo told the Town Council that "all the officers [had] received and acknowledged receipt" of the Handbook prior to the June 7 meeting.

59.     There is no indication that the officers were required to do anything more than "acknowledge receipt."

60.     It does not appear that Defendant Petyo or any other Town of Greensboro policymaker made any effort to ensure that Greensboro PD officers actually read and understood the policies contained within the Handbook, nor consulted with officers regarding their adherence to those policies.

61.     The Handbook appears to be a stock handbook prepared by a private company, Lexipol LLC.  It is 659 pages long.

62.     Despite the bare promulgation of the Handbook, the Greensboro PD continued to operate largely using informally established practices and procedures or ad hoc decisions by individual officers, even where those practices, procedures, or decisions directly contradicted the guidelines set forth in the Handbook.

63.     On July 28, 2018 approximately two months after Officer Webster was sent out on his own, C. L., a mixed race, 15-year-old experiencing a mental health issue, was allegedly tased and brutally beaten by Officer Webster and MSP Trooper Kevin Carabello.  The body-worn camera ("BWC") footage shows the minor, C. Lewis, never did anything to warrant being tased and repeatedly beaten, punched and kicked in the head.

64.     Less than six months after Defendant Petyo facilitated the Town of Greensboro's hiring of Webster over the objections of Black residents by falsifying his certification application; less than three months after Petyo informed the Town Council that Greensboro PD officers had received the Handbook; and just weeks after Webster is alleged to have misused his Taser and used excessive force in a violent attack of another local teenager, the Town's hiring and retention of Officer Webster and its failure to train officers in accordance with the practices in the Handbook would prove fatal.

**The Killing of Anton Black**

65.     Anton Black was 19 years old. He was a former champion athlete at North Caroline High School, an aspiring model and actor, and an expectant father. Anton attended Wesley College in Dover, Delaware.

66.     Unfortunately, during the late summer of 2018, Anton had developed serious mental health issues. In August 2018, Anton began behaving erratically, talking about having an "epiphany."

67.     On August 29, 2018, Antone Black, Anton's father, called police and told them that Anton was at his home and was acting strangely. The Kent County Sheriff's officer who responded to the call took Anton into custody for an Emergency Petition and behavioral health screening.

68.     Based on the Emergency Petition, Anton was involuntarily admitted to the hospital for psychiatric evaluation and treatment. Medical staff noted that he was manic and displayed grandiose delusions, euphoria, disjointed thinking and speech, and agitation. The doctors diagnosed Anton with a severe form of bipolar disorder.

69.     Anton stayed in the hospital until September 5, 2018, at which point he was discharged after the judge overseeing his case concluded that Anton did not present a danger to himself or anyone else.

70.     Anton was released from the hospital and returned home, still learning how to manage his severe bipolar disorder.

71.     On September 15, 2018, Anton went to a basketball court not far from his mother's home in Greensboro. There he met X. B., who was 12 years old at the time.

72.     X.B. and Anton knew each other well.  Their families were close, and X.B.  had grown up around Anton and his family. X.B.'s cousin is married to Anton's sister, and X.B.'s brother was on Anton's track team.  The boys regularly spent time together.

73.     Anton waited at the basketball court for a while, then asked if X.B. was ready to leave. The two of them left the basketball court and walked to X.B.'s home, and then roamed around town, still on foot.  During this period, they were seen together both by Defendant Lannon[2] and Defendant Webster. As Defendant Webster told witnesses, including Anton's mother, he saw Anton

_____

[2]   G. Kazanjian, "Questions linger one year after Anton Black's death," Maryland Matters, Sept. 13, 2019, available at https://www.marylandmatters.org/2019/09/13/questions-linger-one-year-after-anton-blacks-death/

and X.B. together earlier in the day at the park, walking on Greensboro's main street, and riding a bike around town, making clear that Webster was well aware the two were spending time together voluntarily.

74.     X.B. noticed that Anton was acting strangely on the walk. He was talking to himself incoherently and making very little sense. Other witnesses also noticed Anton's odd behavior.

75.     At one point, it was reported that Anton grabbed X.B. and began pulling him along. A woman passing by witnessed this and asked X.B. if he wanted her to call the police. Upset by Anton's strange behavior, X.B. said that he did.

76.     The witness called 911 and reported that an "older boy," a teenager, was dragging a younger boy along.

77.     Notably, however, Defendant Dennis Lannon, who saw Anton and X.B. that day in Greensboro, said his view was that the boys were just engaged in ordinary roughhousing.[3]

78.     Officer Webster responded to the 911 call.  At approximately 7:10 p.m., Officer Webster arrived on the scene to speak with Anton and X.B., and turned on his bodyworn camera ("BWC") to record the interaction.  Both the BWC video and surveillance video from a store across the street showed the two boys standing side-by-side, with no physical contact, in a similar fashion to when Webster had seen them earlier, and contrary to the report that Anton was dragging X.B.

79.     X.B. told Officer Webster that Anton had been acting strangely and was "schizophrenic."

80.     While not an accurate medical diagnosis, these statements and Anton's demeanor made clear to Officer Webster, if he was not already aware, that Anton was experiencing a mental

---

[3]     *See* fn 2.

health crisis.  Additionally, these factors made clear that X.B. was not in fear for his safety at the time Webster approached the boys.

81.     In response to Officer Webster's questions, Anton stated that he was X.B.'s brother. The two were not actually brothers, and X.B. told Officer Webster as much. Anton, appearing confused, repeated that he and X.B. were brothers. This behavior was similar to Anton's behavior on August 29, 2018 - the date he was Emergency Petitioned.  On that date, when looking at a large group military photograph from the 70's of his father and others, Anton insisted it was he in the photograph instead of his father. Anton also had claimed he was Adam of Adam and Eve.

82.     After Anton and X.B. disagreed about whether they were brothers, Officer Webster told Anton to put his hands behind his back. In response, Anton strangely said "I love you" to Officer Webster, and then slowly turned away and began jogging in the other direction.

83.     Kevin Clark, a white civilian wearing a helmet emblazoned with a Confederate flag, had been watching the interaction on his motorcycle from across the street. As Anton jogged away, Officer Webster told Mr. Clark to "hang with him", improperly enlisting the aid of a civilian without law enforcement training.

84.     It was plainly improper for Officer Webster to deputize a random, untrained passerby to assist him in responding to a teenager with a mental health crisis, but Mr. Clark obeyed Officer Webster's instructions and began chasing after Anton on his motorcycle.

85.     Officer Webster then entered his car and called in to update dispatch, repeating X.B.'s statement that Anton was "schizophrenic."

86.     Meanwhile, Anton encountered Defendant Lannon, who works for the Centreville Police Department but was not on duty and not in uniform.  Frightened, Anton turned and ran back toward Officer Webster, and on toward his mother's home, chased by Defendant Lannon.

87.     Officer Webster jumped out of his vehicle and pursued Anton on foot.

88.     The Greensboro Police Handbook then in effect stated that "surveillance and containment are generally the safest tactics for apprehending fleeing persons," particularly where "the identity of the suspect is known or there is information available that would likely allow for later apprehension."

89.     Officer Webster knew Anton's identity, as well as X.B.'s.

90.     Officer Webster, who had acknowledged receipt of the Handbook a few months before, did not follow its guidelines, because he had not been adequately trained in its practices, and had a history of violence and "poor" decision-making as a police officer.

91.     Instead of following the guidelines in the Handbook, Officer Webster knowing Anton was mentally ill, treated Anton like a criminal suspect and, improperly leaving his patrol car unlocked with the keys inside, ran after Anton.  No reasonable officer would leave their vehicle vulnerable this way in order to chase a teenager known to him and experiencing a mental health crisis.

92.     Chief Manos was off duty at the time, and happened to be traveling through Greensboro. He saw Officer Webster pull over, speak with Anton, and then begin the foot pursuit.

93.     Noting that Officer Webster had left his police car unsecured in the middle of the street, he got in Officer Webster's car and drove after Officer Webster and Anton. Chief Manos was not in uniform.

94.     Officer Lannon also pursued Anton joining Mr. Clark, who was on his motorcycle.

95.     Anton ran into the mobile home community where his mother lived, pursued by the three officers and Mr. Clark.  From Anton's perspective, he was being chased by four white men, one wearing a Confederate flag helmet, only one in uniform.  Frightened, he jumped into a family vehicle

and locked the doors from inside.  The car was stuck in the driveway with a flat front tire on the driver's side, and Anton did not have keys to drive it anyway.

96.     Notably, in following Anton to his mother's home, Webster knowingly chased him outside Webster's Greensboro jurisdiction.

97.     Anton was now locked in a vehicle, surrounded by three police officers and Mr. Clark, outside his mother's home. He did not present a threat to anyone, and was making no effort to leave the locked car. He was simply experiencing a mental health crisis, as known and reported to dispatch by Officer Webster.

98.     Officer Webster stated several times during the confrontation that they were not arresting Anton and only taking him into custody because he was having a mental health crisis.

99.     The Handbook reminds Greensboro PD officers that "mental health issues, mental health crises and unusual behavior are not criminal offenses. Individuals may benefit from treatment as opposed to incarceration."

100.    The Handbook notes that "taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis." It instructs officers to make an effort to de-escalate mental health crisis situations by being "patient, polite, calm, courteous and [not] overreacting," to "speak and move slowly and in a non-threatening manner," and to "remove distractions or disruptive people from the area."

101.    The Handbook also states that officers should not "Use stances or tactics that can be interpreted as aggressive," "allow others to interrupt or engage the person," "corner a person who is not believed to be armed, violent, or suicidal," or "argue, speak with a raised voice or use threats to obtain compliance."

102.     Finally, the Handbook represents that the Greensboro PD intended to "develop and provide comprehensive education and training to all department members to enable them to effectively interact with persons in crisis."

103.     On information and belief, no such education or training was ever developed, let alone provided to Officer Webster.

104.     Officer Webster instead proceeded in accordance with the training he did receive—the Greensboro PD's established practice and procedure—and his own troubled *ad hoc* decision making.

105.     Officer Webster knew that Anton was having a mental health crisis, and had stated this information over the radio, informing Chief Manos and Officer Lannon who were present.

106.     Given this knowledge, along with Anton's presence in a locked vehicle without keys, the officers' knowledge of Anton's identity and home address, Anton's slight build, the fact that Anton was a teenager who was not being arrested for committing any crime, the presence of other officers, the option to call for emergency medical or mental health intervention services, and the lack of any indication that Anton presented a danger to himself or anyone else, any reasonable police officer would have recognized that it was a controlled situation, and was an ideal time to de-escalate in order to seek a peaceful resolution and the provision of mental health services.

107.     Any reasonable police department would have trained its officers to de-escalate in such a situation, as Greensboro PD's own Handbook makes clear.

108.     Greensboro PD never provided such training to Officer Webster.

109.     Officer Webster took no steps to de-escalate. Instead, Officer Webster violently and tragically escalated the situation beyond his control, deliberately resorting to force as a primary resort, a predictable outcome in light of his prior record of excessive force.

110.     Officer Webster ran to the driver's side of the vehicle, next to Anton, who was sitting in the driver's seat, drew his baton and, without any warning to Anton, smashed the window next to Anton's head.

111.     The Handbook instructs that "control devices" such as batons should be used *only* "when a decision has been made to control, restrain, or arrest a person who is violent or who demonstrates the intent to be violent."

112.     No reasonable police officer would believe that smashing a window next to a nonviolent teenager having a mental health crisis is an acceptable use of a control device.

113.     As the window shattered next to his head, Anton, terrified, moved to the passenger side of the vehicle, attempting to exit the car.

114.     Officer Webster then drew his TASER and told the other officers "I'm Tasing him" as he reached into the broken window and fired the TASER at Anton.

115.     The Handbook states that a TASER should only be used "to control a violent or potentially violent individual."  It clarifies that "Mere flight from a pursuing officer . . . is not good cause for the use of the TASER to apprehend an individual."

116.     Anton was not violent, and Officer Webster had no reason to believe that Anton might be violent, especially while Anton was locked in the vehicle and had done nothing but flee.

117.     The Handbook states that "A verbal warning of the intended use of the TASER should precede its application," in order to "[p]rovide the individual with a reasonable opportunity to voluntarily comply."

118.     Officer Webster gave no such advance warning, nor did he afford Anton a reasonable opportunity to voluntarily comply.

24

119.     During the June 7, 2018 Greensboro Town Council meeting, Chief Petyo stated that all officers had been "recertified on their TASERS."

120.     That Officer Webster misused of the TASER just after receiving the Handbook and training on Greendboro PD procedures, while contrary to Handbook guidelines and appropriate policing practices, illustrates that his actions were plainly in accordance with the established practices of the Greensboro PD.

121.     The Handbook, which sets forth standards for police use of force, directs an officer "present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances" to "intercede to prevent the use of unreasonable force."

122.     Neither Chief Manos nor Officer Lannon took any steps to intervene when Officer Webster clearly used unreasonable force, escalating a nonviolent mental health crisis into a fatal confrontation. Instead, they joined him, and further escalated the situation.

123.     Officer Webster's TASER use was not only improper, but ineffective. Only one of the two barbs struck Anton. The TASER barb embedded itself in Anton's skin, but did not incapacitate him.

124.      Understandably, being struck by the TASER, Anton attempted to get out of the other side of the car, and ran right into the arms of Chief Manos, who was in plainclothes and not readily identifiable to Anton as a police officer.

125.     Anton and Chief Manos struggled as Officer Webster and Officer Lannon ran over. The officers pinned Anton against the outside wall of his mother's home.

126.     As Anton began to scream for his mother and cry hysterically, Officer Webster told Chief Manos that "He's schizophrenic." Chief Manos replied "Yeah, yeah, yeah."

127.     Mr. Clark then came over to the officers. Officer Webster instructed Mr. Clark, an untrained passerby, to "grab [Anton's] leg, pull it out from under him."

128.     On Officer Webster's body camera, Mr. Clark—identifiable by his Confederate flag helmet—can be seen following Officer Webster's instructions. At the 3:37 mark of the body camera footage, Anton fell to the ground, with the officers restraining him.

129.     "Let's prone him out," Chief Manos commanded, directing the others in the controversial practice of restraining a person lying face down while applying physical pressure to areas of their torso, including the back, shoulders or neck.

130.     The body camera video shows that as the officers pinned Anton down, fearful for his life, he pleaded for his mother, repeating "I love you" and "" and calling out "You were always there! Thank you!"

131.     The officers forced Anton into a prone position, so that his face, chest and stomach were pressed to the ground, and Chief Manos laid across Anton's back, using his full body weight to hold him down and pin him to the ground.

132.     Chief Manos, who is much larger than Anton was, would remain with his weight atop Anton's slight, 159-pound body *for the next six minutes or more*, even when Anton stopped moving, and even with the other men further restraining him in additional ways, such as by holding his legs.

133.     Greensboro's Police Handbook at the time clearly provided that a person should not be "placed on his/her stomach for an extended period, as this could reduce the person's ability to breathe."

134.     Shortly after pinning Anton in a prone position, the officers handcuffed him, and Officer Webster told everyone to "**take a breather**," indicating that no one was in fear for their safety

and that Anton was under their control.   The officers nevertheless continued using their weight to hold Anton down.

135.    Approximately two minutes after the officers handcuffed Anton, Officer Webster told Officer Lannon that "This is gonna be an EP"—an Emergency Petition, similar to the Emergency Petition that had resulted in Anton's earlier admission to the hospital—indicating that none of the officers regarded Anton as anything other than a person experiencing a mental health crisis.

136.    Officer Webster even asked if emergency medical services should transport Anton and in response Officer Lannon told him that "you're gonna have to."

137.    Neither officer attempted to call for medical assistance.

138.    At this point, Anton was still on the ground, facedown, with his hands cuffed behind his back.  He did not pose any risk and he was outnumbered four to one.  However, during this entire time, Chief Manos did not remove his weight from Anton's body, and all three officers continued to hold Anton, bending his legs back so that his feet were facing the sky in a position that made it harder for him to breathe, as his mother came out of her home, having heard him scream "Mommy, help!"

139.    Anton, terrified and struggling to breathe, began trying to move his legs and trying to speak to his mother, but the officers forcefully held him down with their collective weight.

140.    Anton cried out "I love you" and **"please,"** apparently pleading with the men on top of him to stop.

141.    As Anton screamed and cried, a Caroline County Sheriff's Deputy, at Officer Webster's direction, searched for shackles. It took another **four minutes** for the officers to locate shackles, during which time Chief Manos continued pinning an already handcuffed Anton face down with his body.

142.     Despite the well-documented dangers of prolonged prone restraint and maintaining heavy, sustained pressure on a person's upper body, the officers made no effort to check whether Anton was having trouble breathing, nor to roll him over to his side although he was already handcuffed as required by their police protocols.  Instead, as Anton lay dying the Officers began joking among themselves about how hard it was for them to keep up with Anton, a star athlete, during the foot pursuit.

143.     In response to questions from Anton's mother, the officers assured her that they understood Anton's mental health issues. Officer Webster told her that "This is a mental health emergency, we're not treating this like a crime."

144.     Instead of treating him like a person and a teen experiencing a mental health crisis, however, tragically all three officers treated Anton like a non-person or a dangerous suspect, utterly failing to use de-escalation techniques or to follow policies and procedures suited to mental health emergencies.  Worse still, they continued to use force to hold Anton down long after he was handcuffed and subdued, heedless of the obvious dangers posed to Anton by their conduct.

145.     Approximately six minutes after taking Anton to the ground and placing him in a prone position, after his legs were shackled, Chief Manos finally lifted himself off of Anton's body.

146.     Finally at this point, long after such warning and action was required by police protocol, Chief Manos stated, "Let's get him on his side **so he can breathe**," illustrating that he was aware that pinning Anton facedown could impede his breathing.

147.     At that point, Anton was no longer responsive and he had not spoken for minutes.

148.     The officers propped Anton into a sitting position, but Anton remained nonresponsive, his head dangling to the side.

149.     Approximately three minutes after the officers had propped Anton up against the wall while assuring his mother that everything was fine, Ms. Black looked into her son's face and saw that he was turning dark. She asked the officers for help.

150.     As the officers finally uncuffed Anton and laid him down for medical assistance, they also finally acknowledged that he was no longer breathing, and did not have a pulse.

151.     Approximately a minute and a half after his mother said he was turning dark and over four minutes after the officers had finally propped him up after holding him in a prone position for approximately six minutes, the officers, and others on site, finally began administering CPR. Defendants looked around to determine if anyone had AED equipment, but no one did.

152.     As they did so, Katyra Boyce, who at that point was six months pregnant with Anton's daughter, arrived to discover that the father of her child was dying.

153.     Emergency medical personnel then arrived and attempted to resuscitate Anton.

154.     They were unsuccessful. Anton was pronounced dead shortly after being taken to the hospital. The medical evidence shows that the cause of Anton's death was homicide by asphyxiation. Anton Black died at the age of 19 as a direct and proximate result of the Town of Greensboro and Defendant Petyo knowingly hiring an officer with a proclivity for violence against Black civilians; the State of Maryland's knowing certification of an officer who had neither the character nor the temperament for employment as a police officer; the failure of all three towns to adequately train and supervise their officers; Officer Webster's unjustified and unconscionable escalation of a mental health crisis into a fatal confrontation; and the excessive force used by the officers, specifically including Chief Manos.  Worse still, Anton's death has gone unpunished because the very entities sanctioned to avenge his death conspired together to instead protect police and public officials, and evade accountability, risking future lives.

**Plaintiffs' Fight for Accountability and Official Efforts to Evade It**

155.     Almost immediately, police officials began developing a narrative to absolve themselves of any wrongdoing or responsibility for Anton's death.  Just after Defendant Manos and a Caroline Sheriff's Office sergeant began trying to resuscitate Anton, an emergency medical technician, Manos, Webster, and possibly other officers began shifting blame to Anton for his own death.  For the first time, they – without any evidence whatsoever – began claiming that Anton had smoked marijuana laced with something ("spice"), and exhibited "superhuman" strength.  Plainly, they began trying to concoct a false narrative that Anton died as a result of "excited delirium," a medically-dubious illness associated with drug use, particularly stimulants, and deaths in police custody.

156.     Even after his death, Anton continued to be treated as a suspect rather than a victim.  Indeed, even the MSP "investigation" into Anton's death repeatedly mischaracterizes him as a criminal suspect rather than a potential homicide victim, although the officers on the scene flatly stated that Anton was *not* being taken into custody for any crime.

157.     The MSP account of Anton's death omits any reference to the length of time that Anton was restrained with the weight of multiple officers after he was handcuffed, instead noting only that Anton was restrained without the use of pepper spray or hand strikes.

158.     On September 17, 2018, Defendants Manos and Petyo contacted a Caroline County resident and NAACP official Berl L. Lovelace, Sr. who was not involved in the case in any way, and privately shared a version of BWC footage with him, while simultaneously contending that the video was highly confidential and was being withheld from the family and all other members of the public.  Mr. Lovelace viewed the video with Defendants Manos and Petyo, and informed Plaintiffs' representatives that he had done so.

159.     As police tried to obfuscate the events, Anton's grieving family raised questions and launched efforts to hold the government accountable for its wrongdoing.  On September 22, 2018, the family held a candlelight vigil attended by over 200 supporters mourning their son and calling on law enforcement to investigate his killing.  Two days later, Caroline County State's Attorney Joseph Riley shared a version of the BWC footage that had been shown to Burl Lovelace a week before to lawyers for Family Plaintiffs, although the family was not invited to view, and counsel was not provided with, a copy of the footage nor allowed to record it when it was shown to them.

160.     On October 4, 2018, the family and supporters asked the Greensboro Town Council to take action.[4]

161.     Notwithstanding the fact that initial toxicology reports performed immediately after his death showed no drugs in Anton's system, police officials continued to falsely claim to media that they believed drugs were involved.

162.     Months passed, and still public officials took no action and refused to release records.  On December 17, 2018, the family, joined by dozens of supporters, were forced to hold a press conference in Denton, Maryland calling for justice, including requesting an investigation by Maryland State Police and asking for release of BWC footage, the toxicology report, and autopsy.

163.     Defendant Manos, who was one of the persons responsible for Anton's death and therefore conflicted, decided for the Ridgely Police Department that no investigation was warranted, notwithstanding his personal involvement and Ridgely Police Department rules to the contrary.[5]

---

[4]     *See, e.g.*, "Family of Greensboro teen speaks publicly over death while in police custody," WBOC, Oct. 5, 2018, available at http://www.wboc.com/story/39236992/family-of-greensboro-teenager-speaks-publicly-over-death-while-in-police custody?fbclid=IwAR28XENNDL4z-A8r_L-GIOJJEbT0b9k1iYjPkNUe-GC3j1KVRX7ACSvMHz8#.XCbQQ_Z1v0Q.facebook

[5]     G. Kazanjian, "Prosecutor Won't Seek Police Officers' Indictments in Eastern Shore Teen's Death," Maryland Matters, Jan. 24, 2019, available at https://www.marylandmatters.org/2019/01/24/prosecutor-wont-seek-police-officers-indictments-in-eastern-shore-teens-death/

Centreville Police Chief Kenneth Rhodes stated publicly that Centreville Police Department policy did not require an investigation. No Town officials from Ridgely or Centreville took any action at this time to override the Chiefs' decisions.

164.    On December 28, 2018, Plaintiff CJAB set up social media accounts on Facebook and Twitter, aimed at organizing supporters of the Family Plaintiffs in seeking justice for Anton's killing.  Through social media, CJAB made extensive efforts to alert mainstream media to Anton's death, and to circulate and amplify this attention to bring pressure to bear on the government to investigate and act.

165.    In the ensuing days and weeks, CJAB and the Family Plaintiffs continued to urge public officials to act, in the form of joining town meetings, filing public records requests, and issuing calls to action.  On January 3, 2019, CJAB and the Family Plaintiffs convened at the Greensboro Town Council meeting to demand that Defendant Webster, who had been on duty the entire four months since Anton's death, be placed on leave and to take issue with the Town's continued refusal to release body camera footage.  The Council refused to discuss the matter.  It was only after continued advocacy by CJAB and Family Plaintiffs members in the following weeks that the Council capitulated and announced a decision to place Webster on paid administrative leave.  The Plaintiffs continued advocating for the release of various public records pertaining to Anton's killing.

166.    On January 22, 2019, in response to requests from CJAB, Anton's family, and the media, Maryland Governor Larry Hogan called on State and local officials to release body camera footage and the autopsy report.[6] The materials were finally released the following day.

167.    The body camera footage initially was offered to the media in a controlled viewing at Greenboro Town Hall.

---

[6]    See n. 1, *supra*.

168.     The four-month delay in the release of the Medical Examiner's autopsy report without intervention by Governor Hogan was inexplicable on grounds other than obstruction, given that the autopsy was conducted and a primary report issued on September 16, 2018, with the neuropathology report conducted on October 10, 2018, and signed on October 24, 2018, and the cardiology report dated November 1, 2018. Indeed, the State's Attorney for Caroline County acknowledged the fact that the ME's report was not made available until January 23, 2019 was "troubling" and caused the family "a great deal of anguish." Plaintiffs aver that the Medical Examiner declined to release its report based on initial toxicology findings from September 20, 2018 showing an absence of drugs in Anton's system because they contradicted law enforcement officials' claims that his death was the result of drug use as well as any claim that Anton's death could be characterized as a result of "excited delirium." In fact, a supplemental toxicology report, again not finding any signs of drugs, was dated January 23, 2019, the day the ME was forced to release its autopsy report, but four months after the initial toxicology report. The ME was plainly improperly influenced by law enforcement officials. Indeed, in a MSP supplemental write up to the autopsy report, MSP Corporal Nathan Wilson references his discussion with Dr. Alexander, who conducted the autopsy, immediately after the autopsy was done on September 16, 2018 as having told him that "Black's neck looked good," reflecting that both the ME and the MSP wished to rule out evidence of physical violence and asphyxiation by police. In essence, once armed with the knowledge provided by the ME that there was no obvious physical injury to Anton's neck, MSP investigators were free to develop a narrative that absolved the involved officers of their wrongdoing and denied asphyxiation as the cause of death.

169.     Indeed, the Medical Examiner's report was written to obfuscate the otherwise obvious and inescapable conclusion that the involved police officers caused Anton's death by interfering with his ability to breathe—creating positional asphyxia.

170.     In describing the cause of Anton's death, the ME report stated that "[a] significant contributing condition was **bipolar disorder**."  Bipolar is a psychiatric illness. No reasonable medical professional would opine that bipolar disorder contributed to a person's death.

171.     The Medical Examiner concluded that Anton's heart had failed suddenly and attributed this primarily to "anomalous right coronary artery and myocardial tunneling of the left anterior descending coronary artery" when the medical literature, the physical evidence and the video of the incident clearly contradict these findings.

172.     Although the ME report documents **43 blunt force trauma wounds** and acknowledges that "the stress of the struggle contributed to his death," the ME's description of events does not acknowledge the force used by police and that for more than six minutes, at least one officer was lying across Anton's back, interfering with his ability to breathe.

173.     The ME's report unreasonably states that "no evidence was found that restraint by law enforcement directly caused or significantly contributed to the decedent's death; in particular no evidence was found that restraint led to the decedent being asphyxiated."  In making these findings, Plaintiffs aver, on information and belief, the Medical Examiner conspired with and relied upon involved law enforcement officers and the false narrative they presented, rather than actual evidence in the case, such as the body camera footage available for the ME independently to review. Specifically, based on the narrative relayed in the Medical Examiner's opinion, Plaintiffs aver that Medical Examiner Russell Alexander did not view or rely upon the best evidence of what happened

to Anton, namely the video, relying instead on a timeline prepared by the MSP and facts as characterized by police who minimized their prolonged prone restraint of Anton.

174.    The ME's report deliberately ignores general, well-established medical knowledge that in many cases there is little or no physical evidence when a person dies of mechanical or positional asphyxia.  It is a basic precept of forensic pathology – and common sense – that in addition to physical findings, there must be consideration of the external evidence of the circumstances prior to the death.  It was objectively unreasonable for the ME to treat the absence of a physical signature outwardly on Anton's body as a basis for ruling out positional asphyxia as the cause of Anton's death, particularly in light of the known prolonged prone restraint of Anton in the moments leading up to his death and the well-established risks of positional asphyxia.

175.    As every schoolchild learns, breathing is essential for survival and human beings rely on the delivery of oxygen to our brain, heart and other organs to function. Interfering with a person's ability to breathe necessarily puts their survival at risk.  It is well-known that when a person's upper body is compressed by pressure – such as the weight of another person – so is their ability to breathe.  The ability to breathe can be further compromised when a person is face down with their legs bent back while this pressure is on their body.

176.    As noted, the ME's report states that Anton died of "sudden cardiac death due to anomalous right coronary artery and myocardial tunneling of the left anterior descending coronary artery."  However, the medical evidence shows that it is extremely unlikely that an otherwise healthy and athletic 19-year old teenager, with absolutely no history of any problem of heart function, would spontaneously die from this type of heart condition.

177.    Myocardial tunneling is an extremely common physical variation and studies estimate it is found in at least one third of all autopsies.  Myocardial tunneling does not impact the

flow of blood and cardiologists generally consider myocardial tunneling to be a benign condition.   It is objectively unreasonable to claim that myocardial tunneling would cause Anton's sudden death.

178.      It would be exceptionally rare for anomalous right coronary artery ("ACA") to spontaneously cause sudden cardiac death and it is impossible for any medical professional to conclude that ACA caused Anton's death.   Based on well-recognized and accepted standards of forensic pathology Dr. Alexander should have simply concluded that ACA was present, not that it caused Anton's death.

179.      As a trained forensic pathologist, Dr. Alexander and the ME's office knew that it was improper under these facts and circumstances to conclude that Anton "died of sudden cardiac death due to anomalous right coronary artery and myocardial tunneling of the left anterior descending coronary artery." Thus, Anton's cause of death was intentionally misstated.

180.       It defies both common sense and basic standards of forensic pathology to suggest that the actions of law enforcement did not "directly cause" or "significantly contribute" to Anton's death in light of video footage depicting Anton being chased, tased, taken to the ground, and restrained in a prone position with significant compression of his upper body for approximately six minutes.

181.      Anton Black died because police employed excessive force, laying him out prone on his stomach, lying on top of him for approximately six minutes **and approximately five minutes after he was handcuffed**, and folding his legs towards the sky in a manner that further compromised his ability to breathe.   The pressure and positioning prevented him from being able to breathe, depriving him of the oxygen necessary for his heart to function correctly.   It was objectively improper for the ME to intentionally omit this glaringly obvious consideration.

182.     Internal inconsistencies within the ME's report further call its conclusions into doubt.  For example, even though the ME referenced a heart condition as the cause of death, which would suggest the appropriate category as "natural causes," the ME categorized Anton's death as an "accident."  In fact, Anton's death was a homicide—a death caused at the hands of another.  But for the use of force by police in pursuing and restraining him, Anton would be alive.

183.     The National Association of Medical Examiners ("NAME") is the primary professional association for medical examiners.  The publications of NAME clearly establish that in death investigations, medical examiners should consider the "but-for" principle: "But-for the injury (or hostile environment), would the person have died when he/she did?". Moreover, "[r]egardless of whether the non-natural factor (a) unequivocally precipitated death, (b) exacerbated an underlying natural pathological condition, (c) produced a "natural" condition that constitutes the immediate cause of death, or (d) contributed to the death of a person with natural disease typically survivable in a non-hostile environment, this principle remains: the manner of death is unnatural when injury hastened the death of one already vulnerable to significant or even life-threatening disease." [7]

184.     In addition, NAME publications repeatedly encourage medical examiners to categorize deaths at the hands of others based on volitional actions as "homicides": "In general, if a person's death results at the 'hands of another' who committed a harmful volitional act directed at the victim, the death may be considered a homicide from the death investigation standpoint."[8] NAME's longstanding guide to death investigations also explicitly addresses classifications of deaths following police uses of restraint: "Deaths due to positional restraint induced by law enforcement personnel or to choke holds or other measures to subdue may be classified as Homicide. In such cases,

---

[7] NAME, A Guide for Manner of Death Classification at 7 (Feb. 2002), https://name.memberclicks.net/assets/docs/4bd6187f-d329-4948-84dd-3d6fe6b48f4d.pdf
[8] *Id.* at 8.

there may not be intent to kill, but the death results from one or more intentional, volitional, potentially harmful acts directed at the decedent (without consent, of course). Further, there is some value to the homicide classification toward reducing the public perception that a "**cover up**" is being perpetrated by the death investigation agency."[9]

185.     Dr. Fowler who signed the ME report regarding Anton's death was the Chief Medical Examiner of Maryland from 2002-2019 and was the President of NAME in 2015 and Chairman of the Board in 2016. In 2001, he was a member of NAME's Network of Death Investigation Affairs. He's been a Fellow with NAME since 1997. He's held several other positions and with NAME (and still holds committee positions) and is currently a board member.

186.     In 2017, NAME adopted a position paper laying out recommended practices for, among other things, investigations of deaths occurring in police encounters. In that paper, NAME again explicitly reiterated that medical examiners should "consider homicide as the manner of death in cases similar to those that would otherwise meet the threshold of 'death at the hands of another.'"[10]

187.     Whether or not the ME personally believed police acted *improperly* in Anton's death, the ME's responsibility was to opine based on reasonable medical and professional standards as to what caused Anton's death, not to cover up for the officers' actions.  But for the volitional actions of other persons, Anton would be alive, but upon information and belief the ME knowingly and intentionally misrepresented his death as, alternately, one of "natural" causes or "accident."  This intent was demonstrated in part by the ME's assurance to the MSP that Anton's neck "looked good."

---

[9]     *Id.* at 11.

[10] NAME, National Association of Medical Examiners Position Paper: Recommendations for the Definition, Investigation, Postmortem Examination, and Reporting of Deaths in Custody (2017), https://name.memberclicks.net/assets/docs/2e14b3c6-6a0d-4bd3-bec9-fc6238672cba.pdf

By ignoring overwhelming and irrefutable evidence of Anton's prolonged restraint by police as captured on body camera footage; failing to acknowledge the basic principle that compressing a person's body interferes with their ability to breathe; failing to acknowledge that positioning a person face down with their legs bent back further interferes with their ability to breathe; making misleading statements suggesting that asphyxia due to restraint must be ruled out due to the absence of physical signs of asphyxia on Anton's body; making false representations about the significance of Anton's myocardial tunneling; misrepresenting and exaggerating the role of anomalous right coronary artery; claiming that bipolar disorder contributed to Anton's death; and departing from well-established customs in the field that deaths at the hands of another should be characterized as homicide, the ME sought to and did intentionally mask the true cause and police culpability for Anton's death.

188.    As a direct result of the ME's improper and false characterization of the cause of death, the State's Attorney for Caroline County determined that there was no basis for any criminal prosecution of the officers responsible for Anton's death. In a January 24, 2019 press release recounting the factors considered in declining to prosecute, as well as declining to bring the case to a grand jury as the Family Plaintiffs and CJAB requested, State's Attorney Joseph Riley expressly and repeatedly relied on the false, erroneous and misleading assertions made in the ME report, particularly that "Anton Black's cause of death was a Sudden Cardiac Death resulting from a congenital heart defect"; "no evidence was found that restraint by law enforcement directly caused or significantly contributed" to Anton's death; that Anton's "mental health status" was a contributing factor in his death; and that the ME "found that the force used was not a direct cause or a significant contributor to Anton Black's death" in declaring "the cause of death was determined to be accidental."[11]

---

[11]    https://www.baltimoresun.com/news/bs-md-states-attorney-joseph-riley-news-release-0125-pdf-20190124-htmlstory.html.

189.     On January 30, 2019, relying on a public information response indicating that the Town of Greensboro had no documents in its possession to support the earlier claim that Webster had been subject to an extensive background check prior to his hiring, CJAB issued a statement calling attention to Defendant Michael Petyo's false representations in his capacity as Greensboro Police Chief, inviting the Maryland Police Training Commission to undertake an investigation into its certification of Defendant Webster as an officer.  A few weeks later, CJAB and the Family Plaintiffs convened with supporters at Greensboro Town Hall to call on the Council to fire Webster, to no avail.

190.     On March 4, 2019, CJAB organized family and community members to attend the Town Council meeting in Ridgely, to call for investigation into Defendant Gary Manos' role in Anton's killing and for Manos to be placed on leave during the investigation.  The Ridgely Commissioners did not respond.

191.     According to Ridgely Police Department rules, an independent review of Manos should have been opened immediately when Anton died.  But in a media interview, Manos said that as Chief, it was his call to determine whether to place himself on leave, and he did not think he should be placed on leave to allow a review to take place.  Town officials were aware of Manos' decision to unilaterally absolve himself of responsibility for Anton's death, which was publicly reported in the media and raised as a concern by CJAB, but took no action to overturn it.

192.     On April 1, 2019 – having heard no response to their March 4, 2019 requests -- CJAB and supporters congregated again at Ridgely Town Hall, to demand Town officials investigate Defendant Manos' role in Anton's death.  After further delays, on May 14, 2019, in follow up to CJAB's demands, the Town of Ridgely announced it had hired a law firm to "investigate" Defendant Gary Manos' role in Anton's death and whether he followed Department protocols.  The firm later purported to clear Manos of any wrongful conduct.

193.     Meanwhile, in April 2019, the Maryland Police Training and Standards Commission announced it would move forward with a hearing on decertification of Defendant Webster as a Maryland police officer.  The inquiry came in response to the demands of CJAB and Anton's family, and followed a finding by the Maryland State Police that Greensboro officials, including Defendant Petyo, had withheld information about Webster's use of force while employed in Delaware.

194.     On July 26, 2019, the State of Maryland decertified Defendant Webster as a police officer eligible to work in Maryland.  As a result, Greensboro Police Chief Eric Lee (who took over as Chief following Defendant Petyo's departure) announced at a Town meeting on August 1, 2019 that Webster was no longer employed by the Town of Greensboro. The basis of the decertification decision was Defendant Petyo's falsification of Webster's certification application to exclude Webster's extensive record of police abuse as an officer in Delaware.[12]

195.     A highly predictable consequence of these failures  to is the risk that unfit officers employed and/or improperly certified by the Town will violate citizens' constitutional or statutory rights, and due to systemic bias, do so in a racially discriminatory manner.

196.     Defendants Michael Petyo and the Town of Greensboro repeatedly displayed deliberate indifference to this risk, including by:

   a.   Failing to establish adequate standards for applicants' fitness to serve;
   b.   Failing to adequately evaluate Officer Webster's background, including failure to give adequate weight to Officer Webster's well-documented history of violating citizens' rights;
   c.   Failing to consider citizens' reasonable objections to Officer Webster's retention;

---

[12] A. Andrews, "Md. Decertifies Greensboro officer involved in teen's death in custody," Star Democrat, Aug. 2, 2019, available at https://www.stardem.com/news/local_news/md-decertifies-greensboro-officer-involved-in-teen-s-death-in/article_e7235ef7-d25d-5338-ad92 2702ebf9f019.html?fbclid=IwAR1PVDsFdL7sFHB0QilL69c6KQbrbhfBe74yIxe_nWq1vQR5mLwU_6zip7Q#utm _campaign=blox&utm_source=facebook&utm_medium=social

d.   Failing to submit complete or accurate information regarding Officer Webster's background to the Police Standards and Training Commission for evaluation, in violation of the criminal laws of Maryland;

e.   Failing to establish adequate practices and procedures regarding the use of force;

f.   Failing to establish adequate practices and procedures regarding intervention in mental health crises;

g.   Failing to adequately train Officer Webster in use of force or mental health intervention practices;

h.   Failing to adequately supervise Officer Webster; and

i.   Failing to adequately investigate and discipline officers, including Officer Webster, for engaging in use of excessive force against Black citizens.

197.   Defendants the Town of Ridgley and Gary Manos, in his official capacity as Chief of the Ridgley PD, were responsible for establishing practices and procedures of the Ridgley PD and ensuring compliance with those practices and procedures.

198.   Six months after the State of Maryland decertified Defendant Webster as a police officer, Defendant Michael Petyo pled guilty to criminal misconduct in office based on his falsification of records submitted to the Maryland Police and Correctional Training Commission covering up Webster's past abuse to facilitate his hiring.

199.   The State's complicity in covering up the true causes of Anton's death has itself caused great anguish to the Family Plaintiffs. Through delays and denials in access to records, false assertions by law enforcement officials that Anton's death was drug-related, the ME's false report of the cause of death and the State's Attorney's reliance on that report to reject Plaintiffs' request to convene a grand jury to look into the matter, and the overall failure to act except under extraordinary pressure, the government shirked all responsibility for investigating and prosecuting the officers involved in Anton's death, leaving it to Plaintiffs to do the government's job.  Indeed, in his press release, State's Attorney Joseph Riley even noted that if the Family Plaintiffs were able to uncover proof of police wrongdoing through their own private efforts, he might possibly reconsider his refusal to convene a grand jury.

# CAUSES OF ACTION

## COUNT 1
### Wrongful Death
**(Family Plaintiffs v. Thomas Webster IV, Gary Manos, Dennis Lannon, Michael Petyo, Town of Greensboro, Town of Ridgely and Town of Centreville)**

200.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

201.     Plaintiffs Antone Black, Jennell Black, and Katyra Boyce as mother and next friend of W.B. (Family Plaintiffs) are the primary beneficiaries in this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-904(a).

202.     Plaintiffs bring this action within the appropriate time limits set forth in the Maryland Wrongful Death Act.

203.     The excessive force used by Defendants Thomas Webster IV, Dennis Lannon, and Gary Manos in pursuing and subduing Decedent Anton Black caused his death by placing him in a prone position while applying their body weight pressure on his back, which impaired his breathing and ultimately led to his death.

204.     At all relevant times, Officer Webster was acting within the scope and authority of his employment with Defendant Town of Greensboro; Officer Lannon was acting within the scope and authority of his employment with Defendant Town of Centreville; and Chief Manos was acting within the scope and authority of his employment with Defendant Town of Ridgely, and as a policymaking official on behalf of Defendant Town of Ridgely.

205.     At all relevant times, Officer Webster, Officer Lannon, and Chief Manos were acting as agents of Defendant State of Maryland, having been certified by the State as law enforcement officers.

43

206.     Anton had done nothing to warrant the use of deadly force, and there was no legal justification for Defendants' use of force or excessive force. Defendants acted with ill will and actual malice.

207.     As a direct and proximate result of Defendants' acts causing Anton's death, Anton's parents, Jennell Black and Antone Black, have suffered damages, not limited to mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of filial care, loss of society, loss of counsel, and loss of affection of their son and other compensatory damages.

208.     As a direct and proximate result of Defendants' acts causing Anton's death, his minor child, W.B., has suffered damages, not limited to pecuniary loss, mental anguish, emotional pain and suffering, and deprivation of the future support, services, companionship, comfort, society, attention, affection, care, protection, advice, education, guidance, and counsel of her father and other compensatory damages.

**COUNT 2**
**Survival Action**
**(Plaintiffs Jennell Black and Antone Black, as Personal Representatives of the Estate of Decedent Anton Black v. Thomas Webster IV, Gary Manos, Dennis Lannon, Michael Petyo, Town of Greensboro, Town of Ridgely and Town of Centreville)**

209.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

210.     This Count is brought on behalf of the Estate of Anton Black.

211.     Plaintiffs Jennell Black and Antone Black are the Personal Representatives of the Estate of Anton Black and accordingly are entitled and charged by law to represent the Estate of Anton Black and to sue on behalf of the Estate for any sum which may be due it for either liquidated or unliquidated damages. As co-Personal Representatives, they are authorized by law to bring any claims that the Decedent or his representatives could have brought during his life.

44

212.     As a direct and proximate result of the acts set forth in this Complaint, the Decedent experienced severe, permanent, and overwhelming damages, including: conscious pain and suffering, pre-impact and post-impact fright from among other things, being tasered, restrained, and shackled, mental anguish, emotional distress and, ultimately, death.

213.     The Estate has been caused to expend money for funeral and burial expenses.

214.     The damages claimed are directly and proximately caused by the acts of the Defendants and their employees, agents, and servants, both actual and apparent, without any negligence on the part of the Plaintiffs or the Decedent contributing thereto.

## COUNT 3

**Excessive Force in Violation of the Fourth and Fourteenth Amendments
(All Plaintiffs v. Thomas Webster IV, Gary Manos, Dennis Lannon, Michael Petyo, Town of Greensboro, Town of Ridgely and Town of Centreville)**

215.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

216.     Decedent had a protected liberty interest in his freedom of movement, his bodily integrity, and his personal security.

217.     At all relevant times, Defendants Thomas Webster IV, Gary Manos, and Dennis Lannon were employed as law enforcement officers by Defendants Town of Greensboro, the Town of Ridgely, and the Town of Centreville, respectively.  Defendant Michael Petyo was, at all relevant times, the supervisory official and final policy maker for the Town of Greensboro, responsible for hiring, training, supervising and disciplining Defendant Webster.

218.     At all relevant times, Officer Webster was on duty, using his police vehicle, wearing a police uniform, carrying department-issued sidearms and control devices and identified himself to Decedent Anton Black and bystanders as a police officer.

219.     While Chief Manos and Officer Lannon were not in uniform and it may not initially have been clear to Anton they were police officers, during the course of the incident they identified themselves to Decedent and bystanders as police officers.

220.     Officer Webster, Officer Lannon, and Chief Manos were therefore acting under the color of state law at all relevant times.

221.     Acting under the color of state law, Officer Webster initiated a pursuit of Decedent, whom Officer Webster knew to have been undergoing a mental health crisis, used his baton to smash a window next to the head of Decedent, fired a TASER at Decedent without adequate warning, instructed an untrained civilian to assault Decedent, and engaged in excessively forceful restraint of Decedent when Decedent posed no serious threat to any person.

222.     Acting under the color of state law, Officer Lannon and Chief Manos failed to intervene in Officer Webster's clearly excessive use of force despite their knowledge of Decedent's mental health crisis and the obvious potential for escalation, and instead both engaged in excessively forceful restraint of Decedent when Decedent posed no serious threat to any person.

223.     Officer Webster, Officer Lannon, and Chief Manos, through the actions described in the foregoing paragraphs, deprived Decedent of his clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to his right to be free from excessive force and his right to be free from unreasonable seizure, and directly and proximately caused Decedent's death.

224.     The conduct of Officer Webster, Officer Lannon, and Chief Manos, as described above, including the use of excessive force and the deprivation of Decedent's constitutional rights, does not represent a single isolated, accidental, or peculiar incident, but occurred in the regular procedures followed by the Town of Greensboro, the Town of Ridgley, the Town of Centreville,

46

Michael Petyo in his capacity as Greensboro Police Chief and Gary Manos in his capacity as Chief of the Ridgley PD, and represents a pattern and practice of such conduct.

225.    Moreover, the Towns of Greensboro, Ridgley, and Centreville, along with Defendants Michael Petyo and Gary Manos, have failed to properly train and supervise their law enforcement officers in the proper constitutional use of force.

226.    The Towns of Greensboro, Ridgley, and Centreville, along with Michael Petyo and Gary Manos, have also failed to properly train and supervise their law enforcement officers in the proper constitutional seizure of non-criminal persons undergoing a mental health crisis.

227.    The pattern and practice of excessive force and the failure to properly train and supervise officers represent a gross disregard for the constitutional rights of Decedent and the public, and were direct and proximate causes of Decedent's death and deprived Decedent of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

228.    Decedent's death and deprivation of rights were highly predictable consequences of the pattern and practice and failure to train and supervise described herein.

## COUNT 4

**Violation of First and Fourteenth Amendments and Art. 10, Md. Decl. Rts.**
Right to Access to the Courts and Legal Redress
(All Plaintiffs v. Defendants Russell Alexander, David Fowler, and Pamela Southall)

229.    Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

230.    Plaintiffs aver, on information and belief, that Defendants Russell Alexander, David Fowler, and Pamela Southall, while acting under color of state law and as final decision makers for the Office of the Medical Examiner of the State of Maryland, covered up and obscured police responsibility for Anton Black's death, by falsely attributing the cause of death to a heart

condition, bipolar disorder and/or other natural causes, thereby "blaming the victim" for his own death and obscuring official responsibility, resulting in significant impairment and denial of Plaintiffs rights to seek legal redress for their harms under the First and Fourteenth Amendments to the Constitution of the United States and Art. 10 of the Maryland Declaration of Rights.

231.    Specifically, Plaintiffs aver, on information and belief, that in reaching the false conclusion attributing Anton's death to natural causes or accident rather than homicide, Defendants Alexander and Fowler violated well-established principles of forensic pathology requiring them a) to rely upon the best available evidence of what happened as captured on body camera footage, showing Anton's prolonged restraint by multiple officers, rather than misleading police narratives; b) to acknowledge that compression of the upper body compromises a person's ability to breathe; c) to understand that holding a person facedown with their legs bent back further compromises their ability to breathe; d) to accept that positional asphyxia often does not produce a physical signature; e) to acknowledge that myocardial tunneling by itself would not cause death in an otherwise healthy 19-year-old and that anomalous right coronary artery would be extremely unlikely to cause sudden cardiac death; f) to understand and acknowledge that bipolar disorder does not cause death; and g) to accept that deaths resulting from the volitional acts of others are properly characterized as homicides.  By disregarding these basic principles Defendants Alexander and Fowler intentionally concealed police responsibility in causing Anton Black's painful death, and instead falsely ruled, on behalf of the State of Maryland, that a Black teenager who died through asphyxiation at the hands of four white men resulted from "natural causes," or "accident" thereby improperly insulating police officials from responsibility for Anton's death.

232.    As direct and proximate results of Defendants' false reporting of Anton's death as an accident attributable to natural causes rather than homicide, Defendants Alexander and Fowler

48

created enormous, state-imposed obstacles to Plaintiffs' ability to seek legal redress for the harms they suffered as a result of Anton's killing and to hold police accountable for his death.

233.    First, as a direct and proximate result of Defendant Alexander's false ruling as to Anton's cause of death, the Medical Examiner ensured that the only way Plaintiffs could mount a civil action seeking monetary compensation and equitable relief for their grievous losses was to engage medical and police experts to dispute Defendants' erroneous ruling, creating an unconstitutional financial tax on Plaintiffs' right to access to the courts, which if allowed to stand by Defendant Southall, would reinforce a two-tiered system of justice for victims of police killings.

234.    Second, the Medical Examiner's false finding as to cause of death and its accompanying vindication of the police officers who killed Anton directly thwarted the family's and CJAB's ability to hold police accountable through governmental disciplinary and criminal processes.  All governmental agencies involved in investigating Anton's death relied upon the Medical Examiner's Autopsy findings as a basis to reject Plaintiffs' pleas to discipline and prosecute the individual Defendants for their roles in Anton's killing, including the refusal by Defendant Towns of Greensboro, Ridgely and Centreville to investigate or discipline Officers Webster, Manos and Lannon, and the refusal by the State's Attorney for Caroline County even to convene a grand jury to consider the matter.  Rather, Caroline County State's Attorney Joseph Riley stated that only if the Plaintiffs could develop independent evidence – again, requiring them to acquire and expend significant financial resources to engage experts – to dispute the Medical Examiner's findings would the State reconsider Riley's decision not to convene a grand jury to investigate Anton's killing.

235.    Due to the Medical Examiner's Autopsy ruling improperly concealing police wrongdoing in Anton's death and misrepresenting the death as attributable to natural causes or

accident, Defendants Alexander, Fowler and Southall have directly interfered with Plaintiffs' rights to access to the Courts and to seek legal redress for their harms under the First and Fourteenth Amendments and Art. 10, causing them to incur significant expenses in order to gain access to civil justice, and denying them access to fair and equal treatment by the criminal justice system, giving rise to their claims for relief under 42 U.S.C. §1983.

**COUNT 5**
**Violation of Article 24 of the Maryland Declaration of Rights**
**Excessive Force**
**(All Plaintiffs v. Defendants Thomas Webster, IV, Gary Manos, Dennis Lannon, Town of Greensboro, Town of Ridgely, and Town of Centreville)**

236.    Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

237.    Defendants Thomas Webster IV, Gary Manos, and Dennis Lannon used unreasonable and unnecessary force in the treatment of Decedent Anton Black, thereby injuring him as alleged in violation of his rights to due process and to be free from excessive force and unreasonable seizure as protected by Article 24 of the Maryland Declaration of Rights.

238.    Officer Webster's, Chief Manos', and Officer Lannon's actions were without provocation or legal justification and with the intent to violate the civil rights of the Decedent, including but not limited to his rights under Article 24.

239.    As a direct and proximate result of Officer Webster's, Chief Manos', and Officer Lannon's actions, Decedent suffered physical and emotional damages, including but not limited to conscious pain and suffering, assault, battery, severe emotional distress, and loss of life.

240.    Officer Webster, Chief Manos, and Officer Lannon were at all relevant times acting as agents of, and within the scope of their employment by, Defendants the Town of Greensboro, the Town of Ridgley, and the Town of Centreville, respectively, and the Towns are vicariously responsible for the actions of their agents and employees.

## COUNT 6
**Violation of Article 26 of the Maryland Declaration of Rights**
**Excessive Force and Deprivation of Liberty**
**(All Plaintiffs v. Thomas Webster IV, Gary Manos, Dennis Lannon, Michael Petyo, Town of Greensboro, Town of Ridgely and Town of Centreville)**

241.    Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

242.    By the actions detailed above, Defendants Thomas Webster IV, Gary Manos, and Dennis Lannon deprived the Decedent of his rights under Article 26 of the Maryland Declaration of Rights, including but not limited to the right to freedom from unlawful seizure and the right to bodily integrity.

243.    Officer Webster's, Chief Manos', and Officer Lannon's actions were without provocation or legal justification and with the intent to violate the civil rights of the Decedent, including but not limited to his rights under Article 26.

244.    As a direct and proximate result of Officer Webster's, Chief Manos', and Officer Lannon's actions, Decedent suffered physical and emotional damages, including but not limited to conscious pain and suffering, assault, battery, severe emotional distress, and loss of life.

245.    Officer Webster, Chief Manos, and Officer Lannon were at all relevant times acting as agents of, and within the scope of their employment by, Defendants the Town of Greensboro, the Town of Ridgley, and the Town of Centreville, respectively, and the Towns are vicariously responsible for the actions of their agents and employees.

246.    At all relevant times, Officer Webster, Officer Lannon, and Chief Manos were acting as agents of Defendant State of Maryland, having been certified by the State as law enforcement officers.

## COUNT 7
### Battery
### (Plaintiffs v. Defendants Town of Greensboro, Town of Ridgley, Town of Centreville, Thomas Webster IV, Dennis Lannon, and Gary Manos)

247.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

248.     As described in the foregoing paragraphs, Defendants Thomas Webster IV, Dennis Lannon, and Gary Manos repeatedly and intentionally touched Decedent Anton Black in a harmful and offensive manner.

249.     Anton did not give consent to any of these touchings.

250.     The touchings were not justified by any legitimate police necessity.

251.     The touchings were undertaken deliberately, with ill will and actual malice.

252.     As a direct and proximate result of these touchings, Anton suffered damages, including conscious pain and suffering, mental anguish, emotional distress, and loss of life.

253.     Officer Webster, Chief Manos, and Officer Lannon were at all relevant times acting as agents of, and within the scope of their employment by, Defendants the Town of Greensboro, the Town of Ridgley, and the Town of Centreville, respectively, and the Towns are vicariously responsible for the actions of their agents and employees.

## COUNT 8
### Negligent Hiring, Retention, Training, Certification and Supervision
### (All Plaintiffs vs. Defendants Michael Petyo and Town of Greensboro)

254.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

255.     Defendants Town of Greensboro and Michael Petyo in his capacity as Greensboro Police Chief owed a duty to the Town's citizens, including Decedent Anton Black, to hire and retain competent employees as police officers.

256.     Defendants Petyo and Town of Greensboro breached that duty by hiring and retaining Thomas Webster IV.  Additionally, Petyo and the Town breached this duty by falsifying the certification application submitted by the Town to the Maryland Police Training and Standards Commission, in violation of Maryland criminal law.

257.     Defendants Petyo and Town of Greensboro knew or should have known of Officer Webster's history of violent, abusive, and inappropriate conduct and his propensity to violate the rights of Black people.

258.     In the alternative, Defendants Petyo and Town of Greensboro failed to fully and adequately investigate the extent of Officer Webster's history of violent, abusive, and inappropriate conduct and violation of citizens' rights, despite being on notice of certain violent, abusive, and inappropriate actions taken by Officer Webster in his previous employment with the Dover, Delaware police department, and falsifying records to secure Webster's certification as a police officer by the State of Maryland.

259.     Defendants Petyo and Town of Greensboro also owed a duty to its citizens, including Decedent Anton Black, to adequately train and supervise its police officers.

260.     Defendant Petyo and the Town breached that duty by failing to adequately train Officer Webster in the use of force, de-escalation techniques, proper Taser usage, and mental health crisis intervention, and by failing to adequately supervise Officer Webster following his hire.

261.     As a direct and proximate result of Defendant Town of Greensboro's negligence in hiring, retaining, training, and supervising Officer Webster, Anton suffered damages, including conscious pain and suffering, mental anguish, emotional distress, and loss of life.

**COUNT 9**
**Negligent Retention, Training, and Supervision**
**(All Plaintiffs vs. Defendants Town of Ridgley, Town of Centreville, and Gary Manos)**

262.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

263.     Defendants Town of Ridgley, Town of Centreville, and Gary Manos in his official capacity as Chief of the Ridgley Police Department owed citizens of any area in which Ridgley and Centreville police officers operated, including Anton, a duty to adequately train and supervise police officers and to retain only competent police officers.

264.     Defendants Town of Ridgely, Town of Centreville, and Gary Manos in his official capacity breached that duty when they failed to adequately train Officer Lannon and Chief Manos in use of force, de-escalation, mental health crisis intervention, and intervention in other officers' excessive force.

265.     Defendants Town of Ridgely, Town of Centreville, and Gary Manos in his official capacity further breached their duty when they retained Officer Lannon and Chief Manos without adequate training, and when they failed to supervise Officer Lannon and Chief Manos in the absence of adequate training.

266.     As a direct and proximate result of this negligent training, retention, and supervision, Anton suffered damages, including conscious pain and suffering, mental anguish, emotional distress, and loss of life.

**COUNT 10**

**ADA TITLE II (Survival Action)**
**(Estate of Anton Black v. Defendants Towns of Greensboro, Centreville and Ridgely and State of Maryland)**

54

267.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

268.     Defendants, Towns of Greensboro, Centreville and Ridgely, and State of Maryland are "public entities" as defined under Title II of the ADA. *See* 42 U.S.C. §12131, 28 C.F.R.  35.104.

269.     On information and belief, although they were responsible for establishing practices and procedures and ensuring compliance with those practices and procedures, neither the Defendants Greensboro Police Department, Centreville Police Department, Ridgely Police Department provided education or training for officers and employees in how to treat individuals experiencing a mental health crisis as a result of their mental health disability.  These Defendants adopted written policies but took no steps to operationalize them such as by developing protocols, practices and education and training for officers.

270.     The failure of Defendants to properly train the individual Defendants in how to interact with and provide services to individuals with mental health disabilities violated Title II of the ADA.

271.     In light of the well-documented frequency of police encounters with people with mental health disabilities and the disproportionately lethal outcomes of those encounters, [13]failure to establish adequate practices and procedures and failure to provide training relating to intervention in

---

[13] *See, e.g.,* Gary Cordner, Community Oriented Policing Services, U.S. Department of Justice, People with Mental Illness, at 1 (noting police "frequently encounter people with mental illness" and compiling statistics, https://cops.usdoj.gov/RIC/Publications/cops-p103-pub.pdf;          Fatal          Force,          Washington          Post, https://www.washingtonpost.com/graphics/national/police-shootings-2017/; Doris Fuller, Richard Lamb M.D., Michael Biasotti and John Snook, Treatment Advocacy Center, Overlooked in the Undercounted: The Role of Mental Illness      in      Fatal      Law      Enforcement      Encounters,      Dec.      2015,      at      1, https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf; David M. Perry and Lawrence Carter-Long, Ruderman Foundation, The Ruderman White Paper on Media Coverage of Law Enforcement Use of Force and Disability, Mar. 2016, at 1, https://rudermanfoundation.org/wp-content/uploads/2017/08/MediaStudy-PoliceDisability_final-final.pdf.

mental health crises, creates a highly predictable risk that officers will violate the constitutional and statutory rights of individuals with mental health disabilities, and that a person with a mental health disability would be harmed in a police encounter as a result.

272.    Defendants Town of Greensboro, The Town of Ridgley, and Town of Centreville displayed deliberate indifference to that risk by failing to establish adequate practices and procedures and conduct training pertaining to the proper response to mental health crises, as well as by failing to properly train, supervise, investigate and impose discipline upon officers.

273.    As a result of these failures, instead of making reasonable accommodations, Defendants Webster, Manos and Lannon significantly and violently escalated their encounter with Anton Black, despite being aware that he was experiencing symptoms of his disability, and in contravention of the written policies of their Departments.

274.    Likewise, Defendant State of Maryland discriminated against Anton and violated Title II of the ADA when it caused his bipolar disorder to be attributed as being a "significant contributing cause" of Anton's death.  Anton's death was caused by excessive force by police, not mental illness.  If anything, the contributing cause of his death was the *inappropriate response of police to symptoms of his disability*, not his disability.  As a result of these failures, Anton's disability was improperly cited as a contributing cause of his death, akin to "blaming the victim" as a result of his disability.

275.    Defendants' violation of Title II of the ADA proximately caused the death of Anton Black and helped facilitate their cover-up as to the true cause of death.

276.    Defendants' violations of the ADA caused Anton Black to sustain severe conscious pain and suffering between the time of the initiation of his encounter with the Defendant police officers to his death.  Following his death, the Defendant medical examiner further harmed Plaintiffs

by intentionally failing to disclose the police responsibility in causing Anton Black's painful death, and by falsely claiming his death was caused in significant part by his mental disability.

**COUNT 11**
**Section 504 of the Rehabilitation Act – Survival Action**
**(Estate of Anton Black v. Defendants Towns of Greensboro, Centreville and Ridgely and State of Maryland)**

277.    Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

278.    Decedent Anton Black's bipolar disorder qualified him as an individual with a "disability" as protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j).

279.    The Rehabilitation Act dictates that "[n]o otherwise qualified individual with a disability …shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" *See* 29 U.S.C. § 794(a).

280.    Upon information and belief, the Towns of Greensboro, Centreville and Ridgely and State of Maryland receive federal financial assistance and are, therefore, covered by the Rehabilitation Act. They are liable under Section 504 for the discriminatory acts of their employees.

281.    On information and belief, although they were responsible for establishing practices and procedures and ensuring compliance with those practices and procedures, neither the Defendants Greensboro Police Department, Centreville Police Department, Ridgely Police Department provided education or training for officers and employees in how to treat individuals experiencing a mental health crisis as a result of their mental health disability.  These Defendants adopted written policies but took no steps to operationalize them such as by developing protocols, practices and education and training for officers.

57

282.     The failure of Defendants to properly train the individual Defendants in how to interact with and provide services to individuals with mental health disabilities violated Section 504.

283.     In light of the well-documented frequency of police encounters with people with mental health disabilities and the disproportionately lethal outcomes of those encounters, failure to establish adequate practices and procedures and failure to provide training relating to intervention in mental health crises creates a highly predictable risk that officers will violate the constitutional and statutory rights of individuals with mental health disabilities and that a person with a mental health disability would be harmed in a police encounter as a result.

284.     Defendants Town of Greensboro, The Town of Ridgley, and Town of Centreville displayed deliberate indifference to that risk by failing to establish adequate practices and procedures, and failing to conduct training pertaining to the proper response to mental health crises, as well as by failing to properly train, supervise, investigate and impose discipline upon officers.

285.      As a result of these failures, instead of making reasonable accommodations, Defendants Webster, Manos and Lannon significantly and violently escalated their encounter with Anton Black despite being aware he was experiencing symptoms of his disability and in contravention of the written policies of their Departments.

286.     Likewise, Defendant State of Maryland discriminated against Anton and violated Section 504 when it caused his bipolar disorder to be attributed as being a "significant contributing cause" of Anton's death.  Anton's death was caused by excessive force by police, not mental illness. If anything, the contributing cause of his death was the *inappropriate response of police to symptoms of his disability*, not his disability.  As a result of these failures, Anton's disability was improperly cited as a contributing cause of his death, akin to "blaming the victim" as a result of his disability.

287.     Defendants' violation Section 504 proximately caused the death of Anton Black and helped facilitate their cover-up as to the true cause of death.

288.     Defendants' violations of Section 504 caused Anton Black to sustain severe conscious pain and suffering between the time of the initiation of his encounter with the defendant police officers to his death.  Following his death, the Defendant medical examiner further harmed Plaintiffs by intentionally failing to disclose the police responsibility in causing Anton Black's painful death, and by falsely claiming his death was caused in significant part by his mental disability.

### Count 12
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Family Plaintiffs v. All Defendants)

289.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

290.     Defendant police officers, collectively and individually, acted intentionally and/or recklessly in their dealings with Anton Black. The conduct of Defendants was extreme and outrageous.

291.     Defendants' conduct was the direct cause of Decedent's severe emotional distress.

292.     Defendant, the State of Maryland and the Towns of Ridgely and Centerville are liable for the acts of Defendant police officers/employees who were acting within the scope of their employment. Defendants' actions violated Anton Black's rights guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution as well as the common law of the State of Maryland and the Maryland Declaration of Rights.

### Count 13 – Civil Conspiracy
### Md. Decl. Rights, Articles 19 and 24
(All Plaintiffs v. All Defendants)

293.     Plaintiffs incorporate and reallege the foregoing paragraphs as if fully set forth herein.

294.     Pursuant to Maryland common law, Plaintiffs aver, on information and belief, that Defendants conspired together and among themselves to violate Plaintiffs' rights to due process and access to the courts under Articles 19 and 24 of the Maryland Declaration of Rights by intentionally and falsely misrepresenting facts and events that led to the death of Anton Black in a collective effort to protect themselves, evade accountability and obscure official responsibility for Anton's death.

295.     Defendant Officers Manos, Webster and Lannon, among other unnamed police and emergency services personnel, conferred together immediately following Anton's death and began constructing a false narrative of use of drugs ("spice") and abnormal strength to minimize and try to justify their prolonged, unconstitutional restraint of Anton by multiple officers applying direct pressure to his torso and binding his legs in ways that prevented him from breathing.   In turn, they fed this narrative to the Maryland State Police.

296.     The State of Maryland, through the Maryland State Police, relied upon and perpetuated this false narrative in their purported "investigation" into Anton's death, disregarding contrary evidence plainly available on video Body Worn Camera footage showing that Anton was restrained face down by multiple officers, on his stomach with his knees bent back, for approximately five minutes after he had been handcuffed.

297.     Defendants Petyo, Town of Greensboro, Town of Ridgely and Town of Centreville likewise relied upon and perpetuated the individual officers' false narrative about the police practices causing Anton's death, using this misinformation and disregarding contrary evidence plainly available on video Body Worn Camera footage, to decline to investigate and discipline the involved officers.

60

298.    Defendant Russell Alexander conferred, on behalf of the State of Maryland, with MSP investigators in a manner suggesting a mutual desire to avoid findings of police misconduct by the Medical Examiner in connection with Anton's death. The Medical Examiner's autopsy achieved this aim by departing from basic reasonable standards of forensic pathology and falsely absolving Defendant officers of actual or criminal responsibility, thus enabling Defendant officers to evade criminal charges for their unlawful conduct and forcing Plaintiffs to expend significant resources to disprove the Medical Examiner's misrepresentations in order to gain access to legal redress.

299.    Defendants' unlawful conspiracy harmed the Plaintiffs by exacerbating their severe mental anguish and emotional distress, by thwarting their access to civil justice and their efforts to ensure official accountability for Anton's wrongful death as guaranteed by Articles 19 and 24.

## PRAYER FOR RELIEF

Wherefore Plaintiffs respectfully request that the Court:

A.  Award compensatory damages to Plaintiffs Jennell Black, individually and as Personal Representative of the Estate of Anton Black, Antone Black, individually and as Personal Representative of the Estate of Anton Black, and Katyra Boyce, as mother and next friend of W.B., in an amount in excess of $75,000, jointly and severally, against all Defendants;

B.  Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants deprived Anton Black of his life and liberty, in violation of the Fourth and Fourteenth Amendments to the United States Constitution;

C.  Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants Russell Alexander, David Fowler and Pamela Southall deprived Plaintiffs of their rights to access to the Courts and legal redress, as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and Article 10 of the Maryland

Declaration of Rights;

D.  Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants violated the Americans with Disabilities Act and the Rehabilitation Act of 1973;

E.  Issue a permanent injunction that (i) prohibits Defendants, their officers, agents, employees, and successors from engaging in the discriminatory, unconstitutional and abusive practices complained of herein, and (ii) imposes a prohibition of similar conduct in the future;

F.  Require three-year monitoring of all law enforcement activity by all Defendants to prevent any further abusive and racially discriminatory practices;

G.  Award Plaintiffs Jennell Black, individually and as Personal Representative of the Estate of Anton Black, Antone Black, individually and as Personal Representative of the Estate of Anton Black, and Katyra Boyce, as mother and next friend of W.B., appropriate punitive damages, against Defendants in their individual capacities, in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and reckless disregard of clearly established federal constitutional and statutory rights as alleged herein and enter any and all injunctive decrees and relief necessary to effectively prevent Defendants from engaging in similar unlawful misconduct in the future;

H.   Award all Plaintiffs reasonable attorneys' fees, expert witness fees and costs under 42 U.S.C § 1988 & 12205; and;

I.  Award such other and further relief in any form that this Court deems just and proper under the facts and circumstances as proved at trial.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of any and all claims so triable.


Respectfully Submitted,

*/s/ Kenneth Ravenell, Esq.*
Kenneth Ravenell, Bar No. 48969
Ravenell Law
711 St. Paul Street
Baltimore, Maryland 21202
PH:  410-878-0705 / F: 410-834-5488
E: kravenell@kravenelllaw.com

*/s/ Tomeka G. Church, Esq.*
Tomeka G. Church, Bar No. 25311
711 St. Paul Street
Baltimore, MD 21202
PH: 410-878-0705
E: tchurch@churchlawfirm.com

*/s/ Leslie D. Hershfield, Esq.*
Leslie D. Hershfield, Bar No. 08255
Schulman, Hershfield & Gilden, P.A.
One E. Pratt Street, Suite 904
Baltimore, Maryland 21202
P: 410-332-0850 / F: 410-332-0866
E: lhershfield@shg-legal.com

*/s/ Rene C. Swafford, Esq.*
Rene C. Swafford, Bar No. 26309
Law Office of Rene C. Swafford, LLC
P.O. Box 392
Greensboro, Maryland 21639
P: 410-482-4794
E: rswaffordster@gmail.com

*/s/ Deborah A. Jeon, Esq.*
Deborah A. Jeon, Bar No. 06905
ACLU of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, Maryland 21211
P: 410-889-8550
E: jeon@aclu-md.org

/s/ Sonia Kumar, Esq.
Sonia Kumar, Bar No. 07196
ACLU of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, Maryland 21211
P: 410-889-8550
E: kumar@aclu-md.org