IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| JENNELL BLACK, ET AL., | | |
| | * | |
| PLAINTIFFS, | | |
| | * | |
| v. | | Case #: 1:20-cv-03644-CCB |
| | * | |
| THOMAS WEBSTER IV, ET AL., | | |
| | * | |
| DEFENDANTS. | | |
| * * * * * * * | | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS
## THOMAS WEBSTER IV, GARY MANOS, AND DENNIS LANNON'S
## MOTION FOR SUMMARY JUDGMENT

Thomas Webster IV, Gary Manos, and Dennis Lannon, some of the Defendants, in their

individual/personal capacities[1], by their undersigned counsel, pursuant to Local Rule 105.1,

submit this Memorandum in support of their Motion for Summary Judgment.

## I.      PROCEDURAL BACKGROUND

On December 17, 2020, Plaintiffs Jennell Black, individually and as Personal

Representative of the Estate of Anton Black, Antone Black, individually and as Personal

Representative of the Estate of Anton Black, Katyra Boyce, as mother and next friend of W.B.

(collectively "the Family Plaintiffs or "the Plaintiffs"), and Coalition for Justice for Anton Black

("the Coalition")), filed suit in the United States District Court against Thomas Webster IV

---

[1] A claim against a state official in his official capacity is analogous to asserting a claim against the entity of which the official is an agent. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law....Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"). Such official capacity claims must assert that the official's conduct was performed in furtherance of some "policy or custom," as articulated by the United States Supreme Court in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). Further, under Maryland law, the official/individual capacity dichotomy that is part of § 42 U.S.C. § 1983 law does not apply to state constitutional violations.  *See Ritchie v. Donnelly*, 324 Md. 344, 373 (1989).

("Officer Webster"), individually, and in his official capacity as a Greensboro Police Officer, Michael Petyo ("Chief Petyo"), individually, and in his official capacity as Town of Greensboro Police Chief, Gary Manos ("Chief Manos") individually, and in his official capacity as Town of Ridgely Police Chief, Dennis Lannon ("Officer Lannon"), individually, and in his official capacity as a Centreville Police Officer (collectively "the Officers"), the Town of Greensboro, Town of Ridgely, Town of Centreville (collectively "the Towns"), Russell Alexander, individually, and in his official capacity as Assistant Medical Examiner for the State of Maryland, Pamela Southall, in her official capacity as Chief Medical Examiner for the State of Maryland, David Fowler, individually, and in his official capacity as Chief Medical Examiner for the State of Maryland (collectively "the State Defendants"), and the State of Maryland ("the State"). The Complaint sets forth the following causes of action:

> Count 1—Wrongful Death (the Family Plaintiffs v. the Officers and the Towns)
>
> Count 2---Survival Action (the Family Plaintiffs v. the Officers and the Towns)
>
> Count 3---Excessive Force (Fourth and Fourteenth Amendments)[2] (All Plaintiffs v. the Officers and the Towns)[3]

---

[2] The Officers contend that their actions in this case are governed by the Fourth, not the Fourteenth Amendment. The U.S. Supreme Court has held that "all claims that law enforcement officers' have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (analyzing excessive force claim under Fourth Amendment). Because Plaintiffs allege that Defendants used excessive force in the course of taking Anton Black into custody, their substantive due process claim is properly brought under the Fourth Amendment, not the Fourteenth Amendment.

[3] Plaintiffs assert in Count 3 of their Complaint a separate claim against Chief Manos and Officer Lannon for failure to intervene under 42 U.S.C. § 1983. *See* ECF No. 1, ¶ 222. The Fourth Circuit addresses a failure to intervene claim as a theory of "bystander liability" wherein there is "an omission to act ... coupled with a duty to act." *Randall v. Prince George's County,* 302 F.3d 188, 202 (4th Cir. 2002). A "bystander officer" could be liable for his or her nonfeasance if he or she: "1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204. However, if no excessive force is applied by the fellow officer, the officer witnessing the conduct "cannot be held liable under bystander liability for a failure to intervene." *Howie v. Prince George's County*, Civ. No. DKC 2006-3465, 2009 U.S. Dist. LEXIS 68274, 2009 WL

Count 4---Violation of First and Fourteenth Amendments and Article 10 of the Maryland Declaration of Rights (All Plaintiffs v. the State Defendants)

Count 5---Excessive Force (Violation of Article 24 of the Maryland Declaration of Rights) (All Plaintiffs v. the Officers and the Towns)

Count 6---Excessive Force and Deprivation of Liberty (Violation of Article 26 of the Maryland Declaration of Rights) (All Plaintiffs v. the Officers and the Towns)

Count 7---Battery (All Plaintiffs v. the Officers and the Towns)

Count 8---Negligent Hiring, Retention, Training, Certification and Supervision (All Plaintiffs v. Chief Petyo and the Town of Greensboro)

Count 9---Negligent Retention, Training, and Supervision (All Plaintiffs v. Chief Manos and the Towns of Ridgely and Centreville)

Count 10---ADA, Title II (Survival Action) (Estate of Anton Black v. the Towns and the State)

Count 11---Section 504 of the Rehabilitation Act (Survival Action) (Estate of Anton Black v. the Towns and the State)

Count 12---Intentional Infliction of Emotional Distress (Family Plaintiffs v. All Defendants)

Count 13---Civil Conspiracy (Violation of Articles 19 and 24, Maryland Declaration of Rights) (All Plaintiffs v. All Defendants).

All claims and causes arise from an occurrence on September 15, 2018, in which Anton Black died after being restrained by the Officers. As relief, Plaintiffs seek compensatory and punitive damages, declaratory and injunctive relief, and attorney's fees and costs.

---

2426018, at *6 (D. Md. Aug. 5, 2009), *see also Hinkle v. City of Clarksburg, West Virginia*, 81 F.3d 416, 420 (4th Cir. 1996) (holding that "[i]n the absence of any underlying use of excessive force," bystander liability is inapplicable"). As is demonstrated below, there was no excessive force used by any of the Officers.

## II.    STANDARD OF REVIEW

The Supreme Court has repeatedly stressed the desirability to resolve qualified immunity issues at the earliest stage of litigation. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991). And, Rule 56 of the Federal Rules of Civil Procedure provides the necessary vehicle through which district courts evaluate such claimed entitlements. *See Lissau v. Southern Food Serv.*, 159 F.3d 177, 182 n.* (4th Cir. 1998) (stating, "Rule 56 is an integral part of the Federal Rules, not a shortcut.") (citation omitted). Summary judgment proceedings provide the 'put up or shut up' moment in litigation." *Konover Constr. Corp. v. ATC Assocs.*, 2012 U.S. Dist. LEXIS 59497, at *18 (D. Md. Apr. 27, 2012) (citation omitted). Indeed, in opposing a Rule 56 motion made before the opportunity for discovery, "if the additional evidence that would be gained from discovery would not itself create a genuine issue of material fact," then the non-moving party's Rule 56(d) motion should be denied. *Strag v. Board of Trustees*, 55 F.3d 943 (4th Cir. 1995).

This case virtually compels consideration of summary judgment at the earliest opportunity. That is because the Plaintiffs' version of the events as set forth in their Complaint is blatantly contradicted by the summary judgment record, specifically the body worn camera footage recorded by Officer Webster. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, such that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (in reversing affirmance of denial of defendant police officer's motion for summary judgment, noting that videotape capturing the events in question rendered plaintiff's version of the events so "utterly discredited by they record, that no reasonable jury could have believed him.").

### III.     MATERIAL FACTS NOT GENUINELY IN DISPUTE

####     A.     The 911 Emergency Call and the Dispatch of Officer Webster

On September 15, 2018, at approximately 1910 hours, Denise Williams ("Ms. Williams")
called the Caroline County 911 Call Center to report that a male was physically restraining and
dragging a young boy in the area of Sunset Avenue and Route 313 in Greensboro, Maryland.
(Exhibits 1 – 2). She explained that the male had the boy in a "headlock," and that the young
boy was crying out for help. (Exhibits 1 – 2).

The exact text of the call is as follows:

**911 Operator:** Caroline County 911. What is the address of your emergency?

**CALLER (MS. WILLIAMS):** We're sitting on the—the bridge here at Sunset Avenue,
Greensboro. There is--there is an older boy who has a younger boy. He is-- he is
dragging him. He--it is--he's got him in a headlock, and he is making him just walk.
And—the boy is crying out for help.

**911 Operator:** Okay. How old do they look?

**CALLER (MS. WILLIAMS):** They're teen—well, the one is a teenager. The other
boy is much younger. They're up at the light now, and he is dragging him across the
intersection.

**911 Operator:** He is dragging him across the intersection?

**CALLER (MS. WILLIAMS):** He is dragging him across the intersection here at the
light.

**911 OPERATOR:** Okay. How old does the younger boy look?

**CALLER (MS. WILLIAMS):** He—he is definitely under—he is definitely under 12.
And he is—

**911 OPERATOR:**  Okay.

**CALLER (MS. WILLIAMS):**  --asked us to call the police.  We're trying to get back up to him, but the traffic is here.

**911 OPERATOR:**  Okay.  What is your name?

**CALLER (MS. WILLIAMS):**  Denise Williams.  He is on 313 now.  He is—he's headed south on 313.  He is over by Kinnamon's.

**….**

**911 OPERATOR:**  Are they white, ma'm?

**CALLER (MS. WILLIAMS):**  No, they're black.

**….**

**CALLER (MS. WILLIAMS):**  Okay.  The older boy is wearing all black.

**…**

**CALLER (MS. WILLIAMS):**  Black hoodie.  And he is dragging this boy, ma'm.  He is dragging him.

**911 OPERATOR:**  Okay.  We have an officer enroute.

**….**

**CALLER (MS. WILLIAMS):**  I'm a horrible judge of age.  But he is dragging this boy up here.

**….**

**CALLER:**  No.  But the boy is—but the boy is waving at me.  He is flailing.

**911 OPERATOR:**  Okay.  Is he still crying?

**CALLER (MS. WILLIAMS):** He—he's dragging him along. I don't know. This boy is dragging him somewhere he doesn't want to go. He—he's got him in a headlock walking with him.

**….**

**911 OPERATOR:** Okay. Do you see the cop now?

**….**

**CALLER (MS. WILLIAMS):** The police officer is right there, yes.

**….**

**911 OPERATOR:** Ma'm, what kind of car are you in? Do you want him to make contact with you?

**CALLER (MS. WILLIAMS):** No, I just—I want him to see what is happening here.

(Exhibits 1 – 2).

During the call with Ms. Williams, the 911 Operator contacted the Caroline County Police Dispatch, which includes the Greensboro Police Department. (Exhibits 3 – 4). At 1910 hours, Officer Thomas Webster ("Officer Webster") was dispatched to the call. (Exhibits 3 – 4). He arrived at the scene two minutes later and made his initial contact with the two subjects. (Exhibits 5 – 6). The exact text of the dispatch call is as follows:

**DISPATCHER:** Caroline G-4, 10-63. Check welfare.

**OFFICER:** Okay.

**DISPATCHER:** 10-25 the area of East Sunset Avenue, North Main Street, taking a 911 call advising an older male is dragging a younger male down the road across a bridge. At this time, they should be at the intersection at the light.

**OFFICER:** Okay.

**DISPATCHER:** The younger male is approximately 12 years old. He asked the 10-17 to call 911…. Caroline, G-4. Both subjects are going to be number one males. The older boy is wearing all black.

**OFFICER:** 10-4. I'm going 10-23.

(Exhibits 3 – 4).

### B. The Police Response

#### 1. The Initial Encounter

At approximately 1912 hours, Officer Webster arrived in the area. (Exhibits 5 – 8). At the time of the call, he had just finished conducting a business escort and was just a short distance away. (Exhibits 5 – 8). He was in a full police uniform and driving an unmarked police car equipped with emergency lights. (Exhibits 5 – 8). As he reached Route 313, Officer Webster observed the older male dragging the boy down the road. (Exhibits 5 – 8). He could see that the older male had a restraining hold on the boy's neck; it appeared to be a wrestling half-nelson hold. (Exhibits 5 – 8). The two males were near the area of the Cars R Us business. (Exhibits 5 – 8). Although Officer Webster had activated the emergency equipment on his police vehicle, his presence was ignored by the older and larger male, later identified as Anton Black ("Mr. Black"), who was 19 years old. (Exhibits 5 – 8). Mr. Black continued to restrain the boy, later identified as X.B., who was just 12. (Exhibits 5 – 8).

Officer Webster exited his vehicle, activated his departmentally issued body worn camera, and issued a verbal command to Mr. Black to gain his attention. (Exhibits 5 – 8). Mr. Black stopped, looked at Officer Webster, and then pinned X.B. against the hood of the Officer Webster's car. (Exhibits 5 – 8). Officer Webster asked Mr. Black to let X.B. go and, after the second request, Mr. Black complied. (Exhibits 5 – 8). X.B. told Officer Webster that Mr. Black

was "schizophrenic." (Exhibits 5 – 8). Officer Webster asked Mr. Black if the two were brothers, and Mr. Black said they were. (Exhibits 5 – 8). X.B., however, said that they were not brothers. (Exhibits 5 – 8). X.B. then ran from the scene in the direction of the Food Saver parking lot. (Exhibits 5, 7 – 9). He approached Greensboro Volunteer Fire Department Captain Shawn Starkey who happened to be nearby. (Exhibits 7 – 9).

### 2.    Mr. Black Flees from Being Placed in Custody

As X.B. fled, Officer Webster asked Mr. Black to put his hands behind his back because he was being placed in custody. (Exhibits 5 – 8). Before Officer Webster could handcuff, pat down, or search him, Mr. Black said "I love you," turned away from Officer Webster and ran north on Route 313. (Exhibits 5 – 8). Mr. Black was dressed in track pants, a black hooded zip-up jacket, and tennis shoes. (Exhibits 5 – 8). Officer Webster got back in his car and notified dispatch that Black was fleeing on foot. (Exhibits 5 – 8). He also said that Mr. Black "[a]pparently was a schizophrenic subject." (Exhibits 5 – 6). Officer Webster then made a U turn and began to pursue Mr. Black. (Exhibits 5 – 8). As he did, Mr. Black turned around and began running in the opposite direction, back towards Officer Webster. (Exhibits 5 – 8). Mr. Black may have changed direction because he noticed Centreville Police Officer D. Lannon ("Officer Lannon") (Exhibits 5 – 8). Officer Lannon, who was off-duty and dressed in blue jeans and a black short sleeved Under Armour tee shirt, was standing outside his residence. He had seen Mr. Black physically restraining X.B. on Route 313. (Exhibits 5 – 8). He then saw Officer Webster pull up initiate a stop pf Mr. Black and X.B. (Exhibits 5 – 8). Mr. Black then fled in the direction of Officer Lannon. (Exhibits 5 – 8). Upon seeing Officer Lannon, Mr. Black turned and ran in the opposite direction, towards the nearby trailer park. Officer Lannon began pursuing Mr. Black on foot. (Exhibits 5 – 8). Mr. Black and Officer Lannon ran past Officer

Webster's position and continued to run in a southerly direction on Route 313. (Exhibits 5 – 8). Officer Webster then exited his car and also began to pursue Mr. Black on foot. (Exhibits 5 – 8). Officer Lannon slowed his pursuit as Mr. Black proved to be much faster than him. (Exhibits 5 – 8).

As the foot pursuit continued, a civilian witness, Kevin Clark ("Clark"), who was operating his motorcycle in the area of Route 313, saw Mr. Black running from the police officers. (Exhibits 5 – 8). Clark drove his motorcycle towards the trailer park to help the officers keep Mr. Black in sight. (Exhibits 5 – 8). As Mr. Black approached the trailer park, he reached out, grabbed Clark's shirt, and tried to pull him off the motorcycle. (Exhibits 5 – 8). Mr. Black then continued to run into the trailer park and towards the trailer on lot number two. (Exhibits 5 – 8). Clark parked his motorcycle in a neighboring driveway just outside of the trailer park. (Exhibits 5 – 8).

Officer Webster continued his foot pursuit and passed Officer Lannon who had stopped running after Mr. Black. (Exhibits 5 – 8). Another officer, Town of Ridgely Police Chief Gary Manos ("Chief Manos"), who was off-duty and returning from dinner with his wife, heard the radio traffic and observed the events. (Exhibits 5 – 8). Upon reaching the intersection at Route 313, Chief Manos also saw Mr. Black dragging X.B. down the road. (Exhibits 5 – 8). He also observed that Mr. Black had X.B. in what appeared to be a headlock or chokehold. (Exhibits 5 – 8). Chief Manos then observed Officer Webster pull up and, shortly thereafter, saw X.B. running across the street. (Exhibits 5 – 8). He also saw Shawn Starkey, the Greensboro Volunteer Fire Company Captain, who was nearby, run after X.B. (Exhibits 5 – 8).

Chief Manos further observed attempt to detain Mr. Black when Mr. Black turned and ran. (Exhibits 5 – 8). Seeing that Officer Webster appeared to be alone and without any backup,

Chief Manos ran from his car to Officer Webster's car and drove it towards the trailer park both to secure it and to keep Officer Webster in sight. (Exhibits 5 – 8). As he passed Officer Webster, Officer Webster asked Chief Manos to continue his pursuit. (Exhibits 5 – 8). Chief Manos pulled ahead and parked near lot number two. (Exhibits 5 – 8). He also saw Mr. Black try to pull Clark off of his motorcycle. (Exhibits 5 – 8).

### 3. Mr. Black Barricades Himself in a Vehicle and Officer Webster Unsuccessfully Deploys his Taser[4]

Upon reaching lot number two, Mr. Black tried to enter the driver's side front door of a white Honda parked in front, bearing Delaware registration plate 156938. (Exhibits 5 – 7). After some difficulty, Mr. Black entered the car and locked the doors. (Exhibits 5 – 7). Chief Manos, who caught up with him first, could not see Mr. Black's hands but saw that he appeared to be reaching around the vehicle. (Exhibits 5 – 7). Chief Manos was concerned that Mr. Black might be retrieving a weapon from the vehicle. (Exhibits 5 – 7). Chief Manos did not know who owned the vehicle, whether Mr. Black had keys to it, or what was inside of it. (Exhibits 5 – 7).

Mr. Black entered the car, and as Officer Webster neared, Chief Manos told him that Mr. Black was locked in the car and that they needed to get him out. (Exhibits 5 – 7). Officer Webster took out his ASP (retractable) baton and struck the driver's window two times, causing it to shatter. (Exhibits 5 – 7). Chief Manos, who was not armed and not in uniform, began

---

[4] A Taser is a non-lethal electroshock weapon used to incapacitate targets via shocks that temporarily impair the target's physical function to a level that allows them to be approached and handled in an unresisting and thus safe manner. It fires two small barbed darts intended to puncture the skin and remain attached to the target at 180 feet (55 m) per second. Their range extends from 15 feet (4.57 m) for non-Law Enforcement Tasers to 35 feet (10.67 m) for Law Enforcement Tasers. The darts are connected to the main unit by thin insulated copper wire and deliver a modulated electric current designed to disrupt voluntary control of muscles, causing "neuromuscular incapacitation", which is often mistaken for unconsciousness by police officers and bystanders. The effects of a Taser device may only be localized pain or strong involuntary long muscle contractions, based on the mode of use and connectivity of the darts. *See* "Neuromuscular Incapacitation (NMI)", TASER International, published March 12, 2007. Archived April 13, 2008.

.

moving to the vehicle's passenger side as Mr. Black began to move towards the vehicle's passenger side.  (Exhibits 5 – 7).  He called out to Officer Webster to "Watch his hands!" and told him twice to "Tase him!"  (Exhibits 5 – 7).  Officer Webster quickly unholstered his departmentally issued Taser and called out, "Taser! Taser! Taser!"  (Exhibits 5 – 7).  As the body camera footage reflects, Officer Webster was also winded and could barely get the words out.  (Exhibits 5 – 7).  He deployed the Taser at Mr. Black through the broken driver's side window; however, the Taser was ineffective because only one of the two prongs actually made contact with Mr. Black, striking him in the left buttock.  (Exhibits 5 – 7).  As Mr. Black exited through the passenger door, he ran directly into Chief Manos.  (Exhibits 5 – 7).  Black immediately punched, bit, and pushed Chief Manos back several feet as he was telling Mr. Black that he was under arrest.  (Exhibits 5 – 7).  The two then began to struggle, moving up the wooden rampway trailer closest to the Honda.  (Exhibits 5 – 7).  Unbeknownst to the Officers at that time, the trailer was, in fact, Mr. Black's residence.  (Exhibits 5 – 7).  The two men continued to struggle as Officer Webster intentionally dropped his baton and Taser and came around the car to assist.  (Exhibits 5 – 7).

### 4.        The Struggle to Restrain Mr. Black

Chief Manos and Black continued struggling up the ramp towards the door, as Chief Manos repeatedly yelling, "Stop, you're under arrest!"  (Exhibits 5 – 7).  Mr. Black was repeating "Don't get me!"  (Exhibits 5 – 7).  Officer Webster then reached the men tried to assist.  (Exhibits 5 – 7).  As the three struggled up the ramp, Mr. Black began calling out for someone to open the door.  (Exhibits 5 – 7).  Mr. Black, who was five feet nine inches tall, and weighed approximately 160 pounds, appeared to the officers to be extremely strong as they could not stop him from moving up the ramp.  (Exhibits 5 – 7).  The entire time, it appeared to Chief Manos

that Mr. Black simply was not right; something was wrong, he just didn't know what. (Exhibits 5 – 7). Mr. Black seemed to stare past him and never looked directly at him. (Exhibits 5 – 7). Chief Manos continued to try and prevent Mr. Black from reaching the front door because he did not know who or what, including weapons, was inside. (Exhibits 5 – 7). At one point, Officer Webster told Chief Manos that Mr. Black was schizophrenic. (Exhibits 5 – 7). Chief Manos later noticed that Mr. Black was wearing a hospital mental health bracelet. (Exhibits 5 – 7).

As the three men neared the trailer door, Officer Webster called out for someone to pull Mr. Black's legs out from under him. (Exhibits 5 – 7). They managed to get Mr. Black to the ground, and, at this point, the civilian, Clark, and Officer Lannon joined the effort to get Mr. Black handcuffed. (Exhibits 5 – 8). Mr. Black was on his side as Officer Lannon tried to free his left arm. (Exhibits 5 – 8). Mr. Black leaned over and bit Clark on the right hand, breaking the skin. (Exhibits 5 – 8). Mr. Black also had a grip on Chief Manos's pants as the Chief struggled to release it. (Exhibits 5 – 8). During the struggle, Chief Manos had repeatedly told Mr. Black to just "calm down" and to "relax." (Exhibits 5 – 8). He also called out on his radio for help and asked the 911 Center to expedite additional units to assist. (Exhibits 5 – 8). The dispatcher directed Caroline County Sheriff deputies to respond. (Exhibits 5 – 8).

Due to the difficulty in getting Mr. Black handcuffed, caused by Mr. Black's kicking and efforts to change position, Chief Manos asked Officer Lannon to "prone[5] him out" a common tactic that puts the suspect flat on the ground on his stomach so that his arms and legs can be better controlled and to stop continued physical resistance or aggression. (Exhibits 5 – 8). Officer Lannon then straightened Mr. Blacks' legs out while Chief Manos laid partially across

---

[5] Prone position is a body position in which the person lies flat with the chest down and the back up. In anatomical terms of location, the dorsal side is up, and the ventral side is down. The supine position is the 180° contrast. Source: Wikipedia

his hip area, hip to hip to turn him on his stomach. (Exhibits 5 – 8). This occurred at approximately the 3:52, 3:53 mark on the camera footage. (Exhibits 5 – 8).

Chief Manos told Mr. Black to stop fighting, and Officer Webster cautioned everyone that Mr. Black was schizophrenic. (Exhibits 5 – 8). At the 4:00 minute mark, Chief Manos draped his left leg over Mr. Black's buttocks. (Exhibits 5 – 8). At the 4:30 mark, Officer Webster told Chief Manos to "roll on your hips" in the effort to turn Black over. (Exhibits 5 – 8). At the 4:47 mark, Chief Manos can be clearly seen positioned *not* on Black's back as Black is being handcuffed. (Exhibits 5 – 8). Instead, Chief Manos is next to Mr. Black, with his left leg draped over Mr. Black's back and right leg. (Exhibits 5 – 8). Their left feet are touching. (Exhibits 5 – 8). At the time, Chief Manos remained wedged between Mr. Black and the front of the trailer and was in a sitting position on the ground. (Exhibits 5 – 8).

At 4:47, Officer Lannon straddled Mr. Black's left leg, with no pressure on his back or trunk. (Exhibits 5 – 8). When Mr. Black was handcuffed at 5:03, Officer Lannon removed himself from his position, and at 5:07, he stood up, and moved away. (Exhibits 5 – 8). At 5:05, just after the handcuffing was effected, Officer Webster told all of the men to take a breather. (Exhibits 5 – 8). At 5:12, Chief Manos again can clearly be seen sitting up, and not positioned in any way on Mr. Black. (Exhibits 5 – 8). At 6:06, he can be seen sitting on the ramp with his back against the trailer. (Exhibits 5 – 8). At one point, Mr. Black's mother had appeared at the door but quickly went back inside. (Exhibits 5 – 8). Several seconds later, after Mr. Black was handcuffed, his mother reappeared. (Exhibits 5 – 8). Officer Webster explained that Mr. Black had tried to abduct a twelve-year old and then fled from police. (Exhibits 5 – 8).

Although Mr. Black was prone and handcuffed, his legs were unsecured, and he continued to kick with them. (Exhibits 5 – 8). He struck Officer Lannon in the face with one of

them.  (Exhibits 5 – 8).  Chief Manos again ordered Mr. Black to "Stop!"  At 7:03, Mr. Black's mother, who had now been joined by his stepfather, said, "Anton, Stop!" (Exhibits 5 – 8).  She asked if the officers knew what had happened, and at 7:20, she asked if the "little boy" knew Mr. Black.  (Exhibits 5 – 8).  Seconds later, at 7:29, she asked Mr. Black if he knew who X.B.'s father was.  (Exhibits 5 – 8).  She continued over the next twenty seconds to tell the officers that she knew X.B. and that Mr. Black had been riding an orange and black bike. (Exhibits 5 – 8).  At 9:45, it was explained to Mr. Black's mother that he was not going to be locked up.  (Exhibits 5 – 8).

Due to Mr. Black's kicking, Officer Webster asked someone to get leg shackles out of the trunk of his car while Mr. Black was telling his mother that he loved her.  (Exhibits 5 – 8).  Chief Manos again urged Mr. Black to calm down and relax.  (Exhibits 5 – 8).  Because Mr. Black continued kicking, the officers were unable to properly secure the leg shackles.  (Exhibits 5 – 8).

At this point, the first Caroline County Deputy Sheriff, CS-11, Sergeant Richard Baker ("Sergeant Baker"), arrived.  (Exhibits 5 – 8).  He was off duty but had been monitoring his radio.  (Exhibits 5 – 8).  He heard Chief Manos's urgent call for assistance and drove to the scene in his patrol car.  (Exhibits 5 – 8).  Once at the scene, and because Mr. Black was still moving his legs, Sergeant Baker tried to place a Velcro leg restraint on Mr. Black, but Mr. Black's resistance prevented him from doing so.  (Exhibits 5 – 8).

At that point, Officer Webster advised that, instead of arresting Mr. Black, he would be treating this as an "Emergency Petition due to a mental health emergency."  (Exhibits 5 – 8).  Office Webster also explained this to Mr. Black's mother.  (Exhibits 5 – 8).  Sgt. Baker then requested that Detective First Class Koehler, CS-18, who had also arrived, retrieve the leg shackles from his car.  (Exhibits 5 – 8).  Detective Koehler did so and was able to secure Mr.

Black's legs. (Exhibits 5 – 8). His legs were secured at 9:52, and thereafter no officer was restraining Mr. Black in any way. Officer Webster and Chief Manos then positioned Mr. Black on his side, which is known as the recovery position. (Exhibits 5 – 8). Mr. Black was still breathing. (Exhibits 5 – 8).

At the 10:00 minute mark, Mr. Black's mother said that she thought "that somebody did something to him but not today." (Exhibits 5 – 8). Officer Webster then wondered if Mr. Black had gotten into something." (Exhibits 5 – 8). Mr. Black's mother replied, "No, I'm not saying today." (Exhibits 5 – 8).

### 5. Mr. Black's Loss of Consciousness and the Efforts to Revive Him

Almost immediately having his legs restrained, Mr. Black appeared unresponsive. (Exhibits 5 – 8). However, he had shown no signs of medical distress up to this point. (Exhibits 5 – 8). Although Mr. Black appeared unresponsive, Chief Manos determined that he was still breathing and had a pulse. (Exhibits 5 – 8). It was at this time that Chief Manos noticed Mr. Black's medical bracelet. A request was made to check Mr. Black's wrist for a pulse, and Chief Manos informed Sergeant Baker that he could feel Mr. Black's heart beating. (Exhibits 5 – 8). Officer Webster relayed this information to the EMS units who were enroute. (Exhibits 5 – 8). Mr. Black's restraints were removed, and he was taken out of the "recovery position" and placed in an upright, sitting position. (Exhibits 5 – 8). A minute later, Officer Webster notified EMS that Mr. Black was not conscious or alert. (Exhibits 5 – 8). Chief Manos asked Officer Webster to request that EMS "step it up." (Exhibits 5 – 8).

Sgt. Baker obtained a bag-valve mask from Officer Webster's car and immediately began CPR on Mr. Black in the recovery position. (Exhibits 5 – 8). Sgt. Baker performed chest

compressions as Chief Manos assisted with ventilation. (Exhibits 5 – 8). Deputy First Class Thamert, CS-21, assisted Sgt. Baker so that the CPR effort was continuous. (Exhibits 5 – 8).

EMS arrived and Chief Manos asked Greensboro Fire Chief Shawn Starkey ("Starkey") for an Automated External Defibrillator (AED) as he came up the walkway. (Exhibits 5 – 8). Starkey, who had just spoken with X.B., advised that Mr. Black had ingested laced marijuana. (Exhibits 5 – 9). An AED was provided by Deputies Thamert and Koehler, but once it was attached to Mr. Black, the AED advised "no shock." (Exhibits 5 – 8). When the AED was attempted the second time, it again advised "no shock" and to continue CPR. (Exhibits 5 – 8). Mr. Black was administered a 4 mg dose of nasal Narcan by paramedics with no response. (Exhibits 5 – 8). Black's mother also brought out sealed Narcan from inside the trailer. (Exhibits 5 – 8). CPR continued with the use of a LUCUS device (chest compression) until Mr. Black was transported by Paramedic Unit 17 to Easton Memorial Hospital. (Exhibits 5 – 8). From Officer Webster's arrival to the point Mr. Black became unresponsive, approximately twelve minutes had elapsed. (Exhibits 5 – 8).

As officers began clearing the scene, Mr. Black's mother thanked them for their efforts to help her son. (Exhibits 5 – 8).

### C. Mr. Black's Death and Autopsy Results

Mr. Black was pronounced deceased at 2036 hours at the hospital. (Exhibit 10). Mr. Black's family was notified by Lieutenant Baker and Deputy Thamert. (Exhibit 10). Mr. Black's body was transported to the Office of the Chief Medical Examiner in Baltimore for autopsy. (Exhibit 10). The autopsy was performed on September 16, 2018. (Exhibit 10). It was performed by Russell Alexander, M.D., Assistant Medical Examiner. (Exhibit 10). The Cause of Death was identified as "Accident," specifically "Sudden Cardiac Death," caused by

"Anomalous Right Coronary Artery and Myocardial Tunneling of the Left Anterior Descending Coronary Artery."  (Exhibit 10).  This diagnosis was confirmed by Renu Virmani, M.D., President, CVPath Institute.  (Exhibit 10).

Although Mr. Black's body exhibited multiple abrasions and contusions of the head, back and extremities, no fractures were noted.  (Exhibit 10).  The examination of the brain revealed no sign of remote or recent trauma.  (Exhibit 10).  Although a small amount of marijuana (1.2 grams) had been recovered from Mr. Black at Easton Hospital, his Toxicology Report of Findings were negative.  (Exhibit 10).  The report, however, reveals that Mr. Black was not tested for the presence of synthetic cannabinoids.[6]  (Exhibit 10).  A significant contributing condition was identified as bipolar disorder.  (Exhibit 10).  The Medical Opinion stated the following: "There was no evidence (based on a review of officer interviews and a video of the incident) that the decedent was physically struck by officers, or had force applied to his neck." (Exhibit 10).  The Medical Opinion concluded: "Based on a review of the investigation and autopsy findings, it is likely that the stress of his struggle contributed to his death.  (Exhibit 10). However, no evidence was found that restraint by law enforcement directly caused or significantly contributed to the decedent's death; in particular, no evidence was found that restraint led to the decedent being asphyxiated.  (Exhibit 10).  The manner of death is best certified as **accident**."  (emphasis in original).   (Exhibit 10).

---

[6] Synthetic cannabinoids are human-made mind-altering chemicals that are either sprayed on dried, shredded plant material so they can be smoked or sold as liquids to be vaporized and inhaled in e-cigarettes and other devices. These products are also known as herbal or liquid incense. These chemicals are called cannabinoids because they are similar to chemicals found in the marijuana plant. Because of this similarity, synthetic cannabinoids are sometimes misleadingly called synthetic marijuana (or fake weed), and they are often marketed as safe, legal alternatives to that drug. In fact, they are not safe and may affect the brain much more powerfully than marijuana; their actual effects can be unpredictable and, in some cases, more dangerous or even life-threatening.  Source:  NIH National Institute on Drug Abuse. https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice

### D.     The Investigation and the State's Attorney's Office's
###        Declination of Charges

The Maryland State Police ("MSP") were assigned to investigate the circumstances surrounding Mr. Black's death.  (Exhibit 11).  The entirety of their investigation was presented to the State's Attorney for Caroline County.  (Exhibit 11).  On March 7, 2019, Caroline County State's Attorney Joseph Riley informed the MSP that his office was declining "to seek charges against any individuals in the matter involving the In-Custody Death of Anton Black."  (Exhibit 11).

## IV.     ARGUMENT

### Introduction

In this case, this Court is once again called to apply and assess the affirmative defense of qualified immunity.  The Supreme Court has repeatedly emphasized that qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  If a case goes to trial when a valid basis for summary judgment exists, the entire purpose of the immunity is thwarted.  For the purposes of qualified immunity, the Defendants' request for it is not premature.  The issue must be resolved at the earliest stage of the litigation, and where the evidence is not genuinely in dispute, that stage is now.  In other words, "the more litigation the merrier is not at all what qualified immunity is about." *Harris v. Pittman*, 927 F.3d 266, 284 (4th Cir. 2019) (Wilkinson, C.J., dissenting).

In this regard, the Supreme Court's view on the importance of qualified immunity has not wavered. Each year, it has continued to issue opinions, often *per curiam*, reversing a denial of qualified immunity in an excessive force suit.  *See, e.g., City of Escondido v. Emmo*ns, 139 S. Ct. 500 (2019) (*per curiam*); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (*per curiam*); *White v. Pauly*,

137 S. Ct. 548 (2017) (*per curiam*); *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (*per curiam*).  In some cases, lower courts erred by defining the constitutional right at such a high level of abstraction that no conduct whatsoever was protected by the immunity.  *See, e.g., Mullenix*, 136 S. Ct. at 308.  At other times, courts have erred in applying the immunity standard, either by assessing the officer's conduct without regard to the facts on the ground, *see, e.g., Kisela*, 138 S. Ct. at 1153, or wrongfully finding a "genuine" dispute of fact, *see, e.g., Scott v. Harris*, *supra.*  "The Supreme Court has been forced into the fray to prevent the total erosion of qualified immunity."

The facts offered by Defendants here cannot be genuinely disputed.  Many of them have been conceded in the Complaint.  Those that have not, face an impossible climb to overcome the objective evidence in this record, audio, video, or other.  Qualified immunity shields all but those are "plainly incompetent or . . . knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and the Officers here are clearly not deserving of either label.  They violated no clearly established right, or any other right for that matter, and they are entitled to immunity.

## A.    Federal Claims:  Qualified Immunity

Qualified immunity shields law enforcement officers acting under color of state law from civil liability unless the plaintiff can show: (1) the official violated a statutory or constitutional right and (2) that right was "clearly established" at the time of the challenged action.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Courts have discretion to analyze these steps in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Bypassing the constitutional question is particularly appropriate where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right".  *Pearson,* 555 U.S. at 237.

An officer's use of force does not violate of the Fourth Amendment if "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation". *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Evaluating the reasonableness of a particular use of force requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Graham,* 490 U.S. at 396. The Supreme Court has specified three relevant factors to assessing the reasonableness of a particular application of force: the severity of the crime at issue, whether the suspect posed an immediate threat of safety, and whether the suspect was actively resisting arrest or attempting to flee. *Graham,* at 396. Furthermore, courts must judge the reasonableness of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* And, although the *Graham* factors are instructive, they "are not an exhaustive list, as the ultimate inquiry is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Livermore ex rel. Rohm v. Lubelan*, 476 F. 3d 397, 404 (6th Cir. 2007) (quoting *St. John v. Hickey*, 411 F. 3d 762, 771 (6th Cir. 2005).

Even if an officer's actions amount to unconstitutionally excessive force, qualified immunity will still apply if the violated right was not "clearly established." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An officer's conduct violates clearly established law "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Ashcroft, supra,* 563 U.S. at 741. Although there need not be a case directly on point for the law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Staton v. Sims*, 571 U.S. 3, 6 (2013). When a plaintiff can identify

"cases of controlling authority in the jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority" affirming the allegedly violated right, the law is clearly established. *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

The Supreme Court has repeatedly warned lower courts against defining the right to be free from excessive force "at a high level of generality." *Mullenix, supra,* 136 S. Ct. at 308. Rather, the clearly established inquiry "must be undertaken in light of the specific context of the case". *Mullenix,* at 309 (quoting *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)), meaning the court must enunciate "a concrete, particularized description of the right." *Hagans v Franklin County Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). The Supreme Court recently instructed in *Mullenix* that where "none of the precedents 'squarely governs' the specific set of facts at hand, qualified immunity is proper." *Mullenix*, at 310. And, even more recently, the Supreme Court has again emphasized that the "clearly established law" should "not be decided at a high level of generality" but instead it must be "particularized" to the facts of the case and the law determined "beyond debate." *White v. Pauly*, *supra*. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### 1. The Absence of Excessive Force

Count 3 alleges excessive force against the Officers under 42 U.S.C. §1983. To begin, aside from an unsuccessful attempt to tase Mr. Black, no weapons were used against him and there is no body camera footage or other evidence that that depicts any officer striking, choking, punching, or kicking Mr. Black. There is evidence only of the Officers trying to gain control of

Mr. Black to secure him in handcuffs, and, eventually ankle cuffs. Significantly, there is no evidence that the Officers applied any kind or degree of fore to Mr. Black's neck area. Instead, the Officers used only physical strength to try and stop Mr. Black, imploring for him to simply to submit to arrest the entire time. Despite these undisputed facts, Plaintiffs allegations in paragraphs 221 and 222 of their Complaint focus on Officer Webster's use of a baton to break a car window, his firing of a Taser at Mr. Black without adequate warning, his instructing an untrained civilian to "assault" Mr. Black, and his engagement in excessively forceful restraint of Mr. Black, who, according to Plaintiffs, "posed no serious threat to any person." ECF No. 1, ¶ 221. Plaintiffs further accuse Officer Lannon and Chief Webster of failing to intervene to stop Officer Webster's alleged use of excessive force, and, instead, themselves "both engaged in excessively forceful restraint" of Mr. Black, who, again, in Plaintiffs' counterfactual world, "posed no serious threat to any person." ECF No. 1, ¶ 222.

Based on the undisputed objective evidence in this record, including the 911 call, the subsequent police radio transmissions, and the events as captured by Officer Webster's body worn camera, the Affidavits, and related evidence, not one of the Officers used excessive force in contravention of the Fourth Amendment as a matter of fact. And, even if it were to be determined that any or all the Officers had done so, no clearly established law from the Supreme Court or this Circuit prohibited them from using the kind and degree of force they used to restrain Mr. Black on September 15, 2018.

In *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994), the Fourth Circuit cautioned courts that when analyzing the objective reasonableness of the amount of force used by a law enforcement officer not to adopt a "segmented view of [a] sequence of events," where "each distinct act of force becomes reasonable given what [the officer] knew at each point in this

progression." *Id.*, at 173. Such an approach, the court opined, "miss[es] the forest for the trees." *Id.* Instead, the Fourth Circuit instructed, "[t]he better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." *Id.*

Here, Defendants proposed analysis not based upon "artificial divisions" in the sequence of events, but rather the events themselves as they occurred, from beginning to end. The fluidity of the events is fully seen on the body worn camera footage. As such, the events can be analyzed in the stages they occurred in real time, beginning with (1) the determination to seize and Mr. Black's flight; (2) Officer Webster's use of his baton against a window and his use of his Taser, which failed to deliver any electric shock or impact Mr. Black's behavior; (3) the physical struggle between Mr. Black, Chief Manos, and Officer Webster; and (4) the restraint of Mr. Black in handcuffs and leg shackles with the assistance of Officer Lannon and others.

Pursuant to the Supreme Court's decision in *Pearson, supra*, the Officers also ask the Court to exercise its discretion to apply the two-step procedure of *Saucier, supra,* asking first whether a constitutional violation occurred and second whether the right allegedly violated was clearly established. Again, if the right was not clearly established, the Officers are entitled to qualified immunity notwithstanding any perceived violation. *Saucier,* 533 U.S. at 200-01.

For the reasons set forth below, the Officers' determination to seize, and the manner in which that seizure was effected, were objectively reasonable as a matter of law, and, thus, not violative of the Fourth Amendment.

### a. The Determination to Seize

Plaintiffs' racially charged allegations[7] and invective aside, the Officers determination to take Mr. Black into custody cannot be contested. Based on the 911 emergency call and the Officers' actual observations, Officer Webster was responding to a child abduction, *i.e.*, an older male dragging a young boy, approximately 12 years old, by the neck down a road that crossed a bridge. In fact, the twelve-year old had expressly asked the 911 caller to call the police when she stopped to ask him if he was okay. The situation only worsened when Mr. Black pinned X.B. against the hood of the police car. And, other than a twelve-year old's description of Mr. Black as "schizophrenic," Officer Webster had no knowledge of Mr. Black's physical or mental condition, whether he was simply being violent, had ingested drugs, and/or had mental condition that was causing his violent behavior. In any event, Mr. Black's abrupt flight, which occurred just as he was told he was being taken into custody, gave Officer Webster no chance to further investigate and equally deprived him of any opportunity to Mr. Black down for weapons.

Probable cause exists where facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that a criminal offense has been committed and that the suspect committed it. *Humbert v. Mayor of Balt. City*, 866 F.3d 546, 555 (4th Cir. 2017). When the underlying facts are not in dispute, whether probable cause exists is a question of law for the Court. *Gibbons v. Bank of Am. Corp.*, No. JFM-08-3511, 2012 U.S. Dist. LEXIS 3234, * 18 (D. Md. Jan 11, 2012). Courts evaluate probable cause under an objective standard, considering the totality of the circumstances known to the officers at the time of the seizure and without consideration of the subjective beliefs of the officers involved. *See Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017); *see Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016).

---

[7] The Officers hope and expect that the Court will find such language disappointing and counterproductive. This is often the case in this District when parties insert personal bias or prejudice into pleadings.

Maryland law in regard to warrantless arrests is patently clear.  Section 2-202 of the Criminal Procedure Article, titled "Warrantless arrests — In general,"  states, in part:

> (a) Crimes committed in presence of police officer. — A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer.

> (b) Probable cause to believe crime committed in presence of officer. — A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.

Here, the record establishes that Officer Webster had ample probable cause to arrest Mr. Black for any number of crimes, assault.  In Maryland, "Assault" means the crimes of "assault, battery, and assault and battery, which retain their judicially determined meanings."  § 3-201(b) of the Criminal Law Article.  Under Maryland common law "there is no single crime . . . called assault and battery.'" *State v. Duckett*, 306 Md. 503, 510 (1986), superseded by statute as stated in *Robinson v. State*, 353 Md. 683, 728 (1999). "A battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 601 (1999); *accord Ford v. State*, 330 Md. 682, 699 (1993) (disapproved on other grounds by *Henry v. State*, 419 Md. 588 (2011).  An assault is a consummated battery, an attempted battery, or placing a victim in reasonable fear of an imminent battery.  *Snyder v. State*, 210 Md. App. 370, 381-82 (2013).  Notably, "the unlawful application of force to another, however slight, constitutes a battery" in Maryland. *Claggett* v. *State of Maryland*, 108 Md. App. 32, 47 (1996).  Probable cause existed for arrest for other crimes as well, including reckless endangerment.[8]  Further, these offenses were committed in Officer Webster's presence.

---

[8] Section 3-204(a)(1) of the Criminal Law Article prohibits a person from engaging "in conduct that creates a substantial risk of death or serious physical injury to another.

The twelve-year old's characterization of Mr. Black as "schizophrenic," does not change the outcome. In Maryland, involuntary detentions for psychiatric evaluations are governed by § 10-622 of the Health General Article, which provides that

> "[a] petition for emergency evaluation of an individual may be made . . . only if the petitioner has reason to believe that the individual: (1) Has a mental disorder; and (2) Presents a danger to the life or safety of the individual or of others." A peace officer may make such a petition based on "(i) [t]he examination or observation; or (ii) [o]ther information obtained that is pertinent to the factors giving rise to the petition."

§ 10-622(b) of the Health General Article. Under state law, peace officers who act as a custodian of an emergency evaluee are immune from liability if they act "in good faith and with reasonable grounds," thus evidencing the Maryland General Assembly's intent to afford peace officers the ability to exercise discretion in uncertain, tense circumstances. *See* § 10-629(b) of the Health General Article; § 5-624(c) of the Courts Article. It also acknowledges the General Assembly's recognition that police officers are not doctors or mental health professionals and must simply make a judgment call based on their observations and other pertinent information gathered at the scene.

In the seconds Mr. Black was in Officer Webster's presence initially, he learned nothing about him that destroyed his probable cause to arrest. And, even if it is assumed that Mr. Black was in the midst of some sort of mental health crisis, he still was legally justified as a matter of law in taking him into custody. Officer Webster had both the right and the obligation to pursue Mr. Black and take him into custody.[9]

### b.      Officer Webster's Use of His Baton and Taser

---

[9] At the time of the events in question, there were Mutual Aid Agreement (Regional Law Enforcement Compact) in place, enacted pursuant to § 2-102 and § 2-105 of the Criminal Procedure Article, that included Caroline County, and the Towns of Denton, Ridgely, Federalsburg, Preston, and Greensboro. The agreements are a matter of public record:  https://ecode360.com/32614211

None of the Officers involved in this encounter knew whether Mr. Black was armed and dangerous, whether his behavior was drug-induced, caused by mental illness, or something else. None knew what Mr. Black's motives for resisting arrest were or what he intended to do after locking himself in a car. Facing these tense and rapidly evolving circumstances, the Officers needed to take Mr. Black into custody as quickly as possible. It was Mr. Black's behavior, not the Officers, that escalated the encounter

In essence, Plaintiffs in their Complaint engage in the standard and impermissible second-guessing not allowed in police use of force cases. They do so by alleging that the Officers should have done nothing and simply awaited Mr. Black's next move. But the Supreme Court and the Fourth Circuit have never required police officers to engage in such unrealistic "crystal ball" policing. Of course, if Mr. Black had injured X.B., or worse, sped off in the car and injured himself or others, or produced a weapon or retrieved one from the Honda and then used it, or any number of other "crystal ball" outcomes, Plaintiffs would be first to second guess the Officers' failure to forcibly seize Mr. Black and prevent such harm.

When Officer Webster used his baton, he did not do so to strike or injure Mr. Black; he used it to gain access to a locked car that held a suspect who had fled and whose status as criminal, drug user, or mentally ill, was unknown. As was his status as armed or unarmed. What Officer Webster did to reach Mr. Black was dictated by common sense, no more, no less. When, in turn, Mr. Black scrambled over the console in further attempt to escape, it was more than objectively reasonable that he or any reasonable officer in his place would use the less lethal force available escalated the situation; in this case, a Taser, and its use failed. Thus, Plaintiffs are left to direct their grievance at the breaking of a window and the unsuccessful deployment of a Taser. Based on this record, there was no excessive force here.

### c. Mr. Black's Physical Struggle Against Chief Manos and Officer Webster

Once Mr. Black scrambled out of the car, he, not the Officers, continued to escalate the events. He did so by charging into and past Chief Manos, punching, biting, and pushing him as he did. In response, Chief Manos did not punch or strike Mr. Black. He took hold as best he could and repeatedly advised Mr. Black that he was under arrest, and urging him to stop resisting, to calm down, to just relax, all to no avail. Even when Officer Webster rejoined the effort to gain control of him, Mr. Black's resistance continued. It should be noted that, as Officer Webster ran to help Chief Manos, he purposely dropped his ASP baton and his Taser— he had no intention of using either weapon against Mr. Black in such a close quarters struggle. Mr. Black proved incredibly strong and the Officers simply could not stop his advancing up the wooden rampway. The events, captured on Officer Webster's camera footage, shows professional restraint as they struggled to gain control of Mr. Black. Again, at no time was a weapon used against Mr. Black during the struggle, nor was he choked, punched, or kicked. Instead, the Officers used their physical strength only to try and stop Mr. Black, imploring him to simply give up the entire time. There was no excessive force here.

### d. The Securing of Black in Hand and Leg Cuffs

Officer Webster and Chief Manos were finally able to get Mr. Black to the ground at the top of the wooden ramp. That, however, did not end the struggle, as Mr. Black showed no sign of surrender. Even with the assistance of Officer Lannon and the civilian motorcyclist, the Officers continued to struggle to gain control of Mr. Black. He continued to actively resist arrest by biting the men and kicking his legs. Certainly, the use of handcuffs to restrain Mr. Black cannot be questioned as excessive. Neither can the use of leg shackles. Officers do not have to become veritable punching bags or willingly expose themselves to injury when taking a resisting

suspect into custody. Just as with the handcuffs, the use of leg shackles to stop Mr. Black from kicking was more than objectively reasonable, it was imperative.

Further and finally, at no point after Mr. Black was taken to the ground, was he choked in any way nor was the full body weight of the Officers' applied to restrain him. As is broken down second by second in the Officer's factual timeline drawn solely from the camera footage, the Officers tried to move Mr. Black from his back into a prone position, and eventually succeeded in doing so. He was then handcuffed. And, since he continued to kick after being handcuffed, Mr. Blacks' legs were restrained in cuffs after Velcro strips proved ineffective. The footage shows none of the horrendous conduct described in the Complaint, as none of it, in fact, occurred. The physical restraint of Mr. Black after being taken to the ground was objectively reasonable. It took three officers, with the assistance of one civilian, to gain control of Mr. Black, whose fighting and kicking stopped only at the point that his legs were finally secured. *See Pittman*, 927 F.3d at 282 (Wilkinson, C.J., dissenting)("…the action here spun by; the struggle allowed the combatants no time for a coffee break.") Again, and finally, there was no use of excessive force here.

### 2. The Absence of Clearly Established Law

#### a. Use of the Taser

In April 2018, the Supreme Court once again emphasized the need for specificity in Fourth Amendment cases in determining clearly established law. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela, supra,* at 1152 (quoting *Mullenix*, *supra*.) The Court continued, "[u]se of excessive force is an area of the law 'in which the result

depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue. *Kisela,* at 1153 (quoting *Mullenix*). The Court impatiently said that, in the excessive force context, it has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *Id.,* at 1152 (quoting *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1165, 1174 (2015)).

At the time of the events in this case, there was no precedent from either the Supreme Court or the Fourth Circuit governing the circumstances that the Officers encountered on September 15, 2018.[10] To the contrary, beginning with the use of Tasers as a means to subdue, there were only two cases decided under the Fourth Amendment from the Fourth Circuit, *Meyers v. Baltimore County, Md.*, 713 F.3d 723 (4th Cir. 2013), and *Estate of Armstrong ex rel v. Village of Pinehurst, et al.*, 810 F.3d 892 (4th Cir. 2016), cases vastly different from this one. *Meyers* involved a violent police encounter with a forty-year-old, severely bipolar man, who was fighting with and threatening family members. Because Meyers was agitated and armed with a baseball bat, officers on the scene called for an officer trained to use a Taser be sent to the residence. *Meyers*, 713 F. 3d at 728. Evidence in the record established that the officer deployed his Taser almost immediately after ordering Meyers to drop the bat, without giving him time to comply with the command. *Id.* Thereafter, the officer repeatedly discharged his Taser against Meyers in both prong and drive stun (direct contact) mode. After Meyers fell to the ground from the first three discharges in prong mode, the officer with the Taser and two other officers sat on his back. *Id.* While the other officers remained seated on Ryan's back, the Taser

_____

[10] Similarly, there was no governing precedent from the Maryland Court of Appeals or any clear consensus in other circuits' case law regarding this kind of encounter with police.

officer applied his Taser to Meyers again in probe mode and then applied six additional shocks in drive stun mode. All while the officers were sitting on Meyers' back. *Id,* at 729.

When the case reached the Fourth Circuit, that Court reversed the district court's grant of qualified immunity. In denying qualified immunity to the officer who had used the Taser, the Fourth Circuit concluded that: (1) his use of the Taser was not objectively reasonable *after* Meyers ceased actively resisting arrest; and (2) a reasonable person in the officer's position would have known that the use of a Taser in such circumstances violated clearly established constitutional rights. *Id.,* at 735. As to the deployments of the weapon after Meyers had fallen to the ground, the Court said that even if the level of force used at the beginning of the encounter was justified, it became excessive when the justification for the initial force was eliminated. *Id.* at 733.

Based on these facts, the Court announced a guiding principle in this circuit: "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a Taser on an individual who is no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734. The use of Taser in such circumstances is "unnecessary, gratuitous, and disproportionate force." *Id.* It bears virtually no discussion to show that Officer Webster's actions here, *i.e.*, the unsuccessful single discharge of his Taser did not run afoul of *Myers*.

The second Taser case, which also bears no resemblance to the instant case, *Village of Pinehurst, supra. Pinehurst* arose from the death of Ronald Armstrong ("Armstrong") during police efforts to return him to a hospital emergency room from which he had fled. Armstrong suffered from bipolar disorder and paranoid schizophrenia. *Village of Pinehurst,* 810 F. 3d at 896. Village of Pinehurst police were called as soon as Armstrong fled from the hospital. Three

officers immediately responded. *Village of Pinehurst,* at 896. When they subsequently learned at the scene that Armstrong's commitment papers had been completed, the officers surrounded Armstrong and moved toward him. *Id.* at 896-97. Armstrong sat down and wrapped himself around a four-by-four post that was supporting a nearby stop sign. Armstrong, who was 5' 11" tall and weighed 262 pounds, refused to budge. *Id.* at 896. The officers tried prying his arms and legs from the post but were unsuccessful. *Id.* at 896-97. Two hospital security guards were also standing close by. *Id*.

When Armstrong continued to refuse to comply, one of the officers was instructed by his superior to tase Armstrong. *Id*. The officer applied the Taser in drive stun mode approximately five separate times over a period of two minutes. *Id.* The tasing produced more resistance from Armstrong instead of less. *Id*. When the tasing was ineffective, the two hospital security guards moved in to help the officers pull Armstrong off the post. *Id*. Finally, after much effort, the officers and security guards managed to pull Armstrong from the post. *Id*. He was pinned face down on the ground by placing a knee on his back and standing on his back, respectively. *Id*. Armstrong was handcuffed while on the ground, but, even so, he continued to kick the officers. Because of the kicking, the officers shackled Armstrong's legs too. *Id*. Shortly thereafter, it was determined that Armstrong was not breathing. Despite efforts to revive him, Armstrong died.

When the case reached the Fourth Circuit after the officers had been granted qualified immunity in the district court, that excessive force had been used based on three pivotal facts: First, immediately preceding the Taser use, Armstrong had not committed any crime nor was there probable cause for his arrest. *Id.* at 899-900. Second, the Court determined that the officers did not have a sufficient basis to believe that Armstrong posed a threat to them or to others. *Id*. at 901-907. Third, the Court emphasized that at the moment force was applied,

Armstrong was stationary, seated, clinging to a post, and refusing to move.  *Id.* at 906.  He was also outnumbered and surrounded by police officers and security guards.  *Id.*  Thus, the Fourth Circuit concluded that the degree of force necessary to prevent Armstrong's flight was quite limited.  *Id.*  Third, although Armstrong concededly was "resisting" the police by refusing to let go of the post, his resistance was "passive," not "active," and thus did not justify the level of force used.  *Id.*  The Fourth Circuit decided that almost immediately tasing a non-criminal, mentally ill individual, who seconds before had been conversational, was simply not a proportional response.  *Id.*

The court next turned to the issue of whether the officers were entitled to qualified immunity due to uncertainty in the law.  In this regard, the Court ultimately acknowledged that its conclusion that Armstrong had a right not to be tased while offering stationary and non-violent resistance to a lawful seizure was "not so settled" at the time the officers acted.  *Id.* at 907-908.  Thus, they were shielded by qualified immunity.  *Id.* at 908.  But the principle established by the Fourth Circuit is clear:  A Taser may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk and that is reasonably likely to be cured by using the Taser.  *Id.* at 909-10.  The subject of a seizure does not create such a risk simply because he is doing something that can be characterized as resistance – even when that resistance includes physically preventing an officer's manipulations of his body.  *Id.*

Once again, the extreme facts and resulting holding in *Pinehurst* have no bearing here. What is clear from *Meyers* and *Pinehurst* is that the Fourth Circuit views skeptically the promiscuous use of Tasers in drive stun (direct contact) mode as a means of pain compliance. That never occurred here.

       **b.**     **Use of Other Force, Including Compression, Restraint or So-Called "Positional Asphyxia"**

Again, and based on their extreme facts, Fourth Circuit cases concerning the general application of physical force offer no guidance here. *See, e.g.*, *Bailey v. Kennedy*, 349 F. 3d 731 (4th Cir. 2003)(non-Taser case arising from physical force used during seizure of minor for emergency mental evaluation); *Jones v. Buchanan*, 325 F. 3d 520 (4th Cir. 2003)(non-Taser case arising from disproportionate physical force used against injured party voluntarily went to the police station for assistance in recovering from excessive alcohol consumption); *Rowland*, *supra,* (non-Taser case arising from physical force arose used in scuffle between a police officer and a citizen over a lost five dollar bill); *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010)(non-Taser case arising from force including pepper spray and blows from flashlight used during course of an arrest following a traffic stop); and *Waterman v. Battan*, 393 F. 3d 471 (4th Cir. 2005)(non-Taser case arising from fatal shooting of person during car chase of person who sped through toll plaza).

But Plaintiffs false narrative urging death by "positional asphyxia" in the Complaint must be addressed. In this regard, the Officers do not question that "[c]ustody-related deaths are problematic" and that "[t]here clearly is a link between stress, exertion, restraint and Sudden Cardiac Death, but no consensus about causation, other than general agreement that most such deaths are multifactorial." Steven B. Karch, Michael A. Brave, Mark W. Kroll, "On positional asphyxia and death in custody," Sage Journals, Medicine, Science and the Law, August 5, 2015. The court must be cognizant of the fact that North American officers control and restrain agitated and resistant subjects in the prone position over half a million times each year. Chuck Remsburg, *New Study: More Evidence Against the Myth of "Restraint Asphyxia,"* Force Science Institute, Force Science News, January 8, 2019. Subjects end up being "proned out" in about 60 per cent of physical force encounters—without a death or serious injury resulting. *Id*. "Prone

restraint is needed for officer safety, and the stake needs to be driven into the heart of the stubborn myth that this procedure is inherently excessive and dangerous." *Id.* "The concept of compression asphyxia as a cause of arrest-related or custodial deaths has been thoroughly debunked in the peer review." Mark Kroll, University of Minnesota Twin Cities, PhD, *"Positional Compression and Restraint Asphyxia: A Brief Review,"* FAIMBE Feb 2017.

The Officers readily acknowledge that compression asphyxia is a real phenomenon and it has resulted in many deaths. This is not controversial. What is controversial and largely debunked now, is the misapplication of this to arrest-related and custodial deaths. *Id.* In the United States alone, there are about 800 cases of arrest-related-death annually and in some cases the subject expired after law enforcement officers used short-term controlling pressure on the back of the chest during handcuffing. *Id.* Hence, there has been debate about the potential for law enforcement officers to be able to cause fatal compression asphyxia with their body weights. *Id.* This is sometimes incorrectly referred to as "restraint" or "positional" asphyxia due to the restraints of the wrists and ankles along with the prone position in the law-enforcement scenario. Compression or crush asphyxia has caused death from soft-drink (soda) vending machine tipping, building collapse, vehicle accidents, crowd collapse, and trench cave-ins. *Id.* True compression asphyxia has been differentiated as "a form of suffocation where respiration is prevented by external pressure on the body." *Id.* (internal references omitted). Published research has found no evidence of compression asphyxia in hogtied individuals with a static mass up to 102 kg (225 lbs.) on the back. *Id.* However, numerous deaths from falling soda machines have been reported. *Id.* True compression deaths typically involve broken ribs and weights over 1000 lb. *Id.* Since a fully loaded soda vending machine weighs up to 500 kg (1100 lbs.), with most of the mass in the top, these deaths establish that an

impact (falling) load of 500 kg can kill an adult human. Most of the published fatal chest compression cases involve the mass of a car or tractor (typically > 1000 kg) compressing the torso and hence they set a high upper bound on the mass required for ribcage failure. *Id.* In the setting of short-duration chest compression, such as that typically encountered during handcuffing, fatal compression asphyxia, due to ineffective breathing, probably requires a flail chest injury since diaphragmatic breathing can support life even with the chest restricted. *Id.* There was no such injury here.

As compared to "Compression Asphyxia," the most common form of Prone and Positional Asphyxia is people trapped upside down in a car for long period of time. *Id.* This concept also has been carried over and misapplied in an attempt to blame the prone position for arrest-related or custodial deaths. *Id.* In fact, there have been two very large studies covering 1000s of forceful arrests that have shown no increased risk with prone restraint. *Id.* In fact, researchers are now arguing that the prone position is preferred as it leads to increased control and decreased subject and officer injury risks. *Id.* Maximally restrained prone subjects with 225 lb. on the back have sufficient ventilation. *Id.* "Positional asphyxia" or "restraint asphyxia," the theories most frequently proposed, are terms often used synonymously. *Id.* n.1. The term "restraint asphyxia" came into use when the notion of "positional asphyxia" fell from favor (it was retracted in court testimony by its author, Donald Reay) and was replaced with the phrase "restraint asphyxia," which is used in exactly the same way, and should be considered to have the same meaning. *Id.* n.2. Those who accept the theory of "positional or restraint asphyxia" assume that prone positioning is clearly harmful, even though all of the available peer-reviewed evidence suggests that quite the opposite is the case. *Id.* For example, in one case, the

court ruled that "reliance by plaintiffs on the theory of positional asphyxia is irrelevant ... the original proponent of the theory, Dr. Donald Reay, has now retracted it." *Id*. n. 3.

Over the past twenty years, the phrase "positional asphyxia" has surfaced in a handful of opinions of this Court and the Fourth Circuit. Between 2000 and 2017, the Officers have isolated on the handful opinions in which the phrase is mentioned. None of the cases bears even a remote resemblance to the one before the Court, and none certainly can be deemed to rise to the level of "clearly established law." In fact, most of the opinions, which are *nisi prius*, unpublished decisions, concern "hogtieing,[11]" something that did not occur in this case. That certainly was the case in *Sims v. Greenville County,* No. CA-97-2810-6-20, 2000 U.S. App. LEXIS 6846 (4th Cir. April 14, 2000), an unpublished prisoner rights suit decided under the Fourteenth Amendment wherein an inmate died following an altercation with corrections officers. The lawsuit under 42 U.S.C. § 1983 centered on the *Monell*, in which plaintiff contended that the county maintained a policy of deliberately failing to train its officers in the appropriate limitations on the use of force during multiple-officer takedowns of prisoners. Plaintiff attempted to link this alleged policy to her allegation that the decedent was deprived of his constitutional right to be free from excessive force when multiple (five or more) officer took the decedent down, placed their knees and feet on the inmate's neck and back and placed him in a chokehold. *Sims,* 2000 U.S. App. LEXIS 6846 *5-6. Further, the officers hogtied the inmate and left him in a holding cell. *Id.* Eventually, the inmate died of asphyxiation due to pressure that was placed either on his back or around his neck during the struggle with the officers. *Id.*

The Fourth Circuit affirmed the district court's grant of summary judgment for the defendant. In footnote 6 of its opinion, the Court observed that, before the district court, plaintiff

_____

[11] The hogtie is a method of tying the limbs together, rendering the subject immobile and helpless. Originally, it was applied to pigs (hence the name) and other young four-legged animals. From Wikipedia.

contended that compression asphyxiation (caused by pressure to the back or neck during the multiple-officer takedown of the decedent) or positional asphyxiation was the cause of death. The Court continued that,

> Theoretically, positional asphyxiation can occur as a result of an inmate being hog-tied after he has engaged in a violent struggle that causes blood oxygen levels to decrease; the hog-tying prevents oxygen levels from rising because it impairs the process of inhaling and exhaling. *See Price v. County of San Diego*, 990 F. Supp. 1230, 1237 (S.D. Cal. 1998). As at least one federal court has recently noted, however, there is little or no scientific evidence that hog-tying causes positional asphyxiation. *See id*. at 1238 (noting that the scientist who first claimed that hog-tying causes positional asphyxiation and whose work others in the field relied upon heavily now says that hog-tying is physiologically neutral in the face of a new study that refutes his claims; concluding that "like a house of cards, the evidence for positional asphyxia has fallen completely"). On appeal, [plaintiff] does not contest the district court's conclusion that the medical evidence did not support the assertion that positional asphyxiation was the cause of death; she only mentions compression asphyxiation as the cause of death in her brief. Thus, she does not argue, as she did below, that Greenville County was deliberately indifferent to an obvious risk of injury to inmates in that it failed to train its officers on the potential dangers of positional asphyxiation presented by hogtying.

*Id*. at *12 n.6.

The instant case presents nothing remotely similar to the egregious facts in the unpublished opinion in *Sims*. Neither does it resemble the egregious facts in *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294 (4th Cir. 2004), another case decided under the Fourteenth Amendment. The facts there showed that a severely intoxicated man was arrested and a "spit mask" was placed over his head. *Parrish,* 372 F.3d at 297-98. The man was handcuffed in the back of a police van to transport him to an adult detention center, where medical care was available for intoxicated detainees. *Parrish,* at 299. While en route, the man vomited and later died. *Id.* An autopsy revealed the cause of death to be aspiration of gastric content and positional asphyxia, with the man's 0.35 percent blood alcohol content being a contributing

cause. *Id.* at 300. The only issue related to "positional asphyxia" in this case was related to one

of the officer's concerns that placing an extremely intoxicated, handcuffed person on his stomach

during transport in a police van could result in positional asphyxia. *Id*. at 300. Due to that

concern, the man was not placed on his stomach. *Id.*

"Positional asphyxia" next surfaced in another unpublished decision, *Young v. City of Mt.*

*Rainier*, Civil No. L-02-2766, U.S. Dist. LEXIS 116800 (D. Md. Sept. 29, 2006), a police

brutality case decided under the Fourth and Fourteenth Amendments. In the lawsuit, the

decedent's personal representative sued, alleging that the officers had used excessive force while

taking their decedent into custody, specifically by "hogtying,[12]" causing him to asphyxiate while

he lay face down in the backseat of the police car. *Young,* U.S. Dist. LEXIS 116800 *2. The

cause of death was identified as "Cardiac Arrythmia Due to Acute Psychotic State Complicating

Myocardial Fibrosis and A Fatty Liver Associated with Multiple Injuries and Positional

Asphyxia Related to Police Arrest and Restraint." *Young,* at *9-10. The report also concluded

that "[t]he injuries of the wrist and ankles are consistent with the reported use of handcuffs and

leg irons respectively to restrain the deceased." *Id*. The manner of death was "Undetermined."

The district court found no evidence to support the claims.

As to the issue of positional asphyxia---hogtying---, it was examined under the

Fourteenth Amendment because of when it allegedly occurred in relation to Boodoo's detention.

The court stated:

> Plaintiffs must show that the officers actually knew (i) that positional
> asphyxia exists, (ii) that hogtying and placing a person face-down can
> cause positional asphyxia, and (iii) that Boodoo was at a substantial risk of

---

[12] Hogtying occurs when the detainee's handcuffs and leg shackles are connected behind his body, and the connection is short enough to bend his knees and draw his feet up close to his buttocks. *See Young, supra*, at *7.

suffering from positional asphyxia during the ninety-second ride to the hospital. Plaintiffs' proof on these issues is insufficient to reach a jury.

*Id.* at *18. The court continued: "In some excessive force cases, the officers' state of mind can clearly be demonstrated through their actions, such as a beating or failing to assist a person bleeding to death. Unlike those situations, the risk posed by hogtying is not self-evident." *Id.* at *18-19. And, further, the court said that, "[i]ndeed, medical literature suggests that healthy people who lie face-down in a hogtied position for fifteen minutes do not suffer 'any clinically relevant changes in respiratory or ventilatory function.'" *Id.* at *18-19. The evidence in the record failed to establish that positional asphyxia even existed, much less being something that officers were repeatedly warned about. *Id.* at *20.

The court concluded that even if hogtying had been a constitutional violation, plaintiffs' claim still failed under the qualified immunity test, as neither the Supreme Court nor the Fourth Circuit, nor the Maryland Court of Appeals, had determined that there was a due process right to be free of restraint by hogtying. *Id.* at *22-23.

*Iko v. Galley*, Civil No. DKC 2004-3731, 2007 U.S. Dist. LEXIS 106484 (D. Md. Sept. 17, 2007), another unpublished opinion, concerned the death of an inmate at the Western Correctional Institution ("WCI") in Cumberland, Maryland. *Iko,* 2007 U.S. Dist. LEXIS 106484 *3. The inmate died after multiple correctional officers forcibly removed (extracted) him from a prison cell. *Iko,* at *3. He was repeatedly pepper sprayed before being forcibly removed. *Id.* at *5-6. His arms were secured in metal handcuffs behind his back, his legs placed in shackles, and a spit mask placed over his head. *Id.* at 6. He was subsequently moved and placed on his stomach in a holding cell with the entire extraction team holding him down. *Id.* at *7-8. He remained in this position, with various degrees of pressure applied to his head, neck, shoulders, stomach, waist, and legs, for approximately ten minutes while flex-cuffs were located. *Id.* at *8-

9.  The extraction team replaced his metal handcuffs with flex-cuffs and exited the holding cell, leaving the inmate on his stomach, with his arms restrained behind his back and with the spit mask still in place. *Id.*  Well over an hour passed before it was determined that the inmate had died.  *Id*. at 10-11.  The medical examiner, Ana Rubio, M.D., found that the inmate had died of "Asphyxia (the asphyxia was caused by chemical irritation of the airways by pepper spray, facial mask placement, compressional and positional mechanisms). . . . Autopsy revealed blunt force injuries to his face, back of the neck, left anterior shoulder, upper and lower extremities. There was no evidence of lethal blunt force injuries and the brain revealed only an old contusion. The manner of death is Homicide. . . ."  *Id*. at *11.

In the subsequent excessive force lawsuit brought under § 1983 under the Eighth and Fourteenth Amendments, the district court denied qualified immunity at summary judgment as to the extreme use of pepper spray and as to the application of pressure to Shreve's head, neck, shoulders, stomach, waist, and legs for approximately ten minutes while he was wearing a spit mask and "while he was cuffed and compliant and lying prone on the floor." *Id.* at 36-38.  No further discussion is warranted.

The next more recent, albeit unpublished opinion is *Jones v. Chapman*, Civil No. ELH-14-2627, 2017 U.S. Dist. LEXIS 87907 (D. Md. June 7, 2017), a civil rights case that arose from the death of a man following a traffic stop.  The man had been repeatedly pepper sprayed and allegedly had been beaten with batons and fists, until he became unconscious and then died. *Jones,* U.S. Dist. LEXIS 87907 *19-23.   The officers presented a diametrically opposed version of the events although they did admit to using pepper spray during the occurrence.

Pamela E. Southall, M.D., an Assistant State Medical Examiner, performed the autopsy She opined that the cause of death was "Cardiac Arrhythmia due to Cardiac Conduction System

Abnormality complicated by Dehydration during Police Restraint." *Id*. at *25-26. Dr. Southall also wrote: "[A]bnormalities found in [the decedent's] heart and signs of dehydration are certainly causes for sudden cardiac death." *Id*. at *26. Another factor that may have contributed to his death was the extreme environmental temperature. "Temperatures on the day of his death ...were reportedly in the high 90s with a heat index in the low 100s (degrees Fahrenheit)." *Id.* at *26. She also said: "The cardiac conduction system abnormality is a predisposing factor for cardiac arrhythmia." The manner of death could not be determined. *Id.* at *26. Dr. Southall found no signs of asphyxia. *Id.* at *26, 96-97.

As to the use of force claims that lay at the heart of the case, the court focused on the evidence of repeated use of pepper spray, multiple baton strikes, including blows to the head, while the decedent was defenseless, and stomping him while on the ground. *Id*. at *67-72. No court could have found such an egregious use of force to be anything but objectively unreasonable. Thus, summary judgment was denied. *Id.* In addition, one of the key claims was also concerning: the fact that plaintiffs expert witness determined that the manner of death was homicide and that the cause of death was positional asphyxia as a result of the decedent being 'hog tied' and because an adult male sat on his back while he was restrained. *Id*. at 99-101. Again, in an egregious case, the issue of positional asphyxia was related to the hogtieing done by the officers.

*Estate of Saylor v. Regal Cinemas Inc., et al,* Civil No. WMN-13-3089, 2016 U.S. Dist. LEXIS 122008 (D. Md. Sept. 9, 2016), *aff'd sub nom. Estate of Saylor v. Rochford*, 698 Fed. Appx. 72 (4th Cir. 2017), is the last of the unpublished cases to mention positional asphyxia. In the case, a 26-year-old with Down syndrome became engaged in a struggle in a movie theater with several deputy sheriffs. *Saylor,* 2016 U.S. Dist. LEXIS 122008 *2. When they fell to the

ground, the man suffered a fractured larynx and died shortly thereafter of asphyxiation. *Id*.

While the court found at summary judgment that the specific injury to the man's neck was not

foreseeable (and that there was no evidence the deputies caused he fall), the possibility of

significant injury should have been evident under the circumstances. *Id*. at *30-31. The court

further found that the deputies were aware of the particular danger of positional asphyxia when

they restrained the man on his stomach and yet they restrained him in that manner, nevertheless.

*Id.* The court found that the deputies' brief restraint of Saylor after the fall was objectively

unreasonable. *Id*. at *31-32. The court pointed to the fact that the Fourth Circuit had noted,

under similar circumstances, that applying "just enough weight to immobilize an individual

continuing to struggle during handcuffing is not excessive force." *Id*. (quoting *Estate of Village*

*of Pinehurst*, 810 F.3d at 906 n.11.[13]

Based on this discussion, there was no clearly established law in this Circuit as of

September 2018 which would have placed the Officers' on notice that their restraint of Mr. Black

was unconstitutional.

## B.     State Law Claims

### 1.     *In Pari Materia*

Plaintiffs have alleged state constitutional claims under Articles 24 and 26 of the

Maryland Declaration of Rights that are parallel to their claims under § 1983. From the legal

---

[13] Note 11 reads as follows: "We have reviewed Appellant's additional theories of excessive force but
have determined that they lack merit. Those theories are based on Appellees' conduct while handcuffing
and shackling Armstrong. Applying "just enough weight" to immobilize an individual "continu[ing] to
struggle" during handcuffing is not excessive force. *Estate of Phillips v. City of Milwaukee*, 123 F.3d
586, 593 (7th Cir. 1997). Appellant concedes that Armstrong was resisting Appellees' efforts to restrain
him, that Appellees stopped applying force to Armstrong's back when their restraints were secure, and
that Armstrong was left in the prone position for a very short period of time after being restrained.
[Armstrong's sister], herself, even placed her foot on Armstrong's leg to assist Appellees' efforts to
immobilize Armstrong and apply restraints. In those circumstances, an officer at the scene could conclude
that the force used to hold Armstrong down and the length of time Armstrong was left on the ground were
objectively reasonable.

perspective, Articles 24 and 26 are interpreted *in pari materia* with their federal analogs. *See*, *e.g.*, *Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[]"); *Dent v. Montgomery County Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[]"); *Parker v. State*, 402 Md. 372, 400 (2007) (Article 26); *Patterson v. State*, 401 Md. 76, 113 (2007) (Article 26); and *Byndloss v. State*, 391 Md. 462, 465 n.1, (2006) (Article 26). In other words, Articles 24 and 26 have been interpreted to apply "in like manner and to the same extent" as the Fourth and Fourteenth Amendments, so that decisions of the Supreme Court on the Fourth and Fourteenth Amendments "are practically direct authorities." *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 704 (1981)). Therefore, the analysis under Articles 24 and 26 is, for all intents and purposes, duplicative of the analysis under the Fourth and Fourteenth Amendments. Here, as is stated above in footnote 1, this case is governed by the Fourth Amendment, not the Fourteenth. As such, under State law, it is governed by Article 26, not Article 24. That said, the failure of Plaintiffs' Fourth Amendment claims is determinative of the outcome of their claims under the Declaration of Rights.

### 2. The Non-Constitutional State Law Claims

In addition to their claims under the State Constitution, Plaintiffs advance numerous state statutory and common law claims against the Officers. It is the Officers' contention that these claims, including wrongful death, survival action, battery, intentional infliction of emotional distress, and civil conspiracy, are all either derived from and/or dependent on the success or failure of Plaintiffs' Fourth Amendment excessive force claim. For without success in that claim, there is no evidence of "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not

ensued." §3-901(e) of the Courts Article. And, as police officers, the Officers are public officials who enjoy common law immunity from suit for negligent acts performed during the course of their discretionary duties. *Houghton v. Forrest*, 412 Md. 578, 585 (2010). Thus, against the "neglect" and/or "default" aspect of this claim and the accompanying Survival action, the Officers assert the common law and statutory immunity defenses available to them under State law, codified at §5-507 of the Courts Article. The reason being that this record is devoid of either the actual malice and/or gross negligence that is necessary to overcome the immunity.

Malicious conduct is "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, or fraud." *Barbre v. Pope*, 402 Md. 157, 182 (2007). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id*. at 187 (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985)). There is neither malice nor gross negligence in this record.

Further, if the force used is not excessive, battery can only occur when there is no legal authority or justification for the arresting officer's actions. *See Ashton v. Brown*, 339 Md. 70, 119 (1995); and *Williams v. Prince George's County*, 112 Md. App. 526 (1996). That certainly was not the case here as Mr. Black's actions were committed in the presence of Officer Webster, who was then assisted by fellow officers who witnessed the same conduct. Certainly, "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citing *United States v. Watson*, 423 U.S. 411, 424 (1976); *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has

probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")

Just as he had probable cause to arrest or otherwise seize Mr. Black, Officer Webster had the ability to pursue him found in § 2-301 of the Criminal Procedure Article. Section 2-301 limits "fresh pursuits" to felonies committed in the officer's sworn jurisdiction and misdemeanors (including violations of the Maryland Vehicle Law) committed in the officer's presence in his or her sworn jurisdiction. A "fresh pursuit" is defined as one that is continuous and without unreasonable delay. The pursuit, however, need not be an instant pursuit. And, as to the assistance provided by Chief Manos and Officer Lannon, §2-102 of the Criminal Procedure Article authorizes county and municipal officers to enforce the laws of the State throughout the State in certain circumstances, including if the officer is rendering assistance to another police officer and/or acting at the request of a police officer.

Alternatively, and as Plaintiffs' seemingly concede in their pleading, Officer Webster, based on his observations, had every right to detain Mr. Black for a psychiatric evaluation. He certainly would have been acting act "in good faith and with reasonable grounds," and therefore entitled to the immunity created in State law. *See* § 10-629(b) of the Health General Article; § 5-624(c) of the Courts Article. Again, this is an acknowledgment that police officers are not doctors or mental health professionals and must simply make a judgment call based on their observations and other pertinent information gathered at the scene.

Finally, as to civil conspiracy and intentional infliction of emotional distress, there is no evidence of the former in this record and civil conspiracy is not recognized as a separate cause of action in Maryland and, therefore, is improperly alleged as a separate count. *See Woods v. Stewart Title Guar. Co*., Civ. No. CCB-06-0705, 2006 U.S. Dist. LEXIS 55767, 2006 WL

2135518, at *4 (D. Md. July 28, 2006); *see also Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc*., 340 Md. 176, 665 A.2d 1038, 1045 (1995) (noting that conspiracy has consistently been held as "not [being] a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff."). Courts have defined civil conspiracy as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276, 290 (2005); *Green v. Wash. Suburban Sanitary Comm'n*, 259 Md. 206, 269 (1970). Conspiracy operates as a way of "establishing vicarious liability for the underlying tort." *Hill v. Medlantic Health Care Grp*., 933 A.2d 314, 334 (D.C. 2007). Additionally, it can also provide a means to hold a "co-conspirator liable for the acts committed in furtherance of the conspiracy by another member." *Woods,* 2006 WL 2135518, at *4. Here, Plaintiffs have pled civil conspiracy as an independent count, separate from the claims of tortious liability and constitutional violations. Accordingly, dismissal of Plaintiffs 'civil conspiracy claim is proper. Further, the failure of the Fourth Amendment claims against the Officers, would necessarily be dispositive of any conspiracy theory advanced by Plaintiffs under a Fourteenth Amendment or Declaration of Rights theory. There simply is no evidence of any "unlawful act" on the part of the Officers.

Finally, the elements of the tort of intentional infliction of emotional distress ("IIED"), first recognized in Maryland in *Harris v. Jones*, 281 Md. 560, 566 (1977), are: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe. Maryland's appellate courts have explained that "[t]he tort

should be 'used sparingly and only for opprobrious behavior that includes truly outrageous conduct.'" *Mixter v. Farmer*, 215 Md. App. 536, 548 (2013) (quoting *Hines v. French*, 157 Md. App. 536, 558 (2004)). To meet the test of "outrageousness," the conduct "must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 160 (1986)(citing Restatement (Second) of Torts § 652B (1977)). *See Batson v. Shiflett*, 325 Md. 684, 733-734 (1992) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). There is none of that in this record.

## IV. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment must and should be granted.


_____/s/_____
Kevin Karpinski
Federal Bar No. 11849
120 East Baltimore Street / Suite 1850
Baltimore, Maryland 21202
kevin@bkcklaw.com
Office 410.727.5000
Facsimile 410.727.0861
Counsel for Defendant Daniel Webster, IV
In his Individual/Personal Capacity
(Signed with permission from Mr. Karpinski)

_____/s/_____
Jason L. Levine.
Federal Bar No. 16631
7225 Parkway Drive
Hanover, Maryland 21076
jlevine@lgit.org
Office 443.561.1710
Facsimile 443.561.1701
Co-Counsel for Defendant Gary Manos
In his Individual/Personal Capacity
(Signed with permission from Mr. Levine)


_____/s/_____
Patrick D. McKevitt
Federal Bar No. 30078
Whiteford Taylor & Preston, LLP
7 Saint Paul Street
Baltimore, MD 21202-1636
pmckevitt@wtplaw.com
Office  410.347.9447
Facsimile:  410.223.3498
Counsel for Defendant Dennis Lannon
In his Individual/Personal Capacity

_____/s/_____
John F. Breads, Jr.
Federal Bar No. 01343
7225 Parkway Drive
Hanover, Maryland 21076
jbreads@lgit.org
Office 443.561 1710
Facsimile 443.561.1701
Co-Counsel for Defendant Gary Manos
In his Individual/Personal Capacity

(Signed with permission from Mr. McKevitt)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of January 2021, a copy of the foregoing

Memorandum in Support of Defendants' Motion for Summary Judgment was filed electronically and

served electronically upon counsel of record.

_____/s/_____
John F. Breads, Jr.