**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**NORTHERN DIVISION**

| | | |
|---|---|---|
| JENNELL BLACK, et al. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-03644-CCB |
| | * | |
| THOMAS WEBSTER IV, et al. | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS THE TOWNS OF RIDGELY, CENTREVILLE, AND GREENSBORO, AND DENNIS LANNON, MICHAEL PETYO, AND JEANNETTE CLEVELAND'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT ................................... 3

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT .................................................................................................................... 10

I.    THE FIRST AMENDED COMPLAINT STATES FEDERAL LAW
    CLAIMS UPON WHICH RELIEF CAN BE GRANTED. .................................................. 11

    A.    A *Monell* Claim Lies Against the Towns for Their Customs and
       Practices That Were the Moving Force Behind Anton Black's
       Death. .................................................................................................................... 11

          1.    The First Amended Complaint Sufficiently Alleges That
              Plaintiff's Constitutional Deprivations Stemmed from a
              Failure to Train and Supervise. ................................................................ 12

          2.    The First Amended Complaint Sufficiently Alleges That
              Plaintiffs' Constitutional Deprivations Resulted from a
              Course of Action Taken by Official Policymakers. .................................... 17

    B.    Petyo and Cleveland Are Not Entitled to Qualified Immunity. ............................ 19

          1.    Moving Defendants Are Not Entitled to Qualified
              Immunity Because They Violated Anton Black's § 1983
              Fourth and Fourteenth Amendment Rights. ............................................. 20

          2.    It Was Clearly Established That Petyo and Cleveland's
              Deliberate Indifference to Webster's Pattern of Misconduct
              Was Unconstitutional. .............................................................................. 23

    C.    Plaintiffs Have Pled Title II ADA and Rehabilitation Act Claims
       Against the Towns ................................................................................................ 26

    D.    Plaintiffs State Viable Equal Protection Claims. .................................................. 37

II.   THE FIRST AMENDED COMPLAINT ASSERTS STATE LAW CLAIMS
    UPON WHICH RELIEF CAN BE GRANTED. .............................................................. 41

    A.    Moving Defendants Are Not Entitled To State Law Immunity. ............................ 41

    B.    Plaintiffs Have Pled an IIED Claim Under Maryland Law .................................. 44

    C.    Plaintiffs Have Pled a Viable Civil Conspiracy Claim. ....................................... 46

CONCLUSION ................................................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*,
639 A.2d 173 (Ct. Special App. Md. 1994)............................................................................46

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).........................................................10

*Att'y General v. Waldron*,
426 A.2d 929 (Md. Ct. App. 1981).........................................................................................38

*Avery v. Burke Cty.*,
660 F.2d 111 (4th Cir. 1981) ..................................................................................................20

*Bailey v. Kennedy*,
349 F.3d 731 (4th Cir. 2003) ..................................................................................................24

*Baird v. Shagdarsuren*,
No. 17-cv-2000, 2020 WL 208815 (N.D. Tex. Jan. 14, 2020)................................................44

*Bd. of Cnty. Commissioners of Bryan County, Oklahoma v. Brown*,
520 U.S. 397 (1997)................................................................................................................16

*Brown v. Mitchell*,
308 F. Supp. 2d 682 (E.D. Va. 2004) .....................................................................................31

*Burley v. Baltimore Police Dep't*,
422 F. Supp. 3d 986 (D. Md. 2019)........................................................................................22

*Camarillo v. Carrols Corp.*,
518 F.3d 153 (2d Cir. 2008)....................................................................................................27

*City of Canton v. Harris*,
489 U.S. 378 (1988)................................................................................................12, 15, 16

*City of Dist. Heights v. Denny*,
123 Md. App. 508 (Md. App. 1998)........................................................................................42

*Collins v. City of Harker Heights, Tex.*,
503 U.S. 115 (1992)................................................................................................................12

*Connick v. Thompson*,
563 U.S. 51 (2011)................................................................................................12, 15

*Cortez v. Prince George's Cty.*,
  31 F.App'x 123 (4th Cir. 2002) ............................................................................................15

*Crane v. Lifemark Hosps., Inc.*,
  898 F.3d 1130 (11th Cir. 2018) ............................................................................................34

*Daugherty v. Kessler*,
  264 Md. 281 (1972) ...............................................................................................................47

*Duvall v. Cty. of Kitsap*,
  260 F.3d 1124 (9th Cir. 2001) ..............................................................................................34

*Estate of Bryant v. Balt. Police Dep't*,
  No. 19-cv-384, 2020 WL 673571 (D. Md. Feb. 10, 2020)..........................................13, 14, 15

*Estate of Saylor v. Regal Cinemas, Inc.*,
  54 F. Supp. 3d 409 (D. Md. 2014).................................................................................. *passim*

*Gebser v. Lago Vista Independent School Dist.*,
  524 U.S. 274 (1998)...............................................................................................................26

*Gohier v. Enright*,
  186 F.3d 1216 (10th Cir. 1999) ............................................................................................27

*Gray v. Cummings*,
  917 F.3d 1 (1st Cir. 2019).....................................................................................................34

*Greenville Publ'g Co. v. Daily Reflector, Inc.*,
  496 F.2d 391 (4th Cir.1974) .................................................................................................48

*Haberle v. Troxell*,
  885 F.3d 170 (3d Cir. 2018).....................................................................................27, 31, 34

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982)...............................................................................................................19

*Harrison v. Edison Bros. Apparel Stores*,
  814 F. Supp. 457 (M.D.N.C. 1993) ......................................................................................45

*Harrison v. Prince William Cnty. Police Dep't*,
  640 F. Supp. 2d 688 (E.D. Va. 2009) ...................................................................................37

*Heyward v. Tyner*,
  No. 17-cv-01545, 2018 WL 1391434 (D.S.C. Mar. 20, 2018)................................................48

*Hoffman v. Stamper*,
  155 Md. App. 247 (2004), ...............................................................................................46, 47

iv

*Hope v. Pelzer*,
    536 U.S. 730 (2002)...............................................................................................................24

*Houghton v. Forrest*,
    412 Md. 578 (2010) ..............................................................................................................42

*Jackson v. Lightsey*,
    775 F.3d 170 (4th Cir. 2014) ...............................................................................................10

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 (1989)...............................................................................................................18

*Johnson v. Balt. Police Dep't*,
    No. 19-cv-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020) ........................................ *passim*

*Johnson v. Baltimore Police Dep't*,
    452 F. Supp. 3d 283 (D. Md. 2020).......................................................................................23

*Jones v. Jordan*,
    16-cv-2662, 2017 WL 4122795 (D. Md. Sept. 18, 2017)......................................14, 15, 20, 24

*Jordan by Jordan v. Jackson*,
    15 F.3d 333 (4th Cir. 1994) ..................................................................................................16

*Kissoon v. Pearson*,
    No. 3:12CV215, 2013 WL 5999550 (E.D. Va. Nov. 4, 2013) ...............................................10

*Koon ex. rel. Glay v. Prince George's Cty.*,
    No. 17-cv-2799, 2019 WL 1317401 (D. Md. Mar. 22, 2019), ..........................................42, 43

*Lasater v. Guttmann*,
    194 Md. App. 431 (2010) .....................................................................................................44

*Lee v. Queen Anne's Cty. Off. of Sheriff*,
    No. 13-cv-672, 2014 WL 476233 (D. Md. Feb. 5, 2014)..................................................25, 26

*Lewis v. Truitt*,
    960 F. Supp. 175 (S.D. Ind. 1997)........................................................................................32

*Lloyd v. Gen. Motors Corp.*,
    397 Md. 108 (2007) ..............................................................................................................46

*Madison v. Harford Cty.*,
    No. CV MJG-10-197, 2011 WL 13362482 (D. Md. May 3, 2011).........................................45

*Mesmer v. St. Mary's Cty.*,
    No. 10-cv-1053, 2010 WL 4791884 (D. Md. Nov. 18, 2010)................................................25

*Meyers v. Baltimore Cnty.*,
713 F.3d 723 (4th Cir. 2013) ............................................................................................24, 25

*Monell v. New York City Dept. of Soc. Services*,
436 U.S. 658 (1978)....................................................................................................... *passim*

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir.2001) .............................................................................................37, 38

*Murphy v. Edmonds*,
325 Md. 342 (1992) .................................................................................................................38

*N.C. State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ..................................................................................................41

*Neifert v. Dep't of Env't*,
395 Md 486 (Md. Ct. App. 2006) ............................................................................................38

*Owens v. Baltimore City State's Att'ys Off.*,
767 F.3d 379 (4th Cir. 2014) ..................................................................................................17

*Parker v. Gerrish*,
547 F.3d 1 (1st Cir. 2008)........................................................................................................24

*Pearson v. Callahan*,
555 U.S. 223 (2009).................................................................................................................19

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986).................................................................................................................18

*Peprah v. Williams*,
No. 18-cv-990, 2019 WL 224245 (D. Md. Jan. 15, 2019)................................................12, 15

*Pizza di Joey, LLC v. Mayor & City Council of Balt.*,
241 Md. App. 139 (2019) ........................................................................................................38

*Poole v. Cty.*,
No. 15-cv-00309, 2016 WL 4267792 (W.D.N.C. Aug. 11, 2016) ..........................................27

*Randall v. Prince George's Cnty., Md.*,
302 F.3d 188 (4th Cir. 2002) .............................................................................................22, 25

*Raub v. Bowen*,
960 F. Supp. 2d 602 (E.D. Va. 2013) ................................................................................19, 26

*Riddick v. Sch. Bd. of City of Portsmouth*,
238 F.3d 518 (4th Cir. 2000) ..................................................................................................18

*Robinson v. Am. Honda Motor Co.*,
   551 F.3d 218 (4th Cir. 2009) .................................................................................................10

*Robinson v. Prince George's Cty.*,
   No. 09-cv-181, 2011 WL 1743263 (D. Md. May 6, 2011), *aff'd*, 465 F.App'x
   238 (4th Cir. 2012)...................................................................................................................17

*Rosen v. Montgomery Cty. Maryland*,
   121 F.3d 154 (4th Cir. 1997) ...........................................................................................26, 30

*Rowland v. Perry*,
   41 F.3d 167 (4th Cir. 1994) .....................................................................................................24

*Schneider v. Hawkins*,
   179 Md. 21 (1940) ....................................................................................................................42

*Semple v. City of Moundsville*,
   195 F.3d 708 (4th Cir. 1999) ...................................................................................................17

*Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*,
   673 F.3d 333 (4th Cir. 2012) ...................................................................................................27

*Shaw v. Stroud*,
   13 F.3d 791 (4th Cir. 1994) ............................................................................................. *passim*

*Slakan v. Porter*,
   737 F.2d 368 (4th Cir. 1984) ...................................................................................................20

*Smith v. City of Fontana*,
   818 F.2d 1411 (9th Cir. 1987), *overruled on other grounds by Hodgers-
   Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).............................................13, 14, 15, 39

*Spell v. McDaniel*,
   824 F.2d 1380 (4th Cir. 1987) ...................................................................................12, 17, 18

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
   381 F.Supp.3d 536 (D. Md. 2019)...........................................................................................46

*Sylvia Dev. Corp. v. Calbert Cnty.*,
   48 F.3d 810 (4th Cir. 1995) .....................................................................................................38

*Tobey v. Jones*,
   706 F.3d 379 (4th Cir. 2013) ...................................................................................................20

*Ulloa v. Prince George's Cty.*,
   15-cv-0257, 2015 WL 7878956 (D. Md. Dec. 4, 2015) ..........................................................13

*Van Royen v. Lacey*,
  262 Md. 94 (1971) .................................................................................................................46

*Verzi v. Balt. Cty.*,
  333 Md. 411 (1994) ...............................................................................................................38

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977).................................................................................................................41

*Waller ex rel. Estate of Hunt v. Danville, VA*,
  556 F.3d 171 (4th Cir. 2009) .......................................................................................... *passim*

*Walters v. McMahen*,
  795 F. Supp. 2d 350 (D. Md. 2011), *aff'd*, 684 F.3d 435 (4th Cir. 2012) ...............................48

*Wellington v. Daniels*,
  717 F.2d 932 (4th Cir. 1983) ..................................................................................................18

*White v. City of Annapolis*,
  439 F. Supp. 3d 522 (D. Md. 2020)...................................................................................40, 41

*Wicomico Nursing Home v. Padilla*,
  910 F.3d 739 (4th Cir. 2018) ..................................................................................................37

*Wilkins v. Montgomery*,
  751 F.3d 214 (4th Cir. 2014) ..................................................................................................22

*Williams v. Cloverland Farms Dairy, Inc.*,
  78 F. Supp. 2d 479 (D. Md. 1999)...........................................................................................45

*Windesheim v. Larocca*,
  443 Md. 312 (2015) ...............................................................................................................47

*Wllingham v. Crooke*,
  412 F.3d 553 (4th Cir. 2005) ..................................................................................................19

*Wuenschel v. Kristoff*,
  No. 17-cv-1446, 2017 WL 3414040 (D. Md. Aug. 9, 2017)...................................................10

*Yates v. Terry*,
  817 F.3d 877 (4th Cir. 2016) .....................................................................................23, 24, 25

## Statutes

42 U.S.C. § 1983.................................................................................................................. *passim*

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq* ..........................................27

Maryland Code Annotated, Courts & Judicial Proceedings § 5-507(a)(1).....................................42

Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*.......................................................................9

**Other Authorities**

Fourth, Eighth and Fourteenth Amendments to the United States Constitution........................8, 31

Maryland Declaration of Rights Articles 19, 24, 26, and 40 .............................9, 37, 38, 41, 47, 49

Federal Rule of Civil Procedure 12 ........................................................................................14, 20

# INTRODUCTION

On September 15, 2018, officers from three different police departments—Defendants Thomas Webster IV ("Webster"), Gary Manos ("Manos"), and Dennis Lannon ("Lannon")—killed Anton Black (the "Incident"). But they are not the only culpable parties. Defendants Michael Petyo ("Petyo") and Jeannette Cleveland ("Cleveland"), along with the Towns of Greensboro, Ridgely, and Centreville (the "Towns") (together with Lannon referred to as "Moving Defendants"), were moving forces behind Anton's death. Petyo and Cleveland, as Greensboro Police Chief and Town Manager, respectively, hired Webster, falsified his certification application, and concealed his history of racial basis and violence against Black persons, which includes 29 prior excessive use of force incidents. The Towns failed to adequately screen, train, supervise, and discipline their officers, including, but not limited to, failing to adequately train officers on constitutional uses of force, the duty to intervene, and appropriate responses to persons experiencing mental health crises. Each entity played a part in Anton's death.

Plaintiffs Jennell Black, Antone Black, Katyra Boyce, and the Coalition for Justice for Anton Black (collectively "Plaintiffs") sued to hold Defendants liable for their respective acts and omissions. Moving Defendants now seek to partially dismiss certain claims asserted in Plaintiffs' First Amended Complaint ("FAC"), including: (1) municipal liability claims against the Towns (Count 3); (2) all claims against Petyo and Cleveland based on qualified immunity (Counts 1, 2, 3, 8, 9, 12, 13, and 14); (3) ADA and Rehabilitation Act claims against the Towns (Counts 10 and 11); (4) Equal Protection claims against the Town of Greensboro and Petyo (Count 14); all state law claims against Petyo and Cleveland based on governmental immunity (Counts 1, 2, 3, and 8); intentional infliction of emotional distress claim against the Towns,

Petyo, and Cleveland (Count 12); and civil conspiracy against all Moving Defendants (Count 13).

But Moving Defendants motion rests on inapplicable law and misstated facts. At the outset, Moving Defendants seek to dismiss the municipal liability claims asserted against the Towns. Yet they largely ignore the FAC's allegations about the Towns' deliberate indifference to the need for more training. These charges plausibly describe: (1) the nature of the Towns' training deficiencies; (2) that the Towns were deliberately indifferent to the need for more training; and (3) that Anton's death resulted from this lack of training. And the Moving Defendants overlook the FAC's allegations that Petyo and Manos pursued unconstitutional actions as officials with final policymaking authority as an alternative basis for municipal liability against the Towns of Greensboro and Ridgley, respectively. To plausibly allege a municipal liability claim, no more is required.

Similarly, Moving Defendants cite the wrong law in seeking to invoke qualified immunity to shield Petyo and Cleveland's misconduct. Plaintiffs have sued Petyo and Cleveland in their individual capacity based on supervisory liability, which is distinct from a "*Monell*" theory of liability. Yet Moving Defendants cite and apply "*Monell*" caselaw and overlook supervisory liability. But as discussed below, the FAC adequately alleges supervisory liability against Petyo and Cleveland by claiming that their actions, which include concealing Webster's history of misconduct, permitted Webster's constitutional abuses to continue unchecked, and proximately caused Anton's death.

Likewise, Moving Defendants' ADA and Rehabilitation Act arguments ignore multiple allegations about the officers' knowledge of Anton's mental state during the events of September 15, 2018. These allegations, several of which Defendants admit to in their motion for summary

2

judgment, make clear that the officers understood they were interacting with a person suffering from a mental health crisis who required medical attention. And in arguing that Plaintiffs have failed to plead Fourteenth Amendment and Maryland Declaration of Rights violations, Moving Defendants disregard several allegations that make the requisite showing—Defendants discriminated against Anton because he was Black.

Moving Defendants' arguments to dismiss Plaintiffs' state law claims fare no better. Contrary to Moving Defendants' assertions, Petyo and Cleveland are not immune from Plaintiffs' state law claims because the FAC plausibly alleges that the intentional nature of their acts constitutes malice and ill will. Moving Defendants also flout the extreme and outrageous conduct that buttress Plaintiffs' intentional infliction of emotional distress claim and overlook the facts surrounding the cover up that sparks Plaintiffs' civil conspiracy cause of action.

For these reasons, as discussed below, this Court should deny Moving Defendants' motion to dismiss.

## FACTUAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

On September 15, 2018, officers from three different police departments—Webster, Manos, and Lannon—killed Anton Black. A 19-year-old college student at Wesley College in Dover, Delaware, Anton had his whole life ahead of him. He was a former champion athlete at North Caroline High School, an aspiring model and actor, and an expectant father. FAC ¶68. As discussed below, Anton's death is the inevitable result of several actions spearheaded by the Towns, Petyo, Cleveland, and Lannon.

A few months before the Incident, Defendants Michael Petyo, Jeannette Cleveland, and Town of Greensboro hired Thomas Webster IV to join the Greensboro Police Department, pending certification and training by the State of Maryland. FAC ¶25. Previously, Webster had been with the Dover, Delaware police department where he had a long and well-documented

history of using excessive force against Black people, causing serious injuries. FAC ¶39. Webster's pattern of misconduct gained national attention in 2015 when he was criminally charged with second-degree assault against a Black man, Lateef Dickerson. FAC ¶¶29–30. Police video showed Webster approaching Mr. Dickerson, who was unarmed, and whose hands were raised, with his gun drawn, yelling at him to get on the ground. *Id.* As Mr. Dickerson began to comply, while still on his hands and knees, Webster kicked him in the face, shattering his jaw and knocking him unconscious. *Id.* This assault was the latest of *29* documented use of force incidents and likely the incident that led to Webster's forced departure from the Dover police. FAC ¶39.

Indeed, the Dover police had begun recording issues with Webster as early as 2006, when Webster punched a Black man in the face several times following a car chase. FAC ¶31. In 2010, Webster punched another Black man in the face during a drunk-driving arrest with such force that it shattered the man's nose and bruised Officer Webster's knuckles. FAC ¶34. That same year, Webster punched yet another Black man four times in the face after discharging a TASER device. FAC ¶35. Three year later, he stranded two men five miles from where he took them into his custody. FAC ¶37. All these instances were documented, along with performance evaluations that noted "[t]here have been times when he should have [attempted] lesser degrees of force to accomplish an objective" and that "[Officer] Webster has made some poor decisions and he obviously does not think of the consequences of his actions." FAC ¶¶31, 36.

Disciplinary actions failed to cure Webster's pattern of violence. Indeed, Webster was on disciplinary probation when he smashed Mr. Dickerson's jaw. FAC ¶38. In 2015, the City of Dover settled a lawsuit for $300,000 filed by the American Civil Liberties Union on behalf of Mr. Dickerson. FAC ¶41. The next year, the City reached a severance settlement with Webster,

paying him $230,000 in exchange for his resignation and agreement never to seek further employment with the City of Dover. *Id.* Webster's toxic combination of generating national media attention, litigation and documented misconduct created a striking record of abuse against Black victims that was evident upon even the most cursory review. *See*, *e.g.*, FAC ¶¶42–43. Yet, despite knowing this history, the Town of Greensboro hired Webster.

Greensboro officials downplayed and concealed the extent of Webster's past performance issues and excessive force not only to residents, but also to the State of Maryland's Police Training and Standards Commission (PTSC), when the Greensboro sought to have Webster certified. FAC ¶¶26–27, 46. In submitting Greensboro's application for Webster's certification to PTSC, Petyo, acting as the Town's Chief, and Cleveland, as Town Manager and Petyo's supervisor, falsified the certification application by disclosing only information about the 2015 trial and criminal acquittal, while intentionally withholding all other information in their possession, specifically omitting Webster's numerous infractions, disciplinary measures, and excessive force reports. *Id.* These omissions by Petyo and Cleveland constituted criminal misconduct under Maryland law, for which Petyo was later prosecuted and criminally convicted. FAC ¶207.

On July 28, 2018, a short time after Petyo and Cleveland sent out Webster on his own, Webster and another police officer Tased and beat C. L., a mixed race, 15-year-old experiencing a mental health issue. FAC ¶66. Body-worn camera ("BWC") footage shows the child, C. L., did not warrant being Tased and repeatedly struck, punched and kicked in the head by Webster. *Id.*. There is no evidence that Petyo, Cleveland, nor the Town of Greensboro took any action to investigate or discipline Webster's abuse of his Taser or beating of C.L. *Id.* Rather, Webster

continued on the job with no consequences and there was no effort to train him in the policies of the Greensboro Police Handbook. *Id.*

The Town of Greensboro was not alone in this regard: The Towns of Ridgely and Centerville failed to implement adequate training, practices, and procedures for Lannon and Manos, too. *See*, *e.g.*, FAC ¶205. Manos, as Chief of Ridgley's police department also bears direct responsibility for this failure. As an example of Ridgley and Centreville's failures, Maryland State Law requires in-service police training every two years for use of force training, which is to include "special training, attention to, and study of the application of antidiscrimination and use of force de-escalation training." *Id.* ¶206. The Maryland Police Training and Standards Commission (MPTSC) has further determined that "antidiscrimination or anti-bias training . . . should be a part of use of force training to comply with [Maryland Law]." *Id.* Yet the Towns of Ridgley and Centreville failed to establish adequate practices and procedures and/or implement biannual training for in-service police officers on these topics. *Id.* For Anton Black, these failures proved catastrophic.

On September 15, 2018, Webster, Lannon, and Manos would violently escalate an encounter with Anton, a Black teenager displaying symptoms of his bipolar disorder, this time with deadly results. On the day that Anton was killed, he had been acting strangely while walking around town with a younger family friend after a game of basketball. FAC ¶¶74–77. When a passerby asked that family friend if he wanted her to call the police, he answered yes, and the woman did so. FAC ¶¶78–79. Defendant Webster responded to that call and turned on his body-worn camera ("BWC"). FAC ¶81. Webster immediately instructed Anton to put his hands behind his back. FAC ¶85. In response, Anton looked at him, said, "I love you, I love you," then slowly turned and jogged away. FAC ¶85.

Officer Webster then (1) enlisted the help of a civilian wearing a Confederate flag on his motorcycle helmet; (2) got into his cruiser to pursue Anton, and (3) called into dispatch to say that Anton was "schizophrenic," repeating a statement that Anton's friend had made. FAC ¶¶86–88. Anton then encountered Defendant Lannon, who works for the Centreville Police Department but was not on duty and not in uniform. FAC ¶89. Frightened, Anton turned and jogged back toward Webster, and toward his mother's home. *Id.* Anton ran into the mobile home community where his mother lived, pursued by four white men: one officer in uniform (Defendant Webster), two others not in uniform (Defendants Lannon and Manos), and one civilian. FAC ¶¶95–100. Anton jumped into a family car with a flat tire in the driveway and he locked the doors but did not try to start the car. FAC ¶98.

Just after Webster's arrival, Webster went to the driver's side of the car where Anton was sitting in the driver's seat, drew his baton, and smashed the window next to Anton's head without warning. FAC ¶113. Anton moved to the other side of the vehicle to avoid the baton and breaking glass, and Webster next immediately Tased him. FAC ¶¶116–17. As Anton tried to exit the car to escape Webster's Taser that was deployed without warning, he ran right into Manos. FAC ¶¶121, 127. Webster, Lannon, and Manos then pinned Anton against the wall of his mother's home. FAC ¶128. The officers forced Anton into a prone position, so that his face, chest, and stomach were pressed to the ground. FAC ¶132.

Throughout the encounter, the men repeatedly made statements that Anton was not seen as someone who committed a crime, but as a person experiencing a mental health crisis. FAC ¶¶129, 138–39, 146. But for the next six minutes, Anton was forcibly pinned face down with his knees bent back like he was being hog-tied. FAC ¶¶132, 134, 135, 141, 144, 148. From her front door, Anton's mother listened as her son pleaded for her, and then watched as the life drained

from his face: the officers finally propped Anton up after six minutes, but he was no longer responsive and had not spoken for minutes. FAC ¶¶133, 141, 152. He began to turn dark, and the officers' delayed attempts to resuscitate him, at the behest of his mother, failed. FAC ¶¶152, 154. He was pronounced dead shortly after being taken to the hospital. FAC ¶¶157. The evidence and experts show that the cause of Anton's death was homicide by asphyxiation. FAC ¶157.

Anton's death marked the beginning of Defendants' efforts to cover up their wrongdoing— both their wrongdoing in hiring Webster in the first place and in taking the life of a young Black man experiencing a mental health crisis. They claimed he had smoked "spice," FAC ¶158; that he exhibited superhuman strength, *id.*; that he was dangerous or guilty of some crime, FAC ¶159; that his death was anything but their fault. And they conspired with the medical examiner's office to agree. The concocted autopsy notes that "myocardial tunneling" caused Anton's death and lists his bipolar disorder as a contributing cause, without mention of the excessive force applied to his upper body that compromised his ability to breathe and killed him. FAC ¶¶173–75.

To seek redress, Plaintiffs sued Defendants Webster, Petyo, Manos, Lannon, Cleveland, and the Towns, as well as medical examiners Russell Alexander, Victor W. Weedn, and David Fowler and the State of Maryland, Office of the Medical Examiner. FAC, [ECF No. 38]. The FAC seeks to hold one or more of the Moving Defendants liable for: (1) Wrongful Death (Count 1, all Moving Defendants); (2) Survival Action (Count 2, all Moving Defendants); Excessive Force under the Fourth and Fourteenth Amendments (Count 3, all Moving Defendants); Excessive Force under Article 24 of the Maryland Declaration of Rights (Count 5, Lannon and the Towns); Excessive Force and Deprivation of Liberty under Article 26 of the Maryland Declaration of Rights (Count 6, Lannon and the Towns); Battery (Count 7, Lannon and the

Towns); Grossly Negligent Hiring, Retention, Training, Certification, and Supervision (Counts 8—Petyo, Cleveland, and the Town of Greensboro—and 9—the Towns of Ridgely and Centreville); Violations of ADA Title II (Count 10, the Towns) and Section 504 of the Rehabilitation Act (Count 11, the Towns); Intentional Infliction of Emotional Distress (Count 12, Lannon, Petyo, and the Towns); Civil Conspiracy (Count 13, all Moving Defendants); and Violations of Equal Protection under the Fourteenth Amendment and the Maryland Declaration of Rights (Count 14, Petyo, Cleveland, and the Town of Greensboro).

Defendants Lannon, Petyo, Cleveland, and the Towns now move to partially dismiss Plaintiffs' First Amended Complaint. (ECF No. 46.) Moving Defendants make no argument for (1) the dismissal of any of the claims against Defendant Lannon, (2) the dismissal of Counts 5 and 6 for excessive force under Maryland law, or (3) the dismissal of Count 7 for battery. They also do not contest the adequacy of Plaintiffs' claims for wrongful death (Count 1); survival action (Count 2); excessive force against Lannon, Petyo, and Cleveland (Count 3); or grossly negligent hiring, retention, training, certification, and supervision (Counts 8 and 9) on any other ground than qualified or state immunity. They move to dismiss (1) all claims against Petyo and Cleveland based on qualified immunity (Counts 1, 2, 3, 8, 9, 12, 13, and 14); (2) the municipal liability claims against the Towns (Count 3); (3) the ADA and Rehabilitation Act claims against the Towns (Counts 10 and 11); (4) the Equal Protection claims against the Town of Greensboro and Petyo (Count 14); the state law claims against Petyo and Cleveland based on governmental immunity (Counts 1, 2, 3, and 8); the intentional infliction of emotional distress claim against the Towns, Petyo, and Cleveland (Count 12); and the civil conspiracy claim against all Moving Defendants (Count 13).

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must present factual allegations that 'state a claim to relief that is plausible on its face.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "Facial plausibility exists 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wuenschel v. Kristoff*, No. CV JKB-17-1446, 2017 WL 3414040, at *1 (D. Md. Aug. 9, 2017). In evaluating a motion to dismiss, courts must construe the complaint's factual allegations in the non-moving party's favor and accept them as true. *See Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009).

## ARGUMENT

At the outset, although Moving Defendants purportedly seek dismissal on behalf of Lannon, any arguments made on his behalf are nonexistent. Indeed, outside two references in introductory sentences, Lannon goes unmentioned for all of Moving Defendants' motion. As a result, Defendants do not effectively move for dismissal on any claims against Lannon. Thus, the claims against Lannon should survive. Next, Moving Defendants provide no basis, outside a cursory mention in a footnote, for dismissing Counts 5 or 6 against the Towns. As a result, Counts 5 and 6 should similarly endure.[1] Plaintiffs address Moving Defendants arguments to dismiss the FAC's federal and state law claims in turn.

---

[1] In summary fashion, Moving Defendants invoke *Prince George's Cty. v. Longtin*, in arguing that if the Court finds that Plaintiffs have failed to plead a sufficient *Monell* claim, then Counts 5 and/or 6 should similarly fail. 419 Md. 450 (2011). But as described below, Plaintiffs plausibly allege *Monell* claims against the Towns, and Moving Defendants argument is inapplicable.

I.     **The First Amended Complaint States Federal Law Claims Upon Which Relief Can Be Granted.**

   A.     **A *Monell* Claim Lies Against the Towns for Their Customs and Practices That Were the Moving Force Behind Anton Black's Death.**

Count 3 of the FAC asserts a municipal liability claim against the Towns.[2]   Moving Defendants erroneously contend that this claim should be dismissed because the FAC:  (1) does not pinpoint a specific unconstitutional official policy; (2) fails to sufficiently identify the Towns' purportedly deficient training practices; and (3) inappropriately relies on a "series of distant, 'non-events'" in alleging a policy or custom of constitutional violations.  Mot. 9-16  These arguments mischaracterize the legal claims and theories asserted by Plaintiffs and badly miss the mark.  As discussed below, the FAC alleges that Anton's death was directly caused by: (1) the Towns' policies and customs of failing to adequately train and supervise their officers in, among other things, use of force, the duty to intervene, and seizing persons undergoing a mental health crisis; and (2) the direct actions of the Towns' officials with final policymaking authority on behalf of the municipalities.  *See* FAC ¶¶234-39, 270-72, 275-76, 279-83, 292-96, 307.

Section 1983 provides a remedy against "any person" who, under color of state law, deprives another of rights protected by the Constitution.  42 U.S.C. § 1983.  The term "person" includes municipalities and local governments.  *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 690 (1978).  To establish a claim against a municipality, a plaintiff must show two elements: (1) that a constitutional violation caused the alleged harm; and (2) that the municipality is responsible for that violation.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).

---

[2] Count 3 is asserted against the Towns and the individual municipal officer Defendants (Webster, Petyo, Cleveland) (collectively, the "Greensboro Defendants"), Manos, and Lannon.

A municipality may be responsible for a constitutional violation if it subscribes to a custom, policy, or practice that is the "moving force behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987). Municipal liability can be established in several ways, including: (1) the decisions of government's lawmakers; (2) the failure to train certain employees about their legal duty to avoid constitutional rights violations; (3) acts of policymaking officials; and (4) certain practices so persistent and widespread as to practically have the force of law. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Plaintiffs have alleged facts that the Towns are liable under several of these theories.

### 1. *The First Amended Complaint Sufficiently Alleges That Plaintiff's Constitutional Deprivations Stemmed from a Failure to Train and Supervise.*

The FAC sufficiently alleges that the Towns' failures to train and supervise their officers was the moving force behind Anton's death. *See* FAC ¶¶234-39, 270-72, 275-76, 279-83, 292-96, 307. When a municipality fails to train its employees in deliberate indifference to the constitutional rights it is charged to uphold, that neglect is enough to establish a *Monell* claim under Section 1983. *See City of Canton v. Harris*, 489 U.S. 378 (1988). To state a claim for failure to train, a plaintiff must plead facts "revealing: (1) the nature of the training; (2) that the training was a 'deliberate or conscious' choice by the municipality; and (3) that the officer's conduct resulted from said training." *Peprah v. Williams*, No. 18-cv-990, 2019 WL 224245, at *6 (D. Md. Jan. 15, 2019).

At the motion to dismiss stage, "courts should not expect [a] plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers." *Johnson v. Balt. Police Dep't*, No. 19-cv-00698, 2020 WL 1169739, at *34 (D. Md. Mar. 10, 2020). Indeed, a plaintiff will often lack "specific details regarding the municipal actor's internal policies and training procedures before discovery." *Id.* (citing *Ulloa v. Prince George's Cty.*,

15-cv-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015)).  Thus, to plead a viable failure to train claim, a plaintiff need only point to specific training deficiencies rather than detailing the exact contours of municipal training practices.  *See id.*

As such, allegations that identify a deficiency but not the contents of a specific training program are enough to survive a motion to dismiss.  In *Smith v. City of Greensboro*, plaintiffs alleged certain deficiencies in Greensboro's training about restraints on seized persons.  19-cv-386, 2020 WL 1452114, at *11 (M.D.N.C. Mar. 25, 2020).  For example, the *Smith* plaintiffs alleged that the municipality failed to train its officers "in the dangers of use of hogtie restraint devices, especially for people . . . whose physical and mental state make them particularly vulnerable to the lethal effects of hogtie restraint devices."  *Id.*  As a result, the court held that the allegations sufficiently described the deficient "nature of the training."  *Id.*

Similarly, in *Johnson*, plaintiff identified as a training deficiency Baltimore's failure to train officers on the obligation to disclose exculpatory information as required by *Brady v. Maryland*.  19-cv-00698, 2020 WL 1169739, at *33 (D. Md. Mar. 10, 2020).  To show this training defect, plaintiff highlighted other wrongful convictions based on suppressed exculpatory evidence.  *Id.* The court held that the complaint provided "fair notice" of the nature of the training deficiency alleged and therefore denied the motion to dismiss.  *Id.*; *see also Estate of Bryant v. Balt. Police Dep't*, No. 19-cv-384, 2020 WL 673571, at *39 (D. Md. Feb. 10, 2020) (finding that specific allegations on the BPD's failure to train officers on disclosing evidence plausibly alleged *Monell* liability).

Likewise, in *Booker v. City of Lynchburg*, plaintiffs adequately pled deficiencies in training by listing deficient training areas, and asserting the municipality lacked excessive force training.  20-cv-11, 2020 WL 8513807, at *6 (W.D. Va. Nov. 12, 2020), *report and*

*recommendation adopted*, No. 6:20-cv-00011, 2021 WL 519905 (W.D. Va. Feb. 11, 2021). To explain these training deficiencies, plaintiff identified similar past instances of civil rights violations. *Id.* As a result, the court held that allegations adequately set forth the deficiencies. *Id.*

As in *Johnson*, *Smith*, *Booker,* and *Bryant*, it is unsurprising that failure to train allegations comparable to those made here routinely survive Rule 12 motions. *See also Jones v. Jordan*, 16-cv-2662, 2017 WL 4122795, at *9 (D. Md. Sept. 18, 2017). In *Jones*, the plaintiff alleged the municipality 'relies on deficient training on a broad array of substantive policing functions' and 'numerous important topics,' specifically pointing to lack of 'proper[ ] train[ing]' on 'use of force,' 'de-escalation,' 'stops, searches, and arrests,' and 'how to supervise and investigate misconduct.'" *Id.* at *6 (alterations in original). In each of these cases, because the plaintiff had "identified 'specific deficiencies' in the training," the plaintiff had sufficiently "stated the nature of the training for his failure to train claim." *Id.* at *7 (alterations in original) (citation omitted).

Here, contrary to the Moving Defendants' argument, ECF No. 46-1 at 10, the FAC specifically alleges the nature of the Towns' failures to train their officers: the failure to adequately train officers on "constitutional uses of force, the application of antidiscrimination practices, de-escalation techniques, the duty to intervene when another officer is using excessive force, and appropriate response to persons experiencing mental health crises." FAC ¶205. As for mental health crises, the FAC asserts that no such education or training was ever developed by the Town of Greensboro. *See* FAC ¶¶105–06. Nor did the Towns provide de-escalation training to Webster, Manos, or Lannon according to the FAC. *See id.* ¶¶110–111. The FAC also alleges that the Towns of Ridgley and Centreville "failed to establish adequate practices and

procedures and/or implement biannual training for in-service police officers on anti-discrimination, implicit or overt bias, or use of force de-escalation techniques." *Id.* ¶¶204–207.

And just as in *Johnson*, *Smith*, *Booker, Bryant, and Jones*, the allegations here provide Moving Defendants with sufficient notice of the nature of the alleged training deficiencies. Given the severity of the constitutional violations, including, but not limited to: encouragement of an untrained bystander to join in police pursuit of Anton, unnecessary use of a police baton to shatter a glass window by Anton's head, shooting Anton with a Taser without warning or provocation, and having three officers from the Towns, along with their improperly enlisted civilian assistant, pin Anton to the ground in a prone position for six minutes until he died—the need for more training is objectively obvious. *City of Canton*, 489 U.S. at 390. At this stage, to plausibly allege the nature of training deficiencies, no more is required. *See*, *e.g.*, *Cortez v. Prince George's Cty.*, 31 F.App'x 123, 129 (4th Cir. 2002) (failure to train claim was sufficiently pled when defendant "fail[ed] to train correctional officials to provide inmates who exhibit obvious symptomatology of suicidal risk . . . with adequate medical and mental health screening"); *Jones*, 2017 WL 4122795, at *6–7; *Peprah*, 2019 WL 224245, at *6.

Plaintiffs also plausibly allege that the Towns were deliberately indifferent to the constitutional violations arising from their training deficiencies. When policymakers are on actual or constructive notice that a particular omission in their training program may cause constitutional rights violations, the municipality may be found deliberately indifferent. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Two non-exclusive methods satisfy the requisite "level of fault" for failure-to-train liability. First, the need for training "can be said to be 'so obvious' that a failure to [train] could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 489 U.S. at 390 n.10. Police officers have such an "obvious"

15

need for certain skills, such as the use of force to detain an individual, that a municipality's failure to provide such training constitutes "deliberate indifference." *Id.* Alternatively, the frequency of constitutional violations may also make the need for training "plainly obvious" to municipal decision-makers. *Id.* Thus, if the failure to train is obvious, plaintiff need not prove a pattern. *Bd. of Cnty. Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 409 (1997); *see also Jordan by Jordan v. Jackson,* 15 F.3d 333, 341 (4th Cir. 1994).

Here, the FAC sufficiently details the Towns' deliberate indifference. As Plaintiffs allege, "[u]sing force to effectuate an arrest, and seizing non-criminal persons undergoing a mental health crisis are usual and recurring situations with which law enforcement officers and other agents encounter on a regular basis." FAC ¶235. Underscoring the recurring nature of these situations, weeks before the death of Anton, the FAC recounts that Webster Tased and brutally beat another mixed-race teenager experiencing a mental health crisis. *See* FAC ¶66. The child did nothing "to warrant being Tased and repeatedly beaten, punched and kicked in the head" during his mental health crisis. *Id.* Yet no investigation was conducted, no discipline was imposed, and no remedial training occurred. *Id.*

It should have been obvious to the Towns that the failure to train would lead to constitutional violations. *Canton*, 489 U.S. at 390 n.10; FAC ¶237. But, as Plaintiffs allege, the Towns deliberately failed to provide sufficient training to address these usual and recurring situations. *See* FAC ¶236. Thus, the FAC plausibly asserts that the Towns exhibited deliberate indifference to their training deficiencies. *See Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 404 (4th Cir. 2014).

Finally, the FAC alleges that the Towns failed to properly train officers on, among other things, the use of force, the duty to intervene, and appropriate responses to persons experiencing

mental health crises. FAC ¶205. These deficiencies in training practices existed at the time of the incident and caused Plaintiffs' constitutional injuries. *See Robinson*, 2011 WL 1743263, at \*5. And the FAC directly asserts that the training deficiencies were not just "likely," but were the "direct and proximate cause" of Defendants' constitutional violations ultimately causing Anton Black's death. FAC ¶¶157, 272, 276.

These allegations are sufficient, before discovery, to establish custom, policy, or practice was "the moving force behind the specific constitutional violation." *Robinson v. Prince George's Cty.*, No. 09-cv-181, 2011 WL 1743263, at \*5 (D. Md. May 6, 2011), *aff'd*, 465 F.App'x 238 (4th Cir. 2012) (internal citations omitted). The requisite moving force is present because there is a "close fit" between the training deficiencies—the Towns' failures to train and supervise their officers about the use of force in detaining someone experiencing a mental health crisis —and Defendants' excessive use of force resulting in Decedent's death. *See Spell*, 824 F.2d at 1388 (internal citation omitted). Thus, the FAC's municipal liability claims against the Towns based on their failures to train should survive Moving Defendants' Motion to Dismiss.

### 2. *The First Amended Complaint Sufficiently Alleges That Plaintiffs' Constitutional Deprivations Resulted from a Course of Action Taken by Official Policymakers.*

Plaintiffs also allege municipal liability based on the decisions taken by Chief Peyto, Ms. Cleveland, and Chief Manos as official policymakers for the Towns of Greensboro and Ridgley, respectively. Municipalities may be held liable for actions of a policymaker in "response to particular circumstances" that result in a constitutional deprivation. *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999). A municipality may be liable for a single decision or violation when the policymaker acts with "authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986); *see also Spell*, 824 F.2d at 1387 (a policy is fairly attributed to a municipality when "it is

directly made by . . . [an] official having final authority to establish and implement the relevant policy") (internal citations omitted).

A "final policymaker" has "the responsibility and authority to implement final municipal policy with respect to a particular course of action." *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). The determination of who is a final policymaker is a question of state law "to be resolved by the trial judge before the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). In this analysis, courts generally look to "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Id.* (internal citations omitted). When police chiefs are "responsible for the choice and implementation of police department practices and procedures, [their] acts and omissions reflect government policy," they will be considered official policymakers for purposes of Section 1983 liability. *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983); *see also Johnson*, 2005 WL 1793778, at *4 (the Chief of Police for the City of Richmond was a policymaker).

Here, the FAC alleges that Manos and Petyo were the Chiefs of Police departments of the Towns of Ridgley and Greensboro and, in that capacity, were official policymakers on the date of the incident. Both Manos and Petyo were responsible "for establishing practices and procedures" for their respective police departments. FAC ¶11. Moreover, Manos and Petyo were responsible for the constitutional deprivations during the incident—Manos directly participated in the incident, and Petyo established Greensboro's policies and intentionally hired Webster despite his long record of deployment of excessive force against Black civilians. *Id.* ¶¶11, 40, 49–50. Thus, the FAC adequately asserts that Manos and Petyo, as Chiefs of the Ridgley and Greensboro Police Departments, respectively, were official policymakers over the

operations and conduct of the Ridgley and Greensboro police, thereby implicating the Towns of Ridgley and Greensboro themselves in authorizing and carrying out the unlawful conduct. For these reasons, the FAC alternately asserts municipal liability claims against the Towns of Ridgley and Greensboro.[3]

### B. Petyo and Cleveland Are Not Entitled to Qualified Immunity.

Moving Defendants' argument that Counts 1, 2, 3, 8, 9, 12, 13, and 14 should be dismissed against Peyto and Cleveland based on qualified immunity lacks merit.[4] The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). In the Fourth Circuit (and elsewhere), courts rarely grant motions for qualified immunity before discovery. *See, e.g.*, *Raub v. Bowen*, 960 F. Supp. 2d 602, 613 (E.D. Va. 2013); *see also Wllingham v. Crooke*, 412 F.3d 553 (4th Cir. 2005).

When qualified immunity is invoked on a motion to dismiss, a court must view the facts in the light most favorable to the plaintiff and consider whether the complaint plausibly alleges

---

[3] Moving Defendants argument to dismiss Plaintiffs municipal liability claims specifically asserted against the Town of Greensboro also misses the mark. Defs.' Mot. at 13–15. Plaintiffs assert that the Town of Greensboro had knowledge of and were deliberately indifferent to Webster's widespread pattern of unconstitutional conduct. Indeed, Petyo and Cleveland not only knew of Webster's history of violence, but actively concealed his past and falsified his certification as a police officer. This widespread unlawful history included 29 excessive use of force incidents. Thus, the Town of Greensboro's knowledge and indifference can be inferred from the extent of Webster, Petyo, and Cleveland's misconduct. *See Owens*, 767 F.3d at 402–403.

[4] Webster, Lannon, and Manos's motion for summary judgment on qualified immunity is addressed in the separate opposition brief.

that: (1) the conduct violated a constitutional right; and (2) that the constitutional right was "clearly established" at the time. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).

A plaintiff may survive a Rule 12 qualified immunity motion by adequately alleging a constitutional violation. *See Tobey v. Jones*, 706 F.3d 379, 393–94 (4th Cir. 2013) (affirming the denial without prejudice of a qualified immunity defense at the motion to dismiss stage where plaintiff adequately alleged violations of his constitutional rights).

### 1. *Moving Defendants Are Not Entitled to Qualified Immunity Because They Violated Anton Black's § 1983 Fourth and Fourteenth Amendment Rights.*

Plaintiffs have plausibly alleged that Petyo and Cleveland violated Anton's constitutional rights through their deliberate indifference in failing to adequately train, screen, supervise, and retain Webster.[5]  Supervisory officials may be held liable for the constitutional violations of their subordinates. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  This liability stems from "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984).  Thus, supervisory liability may be asserted against "the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Id.*  "[T]his issue is ordinarily one of fact, not law." *Shaw*, 12 F.3d at 799 (citing *Avery v. Burke Cty.*, 660 F.2d 111, 114 (4th Cir. 1981)).

---

[5] Moving Defendants appear to cite and apply the law on "*Monell* liability." [cite].  But Plaintiffs have sued Petyo and Cleveland based on supervisory liability, which is distinct from a *Monell* claim.  A supervisory liability claim seeks to hold a person liable in his or her individual capacity; a *Monell* claim seeks to hold a municipality liable for its official acts. *See Jones*, 2015 WL 4509871, at *13–14, *20–21 (outlining different elements for *Monell* and supervisory liability claims).  Plaintiffs bring *Monell* claims against the Towns and supervisory liability causes of action against Petyo and Cleveland in their individual capacity.

Supervisory liability may attach when: (1) the supervisor had actual or constructive knowledge that his subordinate "posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799.

As for "actual or constructive knowledge," the FAC alleges that Petyo and Cleveland were aware Webster had an extensive history of use of excessive force against Black civilians, including, but not limited to, 29 previous unlawful arrests, excessive uses of force, and overt racial bias. This knowledge was reinforced by community outcry about Webster's hiring despite this background and confirmed because both Petyo and Cleveland took affirmative steps to conceal Webster's history from the State of Maryland by falsifying Webster's application for certification, in violation of Maryland criminal law. FAC ¶¶26, 45–57. The FAC also alleges that Petyo and Cleveland knew that less than two months before he attacked Anton, Webster applied excessive force in detaining a mixed-race teenager who was experiencing a mental health crisis. FAC ¶¶66–67. Under Fourth Circuit precedent, this is enough to establish knowledge. For example, in *Shaw*, the plaintiff's claim prevailed where the supervisor knew that a subordinate officer used unreasonable force against arrestees three times. *Shaw*, 13 F.3d at 800. Petyo and Cleveland's knowledge of Webster's previous 29 excessive uses of force far surpass that.

As to "deliberate indifference," the FAC alleges that Petyo and Cleveland were deliberately indifferent to the consequences of their failure to properly screen, train, and supervise Webster. FAC ¶¶203. Given their knowledge that Webster had at least *29* separate

21

incidents of unlawful arrests, excessive uses of force, and overt racial bias, Petyo, and Cleveland hired Webster and then criminally falsified his application for certification, which was necessary for him to work as a law enforcement officer in the State of Maryland. FAC ¶46. And despite this knowledge, Petyo and Cleveland required no more training or supervision of Webster, even after he attacked another teenager who was having a mental health crisis. *See* FAC ¶66. This is more than enough to plead "deliberate indifference" under Fourth Circuit law. *Shaw*, 12 F.3d at 799; *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) ("inaction in the face of documented widespread abuses.").

As to causation, the FAC alleges that the obvious consequence of Petyo and Cleveland's failure to properly screen, train, or supervise Webster was that he would violate the constitutional rights of Black Greensboro residents, posing an unreasonable risk of constitutional harm. *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1035 (D. Md. 2019). This is more than enough to allege causation in the Fourth Circuit, where causation may be established "where the policy commands the injury of which the plaintiff complains" or "may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Wilkins v. Montgomery*, 751 F.3d 214, 226–27 (4th Cir. 2014).

Moving Defendants' primary argument is that they could not have been deliberately indifferent because Webster had not engaged in the application of "deadly force," Def. Br. 26, but merely excessive force. Mot. at 26. This argument—that Webster, in his prior 29 incidents of excessive force against Black persons, had not killed anyone—fails. Whether a supervisor was deliberately indifferent to a course of conduct that posed an unreasonable risk of constitutional harm to a group of citizens is a distinct question from whether that prior instances of that conduct led to the precise injury to plaintiff. *See Wilkins*, 751 F.3d at 226. Plaintiffs

have alleged that Webster exhibited a particular propensity to use excessive force on Black persons—29 separate times.  FAC ¶39.  And Plaintiffs have also alleged Petyo and Cleveland were aware of this propensity and sought to conceal it.  FAC ¶26-27.  In doing so, Webster engaged in conduct posing unreasonable risk of constitutional harm to citizens like Anton— Black residents of Greensboro.  And contrary to more training to address these obvious deficiencies, Petyo and Cleveland left Webster unsupervised and "on his own."  FAC ¶57.  Plaintiffs thus adequately allege Petyo and Cleveland's deliberate indifference.[6]  As a result, Plaintiffs plausibly allege that Petyo and Cleveland have violated Anton Black's constitutional rights.

### 2. *It Was Clearly Established That Petyo and Cleveland's Deliberate Indifference to Webster's Pattern of Misconduct Was Unconstitutional.*

Plaintiffs also plausibly allege that the specific rights at issue were "clearly established."  As recognized in *Shaw*, supervisory liability under § 1983 for a subordinate officer's abuse of police powers through use of excessive force was clearly established at the time of the incident; and the alleged underlying constitutional violation was also clearly established.  *Shaw,* 13 F.3d

---

[6] Although not addressed in Moving Defendants' Motion to Dismiss, *see* Mot. 26, Petyo and Cleveland's conduct has an "affirmative causal link" to the constitutional violations Anton Black suffered.  *Shaw*, 13 F.3d at 799.  Supervising officials that have actual or constructive knowledge that their subordinate officers are engaging in a pattern of conduct that poses an unreasonable risk of constitutional harm are liable for any constitutional harm that is the "natural consequence" of the supervising officer's deliberate indifference.  *Id.*; *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 307 (D. Md. 2020).  As described above, Plaintiffs allege that Webster engaged in widespread and persistent pattern of excessive force against Black persons, FAC ¶39 and that Petyo and Cleveland had knowledge of these tactics, FAC ¶42. Construing all facts in a light most favorable to Plaintiffs, Petyo and Cleveland's deliberate facilitation of this pervasive misconduct by Webster is a proximate cause of Anton Black's death.  In other words, an obvious consequence of Petyo and Cleveland's decision to not adequately screen, train, and supervise Webster was his eventual excessive use of force against Anton Black.  Thus, the affirmative link in Anton Black's constitutional deprivation is Petyo and Cleveland's deliberate indifference in failing to adequately screen and train Webster.

at 799. "[A] right need not be recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity." *Yates v. Terry*, 817 F.3d 877 (4th Cir. 2016) (internal citations omitted). As the Supreme Court has emphasized, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) For example, *Yates v. Terry*, 817 F.3d 877 (4th Cir. 2016), explains that: "[I]t was clearly established **in 2008** that a police officer was not entitled to use unnecessary, gratuitous, or disproportionate force by repeatedly tasing a nonviolent misdemeanant who presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing." *Id.* at 887 (emphasis supplied); *see also Meyers v. Baltimore Cnty.*, 713 F.3d 723, 734–35 (4th Cir. 2013) ("We also have stated in forthright terms that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.") (internal quotations and citation omitted); *Jones* 325 F.3d at 532 (recognizing same); *Bailey v. Kennedy*, 349 F.3d 731, 745 (4th Cir. 2003) (recognizing same); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (citing *Graham v. Connor* factors to assess reasonableness inquiry, including "'the severity of the [suspected] crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'") (quoting *Graham*, 490 U.S. at 396); *Parker v. Gerrish*, 547 F.3d 1, 9–11 (1st Cir. 2008). The *Yates* Court observed: "Although our decisions in *Meyers, Bailey,* and *Jones* dealt with individuals who were secured when they were subjected to excessive force, our precedent nonetheless provided Terry with fair notice that the force he used against Yates under the facts of this case was unconstitutionally excessive." *Yates v. Terry*, 817 F.3d at 887. The Court further noted that "a

24

right need not be 'recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity.'" *Id.* (quoting *Meyers*, 713 F.3d at 734).

The right of unarmed citizens to be free of excessive use of force from the police officials charged with protecting them was clearly established at the time of the incident. *Meyers v. Baltimore Cnty.*, 713 F.3d 723, 734–35 (4th Cir. 2013) ("We also have stated in forthright terms that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity."). Thus, a reasonable officer would have understood that a brutal, unprovoked attack on a resident would violate that person's constitutional rights. *See*, *e.g.*, *Mesmer v. St. Mary's Cty.*, No. 10-cv-1053, 2010 WL 4791884, at *10 (D. Md. Nov. 18, 2010).

The FAC directly alleges that Webster, along with Lannon and Manos, used excessive force by assaulting and Tasing Anton, which proximately caused his death. *See* FAC ¶232. And the FAC also asserts that assaulting and Tasing violated Anton's clearly established right to be free of excessive use of force. *Id.* Thus, Plaintiffs have sufficiently alleged a violation of a clearly established right.

Further, supervisory liability for excessive use of force had been firmly established long before the incident. *Shaw*, 13 F.3d at 799; Randall, 302 F.3d at 203; *Lee v. Queen Anne's Cty. Off. of Sheriff*, No. 13-cv-672, 2014 WL 476233, at *13 (D. Md. Feb. 5, 2014). For example, in *Lee*, the plaintiff sought to invoke the doctrine of supervisory liability to hold a sheriff responsible for his deputy's excessive use of force. *See id.* The court found that plaintiff had adequately alleged supervisory liability by pointing to prior instances of the deputy's unconstitutional conduct to impute constructive knowledge on behalf of the sheriff. *Id.*

In doing, the court reaffirmed the viability of supervisory liability for excessive use of force by a municipal subordinate. *Id.* Here, as in *Lee*, Plaintiffs allege that Petyo and Cleveland, among other things, had constructive and actual knowledge of Webster's past unconstitutional conduct. As a result, Plaintiffs plausibly allege that it was clearly established that Petyo and Cleveland could be held liable for Webster's excessive use of force. Thus, Plaintiffs sufficiently plead facts to defeat the Moving Defendants' motion to dismiss as to qualified immunity for Petyo and Cleveland. *See Raub v. Bowen*, 960 F. Supp. 2d 602, 613 (E.D. Va. 2013).

### C. Plaintiffs Have Pled Title II ADA and Rehabilitation Act Claims Against the Towns

To state a claim under Title II of the Americans with Disabilities Act ("ADA"), a plaintiff must allege that "(1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability." *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 425 (D. Md. 2014).

The Fourth Circuit long ago recognized that, under the ADA and similar statutes, vicarious liability may be imposed on "a principal," such as the Towns, "for the statutory violations of its agent[s]." *Rosen v. Montgomery Cty. Maryland*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) (citing ADA and Rehabilitation Act cases).[7] By the same token, courts around the

---

[7] Based on the Supreme Court's decision in *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998), Defendants call into doubt, but then conclude that vicarious liability is available under Title II of the ADA and the Rehabilitation Act. ECF No. 46-1 at 33. That conclusion is correct. *Gebser*, a Title IX case, held that a showing of deliberate indifference had to sustain a *claim for money damages*. Plaintiffs here are seeking equitable relief along with money damages. And importantly, courts in the Fourth Circuit post-*Gebser* continue to treat *respondeat superior* liability as a valid theory of relief under the ADA and Rehabilitation Act. *See*, *e.g.*, *Estate of Saylor*, 54 F. Supp. 3d at 428 (citing *Rosen*, 121 F.3d at 157 n.3).

country, and several in this Circuit, have found that public entities may be liable under Title II of the ADA under a failure to train theory. *See*, *e.g.*, *Haberle v. Troxell*, 885 F.3d 170, 179 n. 7 (3d Cir. 2018); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2d Cir. 2008) (recognizing failure to train under Title III of the ADA); *Gohier v. Enright*, 186 F.3d 1216, 1222 (10th Cir. 1999) (stating that the plaintiff should have "argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability."); *Poole v. Cty.*, No. 15-cv-00309, 2016 WL 4267792, at \*6 (W.D.N.C. Aug. 11, 2016) (declining to dismiss ADA failure to train claim); *Estate of Saylor*, 54 F. Supp. 3d at 424–425 (noting that although the Fourth Circuit has not explicitly recognized such a theory, there is no indication that the Fourth Circuit *would not* recognize it in appropriate circumstances).

Here, Moving Defendants do not dispute the first and second elements of Plaintiffs' ADA claim—that is, that Anton was disabled and otherwise qualified to receive the benefits of a public service, program, or activity.[8]  Moving Defendants also do not dispute that the ADA and Rehabilitation Act claims may be combined for analytical purposes "because the analysis is substantially the same." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (internal quotation marks omitted).  And the Towns do not dispute that the prohibitions against disability discrimination in Title II of the ADA and Rehabilitation Act apply to them as public entities.  ECF No. 46-1 at 29.

---

[8] Defendants argue that because the officers did not know of Anton's disability, "for purposes of the ADA, [Anton] was not a qualified individual with a disability."  ECF No. 46-1 at 30.  While Plaintiffs address Defendants' knowledge argument extensively below, Defendants do not factually dispute that Anton was disabled or otherwise qualified under the ADA and Rehabilitation Act.

Whether Plaintiffs have stated a claim under the ADA and Rehabilitation Act thus turns on whether Anton was "was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability." *Estate of Saylor*, 54 F. Supp. 3d at 425.

In the context of an arrest, courts have recognized two types of Title II ADA claims: wrongful arrest, where a police officer detains a suspect based on his disability and not for any criminal activity; and reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing the arrestee to suffer greater injury or indignity than other arrestees. *See Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 174 (4th Cir. 2009). The allegations in the FAC state a claim under both theories.

The FAC specifies how the officers were specifically informed that Anton had a mental illness and directly observed Anton's erratic behavior that day. For example, during the initial moments of the encounter, the FAC alleges that Officer Webster was told explicitly by X.B. that Anton was suffering from mental illness at the time, a fact that he relayed over the radio, informing Chief Manos and Officer Lannon. FAC ¶¶82, 83, 88, 108, 304. The FAC's allegations about the officers' communications between themselves during the arrest also confirm their understanding that Anton was suffering from a mental health crisis. *Id.* ¶¶129, 138, 304 (Officer Webster to Chief Manos: "He's schizophrenic," to which Chief Manos replied, "Yeah, yeah, yeah"; and Officer Webster to Officer Lannon: "This is gonna be an [Emergency Petition.]"). And perhaps most powerfully, the FAC alleges that in response to questions from Anton's mother, Officer Webster told her: "*This is a mental health emergency, we're not treating this like a crime.*" *Id.* ¶¶146, 304 (emphasis added); *see also id.* ¶101 ("Officer Webster

stated several times during the confrontation that they were not arresting Anton and only taking him into custody because he was having a mental health crisis"). These facts were captured on the police body camera footage.

The allegations about the officers' knowledge of Anton's disability are more than enough to survive a motion to dismiss. Because the officers were told of Anton's disability and knew that the erratic behavior they were witnessing from Anton was not criminal conduct, but a manifestation of his disability, the officers discriminated against Anton based on his disability by wrongfully detaining him for the physical manifestations of his disability, and such discrimination by the officers is attributable to the Towns that employ them. Plaintiffs have thus stated a disability discrimination claim based on the officers' wrongful detainment of Anton. *Waller ex rel. Estate of Hunt*, 556 F.3d at 174.

Similarly, the officers discriminated against Anton based on his disability by failing to make *any* reasonable accommodations that would have allowed them to resolve the situation safely and without violating Anton's civil rights. The Greensboro Police Department Policy Manual (the "Greensboro Handbook" or "Handbook"), which was received by each Greensboro police officer, including Officer Webster, states, "mental health issues, mental health crises and unusual behavior are not criminal offenses. Individuals may benefit from treatment as opposed to incarceration." FAC ¶¶61, 102. The Handbook notes that "*taking no action* or *passively monitoring the situation* may be the most reasonable response to a mental health crisis," and instructs police officers to de-escalate mental health crisis situations by being "patient, polite, calm, courteous and [not] overreacting," to "speak and move slowly and in a non-threatening manner," and to "remove distractions or disruptive people from the area." *Id.* ¶103 (emphasis added and internal quotation marks omitted). The Handbook also notes that officers should not

"[u]se stances or tactics that can be interpreted as aggressive," "allow others to interrupt or engage the person," "*corner a person who is not believed to be armed, violent, or suicidal*," or "argue, speak with a raised voice or use threats to obtain compliance." *Id.* ¶104 (emphasis in FAC and internal quotation marks omitted). The Handbook represents that the Greensboro Police Department intended to "develop and provide comprehensive education and training to all department members to enable them to effectively interact with persons in crisis." *Id.* ¶105 (internal quotation marks omitted).

Despite Officer Webster having been provided with the Handbook, and supposedly having been trained in dealing with individuals suffering from a mental health crisis, he implemented none of the accommodations described in the Handbook. In fact, he and the other officers made *no accommodations* for Anton. Indeed, rather than make such accommodations, the officers violently escalated the encounter, causing Anton to "suffer greater injury [and] indignity than other arrestees," including his death. *Id.* ¶296; *Waller ex rel. Estate of Hunt*, 556 F.3d at 174. Plaintiffs have thus also stated a claim for disability discrimination under the failure to accommodate theory. *Waller ex rel. Estate of Hunt*, 556 F.3d at 174.

Because Officers Manos, Lannon, and Webster were or are employees of the Towns of Greensboro, Centreville, and Ridgely, and were acting within the scope of their employment, the Towns are vicariously for the officers' violations of the ADA and Rehabilitation Act. *See Rosen*, 121 F.3d at 157 n.3; *Estate of Saylor*, 54 F. Supp. 3d at 428.

Along with the Towns' vicarious liability, the FAC sufficiently alleges direct liability against the Towns under Title II of the ADA and Rehabilitation Act for failing to train their officers in how to deal with individuals suffering from mental illness. As discussed above, in the § 1983 context, to survive a motion to dismiss on a failure to train theory, the complaint must

allege deliberate indifference on the part of the municipality, "which may be based on the [municipality] failing to act in the face of a pattern or practice of unconstitutional behavior, or the [municipality] failing to act when the supervisor has an obvious duty to do so because the risk of harm is foreseeable." *See Brown v. Mitchell*, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004). This framework has been applied in the context of Title II ADA claims. *See Haberle,* 885 F.3d at 181 (applying deliberate indifference standard from the § 1983 Eighth Amendment context against municipality for ADA claim).

As discussed above, the allegations in the FAC are enough to state a violation of Anton's rights under Title II of the ADA and the Rehabilitation Act. The allegations in the FAC also show that the Towns, by failing to take appropriate steps to implement training on responding to individuals experiencing mental health crises, were deliberately indifferent to the rights of disabled persons, and that their deliberate indifference caused Anton's rights under the ADA and Rehabilitation Act to be violated. The FAC specifically alleges that, although the Towns were responsible for establishing practices and procedures and ensuring compliance with those practices and procedures within their police departments, none of the Towns provided education or training for officers on how to treat individuals experiencing a mental health crisis as a result of a mental health disability. FAC ¶279. The FAC also alleges that the Towns adopted written policies but took no steps to operationalize them such as by developing protocols, practices, education, and training for officers, and that this failure by the Towns violated Title II of the ADA and Rehabilitation Act. *Id.* ¶¶279–280, 292–293.

Perhaps most importantly, the FAC alleges:

In light of the well-documented frequency of police encounters with people with mental health disabilities and the disproportionately lethal outcomes of those encounters, failure to establish adequate practices and procedures and failure to provide training relating to intervention in mental health crises, creates a highly

31

predictable risk that officers will violate the constitutional and statutory rights of individuals with mental health disabilities, and that a person with a mental health disability would be harmed in a police encounter as a result.

*Id.* ¶281. The FAC also alleges that, by failing to implement said policies and procedures, the Towns displayed deliberate indifference to the risk that individuals with mental health disabilities would have their constitutional and statutory rights violated, *Id.* ¶282 (satisfying the deliberate indifference element), and that this failure caused the officers to violently escalate their encounter with Anton, and ultimately kill him, rather than make reasonable accommodations, *Id.* ¶283.

The above allegations satisfy Plaintiffs' burden for imposing direct liability on the Towns under the ADA and Rehabilitation Act through a failure to train theory. Indeed, there is evidence from around the country that police encounters with individuals experiencing symptoms of a mental health disability are frequent, and thus highly predictable. *See id.* ¶281 n. 15. And because multiple courts have found that Title II of the ADA applies to *ad hoc* police encounters, *see, e.g.*, *Waller ex rel. Estate of Hunt*, 556 F.3d at 174, it follows that municipalities have an affirmative duty to train their police officers to recognize and properly respond to individuals suffering from mental illness. *See Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997) ("In order to comply with the non-discrimination mandate [of the ADA], it is often necessary to provide training to public employees about disability."). Indeed, it is simply a matter of common sense that a municipality has an obligation to implement some level of training on this issue considering how often it occurs. *See also* FAC ¶¶281–82 (alleging the risk is highly foreseeable and that the Towns' failure to take action amounts to deliberate indifference). Here, the Towns implemented no such training.

Turning to Moving Defendants' specific arguments, much of Moving Defendants' Memorandum focuses on their untested and self-serving assertions disputing evidence recounted in the FAC that the officers knew of Anton's mental state and his disabled status. Claiming instead their knowledge of Anton's disability was insufficient, the Towns claim the officers could not have discriminated against Anton based on his disability. Moving Defendants claim that X.B.'s statement should not have been credited because of his age and because he misdiagnosed Mr. Black. Yet at the time of the incident, Defendant Webster thought X.B.'s assessment that Anton was in mental distress—combined with his own observations of Anton's behavior—were authoritative enough to report clearly to dispatch. Moreover, this argument ignores the multiple other statements the officers made during the arrest that confirm their own awareness and independent assessment that Anton was in the midst of a mental health crisis symptomatic of his disability. *See* FAC ¶¶70–74, 82, 83, 88, 101, 108, 129, 138, 146, 304. Indeed, in the officers' summary judgment memorandum, ECF No. 19-2, they acknowledge that it appeared to "Chief Manos that Mr. Black was simply not right"; that during the struggle, Officer Webster told Chief Manos that Anton was schizophrenic; and that Chief Manos later noticed that Mr. Black was wearing a hospital mental health bracelet. ECF No. 19-2 at 12–13. The officers also acknowledge that Officer Webster advised that, rather than arrest Mr. Black, he would be treating this as an "Emergency Petition due to a mental health emergency." *Id.* at 15. Moving Defendants' argument that the officers did not violate Anton's ADA and Rehabilitation Act statutory rights because of their lack of knowledge must fail for these reasons.

Next, Moving Defendants focus on the availability of money damages for ADA Title II actions. Moving Defendants contend that the Towns must exhibit more than deliberate indifference (*i.e.*, discriminatory animus) because intentional discrimination is required for

money damages under the ADA and Rehabilitation Act. Putting aside the fact that Plaintiffs are seeking equitable relief along with money damages for which Moving Defendants' argument is inapplicable, and that the issue of damages is premature at this procedural posture, Plaintiffs are alleging deliberate indifference and the decisions that Moving Defendants reference in their memorandum have all concluded that a showing of deliberate indifference is enough to establish entitlement to money damages. *See Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019) ("that deliberate indifference is the appropriate standard."); *Haberle*, 885 F.3d at 181; *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). Plaintiffs have met this standard at the pleading stage.

Here, the allegations in the FAC show that the Towns displayed deliberate indifference to the statutory rights of disabled people by failing to act and implement training on the issue of officer interactions with individuals suffering from mental health disabilities, despite the risk of such harm being highly predictable. *See* pp. 28–30, *supra* (showing that Plaintiffs have plausibly alleged deliberate indifference against the Towns under a failure to train theory). Money damages are thus available on Plaintiffs' failure to train theory of liability against the Towns.

The officers, for their part, also displayed, *in the least*, deliberate indifference to the rights of disabled persons, including Anton, when they wrongfully detained him (and detained him by unnecessary and excessive force) because of his disability, failed to accommodate his disability during the arrest, and instead used it to escalate their use of force. *Id.* at 26–28, *supra*. Put another way, the officers knew Anton had a disability that required them to act differently than they otherwise would have acted, "yet failed to adjust [their] behavior accordingly." *See* ECF No. 46-1.

34

On this point, Moving Defendants' argument that the officers were unaware of Anton's disability and therefore did not know that Anton's behavior was not illegal conduct, but a symptom of his disability, holds no water given the FAC's extensive allegations of the officers' knowledge of Anton's disability. *See* pp. 26–28, *supra*.

And the same conclusion must be reached on Moving Defendants' argument that because Officer Webster did not have "particularized knowledge" of Anton's disability, he "had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances." ECF No. 46-1 at 35. To the contrary, Officer Webster's communications before and during the arrest show that he and the other officers knew that they were dealing with a disabled person who needed medical assistance, which triggered their duty under the ADA and Rehabilitation Act to provide reasonable accommodations. *See* FAC ¶304 ("This is a mental health emergency, we're not treating this like a crime.").[9] Moving Defendants' narrow focus on Officer Webster believing Anton was suffering from schizophrenia when he in fact had bipolar disorder misses the forest for the trees; what matters is that the officers knew Anton was in the midst of a mental health crisis, that Anton was unstable, and that a medical response was necessary. And what's more, Officer Webster was provided with a Handbook that *outlined specific accommodations* for individuals suffering from mental health crisis, such as passively

---

[9] If Defendants are arguing that Officer Webster needed to have a particular reasonable accommodation in mind and know that he needed to implement that accommodation but refused to do so, that argument fails and, if anything, redounds to Plaintiffs' benefit. ECF No. 46-1 at 34. First, this argument holds no water because the Greensboro Handbook provided specific accommodations for these exact situations. Second, if Officer Webster in fact did not know how to reasonably accommodate Anton—which he should have known how to do based on the Greensboro Handbook he received—then that is only more evidence that the Town of Greensboro failed to implement the Greensboro Handbook or provide any other training on the issue of police interactions with mentally ill individuals, also supporting direct liability against Town's under the failure to train theory.

monitoring the situation, and avoiding cornering a person who is not believed to be armed, violent, or suicidal. FAC ¶103–104. Moving Defendants' argument that Officer Webster was not able to reasonably accommodate Anton because he did not have sufficiently particularized knowledge of his mental health situation ignores the fact that Officer Webster received a handbook that instructed him on how to handle this precise situation. Officer Webster and the other officers exhibited deliberate indifference to Anton's statutory rights when the officers— fully aware that Anton was suffering from a mental health crisis requiring medical attention—not only failed to reasonably accommodate Anton but escalated the situation and ultimately killed him. Money damages are thus also available on Plaintiffs' vicarious liability theory of liability against the Towns.

Moving Defendants also argue that Plaintiffs have not sufficiently alleged direct liability against the Towns under a failure to train theory. Moving Defendants contend that Plaintiffs have not alleged an obvious risk of harm, but Paragraph 281 does just that. *Id.* ("In light of the well-documented frequency of police encounters with people with mental health disabilities and the disproportionately lethal outcomes of those encounters . . . ." failure to establish adequate practice and procedures creates "a highly predictable risk that officers" will violate the statutory and constitutional rights of individuals). And Moving Defendants' characterization of the FAC as alleging only that the Towns "adopted written policies but took no steps to operationalize them . . . ." overlooks multiple relevant allegations describing the foreseeable nature of the risk and how the Towns' failure to implement training and procedures caused Anton to be discriminated against based on his disability, ultimately leading to his death. *See* pp. 28–30, *supra*. To survive a motion to dismiss, Plaintiffs' allegations are more than enough to maintain ADA and Rehabilitation Act claims under a failure to train theory against the Defendant Towns.

Finally, in a footnote, Moving Defendants claim that because Anton is deceased, there is no remedy available to Plaintiffs under the ADA, and that any claim for equitable relief must be dismissed.  ECF No. 46-1 at 36 n.14.  Courts in the Fourth Circuit have been clear that representatives of deceased individuals can bring claims under the ADA.  *See, e.g.*, *Waller ex rel. Estate of Hunt*, 556 F.3d at 172; *Estate of Saylor*, 54 F. Supp. 3d at 429.  And while it is "it is axiomatic" that "a deceased litigant" cannot enjoy prospective injunctive relief, Moving Defendants' argument that equitable relief is unavailable to Plaintiffs disregards that all Plaintiffs, including the Coalition for Justice, have brought ADA and Rehabilitation Act claims against the Towns.  *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 749 (4th Cir. 2018) (internal quotation marks omitted); *see* FAC ¶¶277–300.  Thus, contrary to Moving Defendants' undeveloped assertion, equitable relief is fully available for Plaintiffs' ADA and Rehabilitation Act claims.

### D.    Plaintiffs State Viable Equal Protection Claims.

Plaintiffs bring an equal protection claim under the Fourteenth Amendment to the U.S. Constitution Article 24 of Maryland's Declaration of Rights against Defendants Webster, Petyo, Cleveland, and the Town of Greensboro (Count 14).

To state an equal protection violation, a plaintiff must allege (1) that he was treated differently from similarly situated individuals and (2) that the unequal treatment resulted from intentional or purposeful discrimination. *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir.2001); *see also Harrison v. Prince William Cnty. Police Dep't,* 640 F. Supp. 2d 688, 706

(E.D. Va. 2009) (applying *Morrison* in the excessive force context).[10] The FAC brims with allegations more than enough to meet both requirements.

Plaintiffs' FAC details how Moving Defendants (1) explicitly classified Anton based on his race, and (2) implemented policies and practices applied so that they disproportionately impacted people of color, including Anton. *See Sylvia Dev. Corp. v. Calbert Cnty.*, 48 F.3d 810, 818–19 (4th Cir. 1995) (explaining that an equal protection violation occurs in one of these two ways). Through both means, Moving Defendants "implemented an unconstitutional system of race discrimination in policing in the Town of Greensboro" that intentionally or purposefully treated Anton differently from similarly situated individuals based on his race. *See* FAC ¶316. The FAC details that system in Paragraphs 25 through 157, and then summarizes them in the context of Plaintiffs' equal protection claims in Paragraphs 316 through 318.

*Explicit classification.* Defendant Webster explicitly relied "on race as a motivating factor in determining how to respond to an incident involving a nonviolent and unarmed Black teenager experiencing a mental health crisis, in a way he never would respond to a similarly-situated white teenager." FAC ¶318. Indeed, Officer Webster has a history of employing racially discriminatory practices against Black people. *Id.* Defendants Petyo, Cleveland, and the Town of Greensboro are also responsible for this explicit racial classification, because they "hir[ed],

---

[10] Plaintiffs state an equal protection claim under both the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. *See, e.g.*, *Neifert v. Dep't of Env't*, 910 A.2d 1100 (Md. Ct. App. 2006) (analyzing Article 24 and Fourteenth Amendment claims together under the federal framework). "Article 24 equal protection doctrine and federal equal protection doctrine are 'complementary but independent.'" *Pizza di Joey, LLC v. Mayor & City Council of Balt.*, 241 Md. App. 139, 164 (2019) (quoting *Verzi v. Balt. Cty.*, 333 Md. 411, 417 (1994)). Maryland courts generally interpret Article 24 to apply "'in like manner and to the same extent as' the Fourteenth Amendment." *Murphy v. Edmonds*, 325 Md. 342 (1992) (quoting *Att'y General v. Waldron*, 426 A.2d 929, 941 (Md. Ct. App. 1981)).

fraudulently and unlawfully secur[ed] certification for, employ[ed], fail[ed] to train and supervise, [and] fail[ed] to discipline" Officer Webster when they knew of his history of racially discriminatory practices. FAC ¶¶317–18.

*Discriminatory but facially neutral policies and practices.* Moving Defendants "implement[ed] police practices and policies," specifically on de-escalation of mental health crises and the use of force, that "treat[ed] Black people -- specifically including Anton Black -- more harshly than white people with respect to law enforcement." FAC ¶¶316, 318.[11] Again, each of Defendants Webster, Petyo, Cleveland, and the Town of Greensboro intentionally administered these practices and policies in a racially discriminatory manner. Officer Petyo, Cleveland, and the Town of Greensboro "hir[ed], fraudulently and unlawfully secur[ed] certification for, employ[ed], fail[ed] to train and supervise, [and] fail[ed] to discipline," Officer Webster who they knew to have a record of treating Black people more harshly based on their race, setting into motion the discriminatory application of the department's facially neutral policies and practices. FAC ¶¶317–18.

Thus, the FAC makes clear that Black people, specifically Anton, were intentionally treated more harshly than white people and that Anton in particular—a nonviolent, unarmed Black teenager experiencing a mental health crisis— was treated differently than a similarly situated white person would have been, *id.* ¶318. *See, e.g.*, *Smith v. City of Fontana*, 818 F.2d 1411, 1420 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (concluding that complaint adequately alleged black decedent was

---

[11] It is incorrect that Plaintiffs have identified no particular practice or policy that was administered in a discriminatory manner. *Compare* ECF No. 46-1 at 40 *with* FAC ¶¶2, 94, 103–05, 124, 147, 205–06, 226, 318 (de-escalation of an individual in mental distress and excessive force).

denied equal treatment when it alleged the officers used excessive force because of the decedent's race, acting under "an unwritten City policy authorizing the use of excessive force, particularly against black persons, and that the City also had a policy of failing to train and supervise police officers concerning the use of deadly force").

Moving Defendants' arguments to the contrary fall short. They argue that "[t]his is not a case in which officers engaged in racial profiling or were presented with uncertain information as to a suspect's race and targeted a particular race." ECF No. 46-1 at 40. Plaintiffs' equal protection claim is not focused merely on the decision to approach Anton, but on the decision to treat him more harshly than a white person would have been treated under the same facts *after* he was approached (and the policies and practices that enabled such unequal treatment). Again, the FAC teems with specific allegations that make this showing. *See, e.g.*, FAC ¶¶2, 29, 33–36, 44–46, 51, 86–87, 94, 103–05, 124, 147, 205–06, 226, 316, 318.

Additionally, in arguing that Plaintiffs have not adequately alleged that any discrimination was intentional, Moving Defendants ignore that nearly every allegation of the first 157 paragraphs of the FAC bear on one or more of the non-exhaustive factors Moving Defendants ask this court to consider.[12] Plaintiffs allege that the policing policies of Moving Defendants—including policies relating to the use of force and de-escalation of mental health crises—were administered in a way that discriminated against Black people. *See* FAC ¶¶2, 94,

_____

[12] Defendants urge the court to consider various factors, some of which would only be relevant to the enactment of a piece of legislation or regulation. *See* ECF No. 46-1 at 50 ("(1) whether the action bears more heavily on one race than another; (2) whether there are clear patterns of action that are unexplainable on grounds other than race; (3) the historical background of the action in question: (4) the sequence of events leading to the defendant's actions, (5) departures from a defendant's regular course of action, and (6) the legislative or administrative history" (citing *White v. City of Annapolis*, 439 F. Supp. 3d 522, 539 (D. Md. 2020))).

103–05, 124, 147, 205–06, 226, 318. The FAC alleges that there are clear patterns of actions about use of force against Black individuals. *See*, *e.g.*, FAC ¶¶25–67, 316, 318. The FAC describes the historical background of the use of force against Anton and the events leading to the same, including Officer Webster's history of discriminatory actions. *See* FAC ¶¶28–45, 68–157; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.") And the FAC describes the hiring, training, and recertification background of Officer Webster. *See* FAC ¶¶25–67. The court "should not consider 'each piece of evidence in a vacuum' but instead engage in a totality of the circumstances analysis.'" *White*, F. Supp.3d at 540 (denying motion to dismiss because some factors supported discriminatory motive and others weighed against) (quoting *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016)). All of these allegations are sufficient grounds, together and on their own, from which a jury could find that Moving Defendants intentionally discriminated against Anton in violation of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

## II.    The First Amended Complaint Asserts State Law Claims Upon Which Relief Can Be Granted.

### A.    Moving Defendants Are Not Entitled To State Law Immunity.

Moving Defendants argue that Petyo and Cleveland are shielded from liability in Counts 1, 2, 3, and 8 based on "the availability of common law and statutory immunity."[13]  Mot. 20

---

[13] As Defendants appear to recognize, even if immunity shielded Petyo and Cleveland as to the state-law claims (it does not), immunity could not shield them from liability as to Count 3, which stems from federal constitutional law. *See* Mot. 21-22.

(capitalization altered).  But state-law immunity does not shield Defendants Petyo and Cleveland from suit.

In Maryland, common law public official immunity protects "public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary (as opposed to ministerial) duties."[14] *Houghton v. Forrest*, 412 Md. 578, 585 (2010).  Public official immunity is also codified:  Section 5-507(a)(1) shields officers "acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority."  Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1).

"In either form, common law or statutory, public official immunity is qualified, not absolute." *City of Dist. Heights v. Denny*, 123 Md. App. 508, 516 (Md. App. 1998) (internal quotation marks and brackets omitted).  Immunity "may be defeated by proof of malice."  *Id.* "Malice in the context of public official immunity means conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will, or fraud." *Koon ex. rel. Glay v. Prince George's Cty.*, No. CV DKC 17-2799, 2019 WL 1317401, at *7 (D. Md. Mar. 22, 2019), *reconsideration denied*, No. CV DKC 17-2799, 2019 WL 2642834 (D. Md. June 27, 2019) (internal quotation marks and citation omitted).

Plaintiffs have shown actual malice because they alleged facts supporting that Petyo and Cleveland acted with deliberate ill will and fraud.  For example, Petyo and Cleveland falsified and omitted information to have Webster certified as a police officer.  FAC ¶26.  That is, of course, fraud.  And this fraud was committed with ill-will:  Petyo and Cleveland's fraud was to

---

[14] Plaintiffs agree with Defendants that Petyo and Cleveland are public officials. Plaintiffs also agree that hiring Officer Webster and choosing to keep him employed in the face of known racial violence were not ministerial functions.  Petyo and Cleveland's actions were, indeed, discretionary, as "they act[ed] according to" their own (poor) "judgment."  *See Schneider v. Hawkins*, 179 Md. 21, 25 (1940).

support hiring a cop who had been criminally charged for assaulting a Black man, received professional reprimands and suspension for his use of force and poor judgment, and who had known complaints of racial bias. FAC ¶¶28–42. Because Plaintiffs' alleged facts support actual malice, Petyo and Cleveland cannot be shielded by public official immunity.

Moving Defendants also try to evade liability by underplaying Petyo and Cleveland's actions, arguing that Petyo and Cleveland did not "personally participate[]" in the allegations in Counts 1, 2, or 3. They support their argument with a case that has no bearing here. In *Vinnedge v. Gibbs*, a prisoner did not receive psychiatric medical care after authorities suggested that he would receive such care. 550 F.2d 926, 928 (4th Cir. 1977). The Fourth Circuit held that an administrative official who "set[] minimum standards for the . . . medical attention of prisoners" could not be liable because "[n]o allegation has been made, let alone factually supported, however liberally we construe the complaint, that [the administrative official] had any personal connection with any denial of medical care." *Id.*

Here, however, Plaintiffs specifically allege Petyo and Cleveland's connection to Mr. Black's death because of excessive force. As noted, Petyo and Cleveland submitted a false certification to hire Officer Webster, a violent cop who later used deadly force against Mr. Black. FAC ¶26. And they brushed off citizen concerns about Officer Webster's racial violence. FAC ¶¶48–54. Petyo and Cleveland later failed to respond to or investigate Officer Webster's violence against a mixed-race child. FAC ¶66. These facts show a causal "personal connection" with Mr. Black's death.

Finally, Moving Defendants also argue that Count 8 must be dismissed because Petyo and Cleveland are not "employers." Mot. 21. In support of their contention, Moving Defendants cite an irrelevant, out-of-state case where the court discussed what, under Texas law, plaintiffs

must show for an employer to be held liable.  *See Baird v. Shagdarsuren*, No. 3:17-CV-2000-B, 2020 WL 208815, at \*9 (N.D. Tex. Jan. 14, 2020).[15]  In *Baird*, the court did not consider whether a public official can be liable for negligent hiring.  *See id.*  At bottom, Moving Defendants have provided no relevant support for their argument that Petyo and Cleveland should not be liable for their grossly negligent hiring, retention, training, certification, and supervision of Officer Webster.  For these reasons, Plaintiffs have failed to show that Counts 1, 2, 3, or 8 should be dismissed as to Defendants Petyo and Cleveland.

### B.    Plaintiffs Have Pled an IIED Claim Under Maryland Law

Contrary to Moving Defendants' assertion, Count 12 plausibly alleges an intentional infliction of emotional distress claim.  Under Maryland law, the elements of an intentional infliction of emotional distress ("IIED") claim are:  "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." *Lasater v. Guttmann*, 194 Md. App. 431, 448 (2010).[16]

Although this motion does not specifically dispute the factual allegations comprising Plaintiffs' IIED claims against the officers who were at the scene, those claims are well pled.  As explained in the section Plaintiffs' ADA and Rehabilitation Act claims, each officer who was at the scene was aware of Anton's mental health disability.  And yet, rather than treat Anton as a person requiring medical attention, Defendants treated him like a criminal and violently escalated the situation, knowing that their actions were causing him distress.  These actions were

---

[15] The discussion in *Baird* about Texas's legal standards for employer negligence occurs in a different opinion issued in the case than that cited in Defendants' Motion.

[16] Despite Defendants' arguments to the contrary, Plaintiffs have not sued Ms. Cleveland for intentional infliction of emotional distress.

not only extreme and outrageous, but were also intentional and/or reckless, and caused Anton to suffer untold emotional distress in the moments preceding his death. *See* FAC ¶¶301–07.

As for Chief Petyo, Moving Defendants' motion fails to acknowledge that Petyo may be held liable under a vicarious liability theory for Officer Webster's intentional infliction of emotional distress. *See Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 483–4 (D. Md. 1999). Moving Defendants' arguments about Petyo's liability—who was not at the scene but was the supervisor of Officer Webster—ignores caselaw holding that employers can be vicariously liable for the intentional infliction of emotion distress of their employees. "In order to prevail on [a claim for] intentional infliction of emotional distress against an employer on a vicarious liability theory, a plaintiff must establish that the tortious conduct was committed by an agent of the employer, and such conduct was either (1) expressly authorized by the employer, (2) committed within the scope of the agent's employment, or (3) ratified by the employer." *Harrison v. Edison Bros. Apparel Stores*, 814 F. Supp. 457, 463 n.11 (M.D.N.C. 1993).

Here, because Officer Webster's actions were intentional, extreme and outrageous, and the direct cause of Anton's death, and because Officer Webster committed these actions within the scope of his employment, vicarious liability applies. And while Maryland courts have held that an officer or manager may only be vicariously liable when the managing employee participated in or directed the conduct, *see Madison v. Harford Cty.*, No. CV MJG-10-197, 2011 WL 13362482, at *2 (D. Md. May 3, 2011), this is no limitation to Officer Petyo's liability. Here, Officer Petyo, as the Chief of Police for the Town of Greensboro, was on notice that the Town of Greensboro had failed to implement the mental health training manual for its officers. He was also involved in the wrongful hiring and certification of Officer Webster, engaging in criminal misconduct to bring about Webster's certification in Maryland by covering up his long-

45

record of violence and abuse against Black people. Because he recklessly hired, criminally certified and then failed to train and supervise Officer Webster—including by failing to implement the Greensboro Handbook—Petyo, through his acts and omissions, is directly responsible for the events of September 15, 2018 and the harm caused to Anton Black.

For these reasons, Peyto should be treated as a participant for purposes of vicarious liability.

## C. Plaintiffs Have Pled a Civil Conspiracy Claim.

Plaintiffs' civil conspiracy claim against all Moving Defendants in Count 13 should also survive dismissal. To state a claim for civil conspiracy, a plaintiff must allege: "1) [a] confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of lawful or tortious means to accomplish an act not in itself illegal; and 3) [a]ctual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154 (2007) (quoting *Van Royen v. Lacey*, 262 Md. 94, 97–98 (1971)). In other words, civil conspiracy is a valid cause of action where plaintiffs adequately allege injury by an overt tortious or unlawful act done in pursuance of the conspiracy. *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F.Supp.3d 536, 573 (D. Md. 2019); *see also Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*, 639 A.2d 173, 177 (Ct. Special App. Md. 1994) ("The gist of a civil conspiracy is not the agreement but rather the overt conduct committed pursuant to it and the harm that flows from that conduct."). That is the case here.

First, the FAC makes clear that there was an agreement or understanding between two or more people. "To prove the existence of a conspiratorial agreement, it is enough to show that the conspirators came to a tacit understanding about the unlawful purpose; it is not necessary to show that they reached a formal agreement." *Hoffman v. Stamper*, 155 Md. App. 247, 290–91,

(2004), *aff'd in part, rev'd in part and remanded,* 385 Md. 1 (2005). Moreover, "the existence of a conspiracy may be shown circumstantially, 'by inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relations of the parties, their motives and all surrounding circumstances preceding and attending the culmination of the common design.'" *Id.* (quoting *Daugherty v. Kessler,* 264 Md. 281, 292 (1972)). This is because "in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone." *Windesheim v. Larocca*, 443 Md. 312, 347 (2015).

For this precise reason, Plaintiffs aver "on information and belief" that Defendants conspired together to deprive Plaintiffs of their rights to due process and access to the courts under Articles 19, 24, and 40 of the Maryland Declaration of Rights because the direct evidence of that conspiracy is "uniquely in the possession of the Defendants." *See* ECF No. 46-1 at 37. (arguing that Plaintiffs have misused the phrase because the information must be uniquely in the possession of Defendants or not in possession of Plaintiffs). But Plaintiffs provide the specific details in Paragraphs 310 through 313 of the FAC to show why they have "sufficient data" to allege the conspiracy and the circumstantial evidence to support that allegation, an appropriate use of the phrase "on information and belief" under the case Moving Defendants themselves cite. *Id.* As just a few examples, Plaintiffs allege that agents of all three municipalities acted in concert to by constructing a false narrative of Anton's use of "spice" and abnormal strength, ¶310, by disregarding contrary evidence available on the video Body Worn Camera footage, ¶311, and perpetuating the false narrative that the officers' actions did not cause Anton's death, ¶¶312–13, by declining to investigate and discipline the involved officers, ¶312, and (as to the

Medical Examiner) by departing from basic reasonable standards of forensic pathology, ¶313, to cover up for the other Defendants' misconduct.

That Plaintiffs allege the presence of a conspiracy among various municipalities and agents dooms the Moving Defendants' argument that this claim is barred by the "intra-corporate" conspiracy doctrine, *see* ECF No. 46-1 at 38 n.15. But even if this were a conspiracy among a single entity and its agents, the intra-corporate conspiracy doctrine would not apply because each of the officers had "an 'independent personal stake' in achieving the illegal objectives" of covering up their misconduct. *Walters v. McMahen*, 795 F. Supp. 2d 350, 358–59 (D. Md. 2011), *aff'd*, 684 F.3d 435 (4th Cir. 2012) (quoting *Greenville Publ'g Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974)). Each of the named Defendants who are officers or agents of their municipalities have an independent personal stake in achieving the illegal objectives of their organization: namely and principally, Manos, Webster, and Lannon had an interest in not being held responsible for their unlawful use of excessive force and wrongful death of Anton, and Defendants Petyo, Cleveland, and the Towns of Greensboro, Ridgley, and Centreville had individual stakes in not being held liable for the negligent hiring, retention, training, certification, and supervision of the officers. *See, e.g.*, *Heyward v. Tyner*, No. 2:17-01545-DCN, 2018 WL 1391434, at *5 (D.S.C. Mar. 20, 2018) (finding exception to intra-corporate conspiracy doctrine where defendants were motivated to convince their superior and the public that their use of force was justified and where other officers could be motivated to protect one of their follow officers and avoid further scrutiny on themselves and police offers in the wake of the shooting).

Second, the FAC specifically alleges the acts Defendants took to evade accountability for Anton's death, and the harm that those acts caused. *See* FAC ¶¶158–61, 164–166, 171–77, 182–

83, 185, 190, 194–95, 310–14. It is thus far from true that the FAC is "'devoid' of any allegation related to an unlawful or tortious act done in furtherance of the conspiracy. The FAC contains many allegations and details about the Defendants' cover up and the harm that resulted: the violation of Plaintiffs' rights to due process and to access to the courts under Article 19, 24, and 40 of the Maryland Declaration of Rights. FAC ¶¶310–14.

## CONCLUSION

For the reasons discussed above, Moving Defendants' Motion to Dismiss should be denied.

Respectfully Submitted,

*/s/ Kenneth Ravenell, Esq.*
Kenneth Ravenell, Bar No. 48969
Ravenell Law
711 St. Paul Street
Baltimore, Maryland 21202
PH: 410-878-0705 / F: 410-834-5488
E: kravenell@kravenelllaw.com

*/s/ Tomeka G. Church, Esq.*
Law Office of Tomeka G. Church, LLC,
Bar No. 25311
711 St. Paul Street
Baltimore, MD 21202
PH: 410-878-0705
E: tchurch@churchlawfirm.com

*/s/ Leslie D. Hershfield, Esq.*
Leslie D. Hershfield, Bar No. 08255
Schulman, Hershfield & Gilden, P.A.
One E. Pratt Street, Suite 904
Baltimore, Maryland 21202
P: 410-332-0850 / F: 410-332-0866
E: lhershfield@shg-legal.com

*/s/ Rene C. Swafford, Esq.*
Rene C. Swafford, Bar No. 26309
Law Office of Rene C. Swafford, LLC
P.O. Box 392
Greensboro, Maryland 21639

P: 410-482-4794
E: rswaffordster@gmail.com

*/s/ Deborah A. Jeon, Esq.*
Deborah A. Jeon, Bar No. 06905
Sonia Kumar, Bar No. 07196
ACLU of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, Maryland 21211
P: 410-889-8550
E: jeon@aclu-md.org
E: kumar@aclu-md.org

*/s/ John A. Freedman*
John A. Freedman, D. Md. No. 20276
Jayce Born (*pro hac forthcoming*)
Megan Pieper (*pro hac forthcoming*)
Florence Bryan (*pro hac forthcoming*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, N.W.
Washington, DC  20001
P: 202-942-5000
E: john.freedman@arnoldporter.com
E: jayce.born@arnoldporter.com
E: megan.pieper@arnoldporter.com
E. florence.bryan@arnoldporter.com

Ryan Budhu (*pro hac forthcoming*)
Joseph P. Klemme (*pro hac forthcoming*)
John F. Mezzanote, Jr. (*pro hac forthcoming*)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY  10019-9710
P: 212-836-8000
E: ryan.budhu@arnoldporter.com
E: joseph.klemme@arnoldporter.com
E: john.mezzanote@arnoldporter.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2021, a copy of the foregoing memorandum of law was electronically filed in this case through the ECF system and served electronically upon counsel of record.

*/s/ John A. Freedman*
John A. Freedman