### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JENNELL BLACK, *et al.* | * | |
| | * | |
| v. | * | Civil Action No.   20-cv-3644 |
| | * | |
| THOMAS WEBSTER IV, *et al.* | * | |
| . | * | |

************

## MEMORANDUM

Pending before the court is a fourteen-count complaint filed by Plaintiffs Jennell Black, individually and as Personal Representative of the Estate of Anton Black; Antone Black, individually and as Personal Representative of the Estate of Anton Black; Katyra Boyce, as mother and next friend of W.B.; and the Coalition for Justice for Anton Black against defendants Thomas Webster IV, Gary Manos, and Dennis Lannon ("defendant officers"), alleging use of excessive force in violation of the U.S. and Maryland Constitutions as well as various tort claims. (ECF 38, First Am. Compl.).[1] Webster is a former police officer of the town of Greensboro, Maryland, Manos is the former Chief of the Ridgley, Maryland Police Department, and Lannon is a police officer of the town of Centreville, Maryland.

On January 21, 2021, the defendant officers filed a motion for summary judgment (ECF 19), which they supplemented on March 5, 2021 (ECF 48). Though the complaint was

---

[1] The plaintiffs also bring claims against former Greensboro, Maryland Police Chief Michael Petyo; former Greensboro Town Manager Jeannette Cleveland; the Towns of Greensboro, Ridgley, and Centreville, Maryland; Assistant Medical Examiner for the State of Maryland Russell Alexander; Chief Medical Examiner for the State of Maryland Victor Weedn; former Chief Medical Examiner for the State of Maryland David Fowler; and the State of Maryland.

subsequently amended on February 18, 2021, all parties agree that the officers' motion for summary judgment remains pending before the court. (*See* ECFs 82, 83, 84).[2] The motion is fully briefed (ECFs 19, 48, 56, 75) and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons explained below, the motion will be denied.

## BACKGROUND

This case stems from the 2018 death of Anton Black, a nineteen-year-old resident of Greensboro, Maryland, following his physical encounter with and arrest by the defendant officers. The following facts are taken from the First Amended Complaint, Webster's body worn camera footage, and the affidavits and reports submitted by the parties.

### I.   Initial Confrontation Between Webster and Black and Subsequent Foot Chase

On August 29, 2018, Anton Black had been acting strangely at home, prompting his father, Antone Black, to call the police. (ECF 38 ¶ 70). Black was subsequently taken into custody by the Kent County Sheriff for an Emergency Petition and behavioral health screening. (*Id.*). Based on this petition, Black was diagnosed with a severe form of bipolar disorder. (*Id.* ¶ 71). Black was discharged from the hospital upon judicial order on September 5, 2018. (*Id.* ¶ 72).

Approximately a week-and-a-half after his discharge from the hospital, on September 15, 2018, Black and X.B., a twelve-year-old family friend of the Blacks, met on a basketball court in Greensboro. (*Id.* ¶ 74). The two left the court and walked around town together. (*Id.* ¶ 76). Black began grabbing and pulling X.B., catching the attention of onlookers and prompting one witness to ask X.B. if he wanted her to call the police. (*Id.* ¶ 78, ECF 19-10, Manos Aff., ¶ 3). X.B. requested that she call, and the witness informed the 911 operator that an older boy was dragging a younger boy along the road. (ECF 19-5, 911 Call, at 4-5).

---

[2] The other defendants' pending motions to dismiss will be addressed separately.

At approximately 7:10 p.m., Officer Webster arrived where Black and X.B. were walking on the side of the road and turned on his body worn camera after exiting his vehicle. (ECF 38 ¶ 81). X.B. informed Webster that Black was "schizophrenic" and had been acting strangely. (*Id.* ¶ 82). In response to Webster's questions, Black stated that he and X.B. were brothers, but X.B. denied this multiple times. (ECF 19-8, Body Worn Camera Footage, at 0:00-0:10). Officer Webster then ordered Black to put his hands behind his back and told him he was under arrest. (*Id.* at 0:11-0:12). Black said "I love you," turned, and jogged in the opposite direction. (*Id.* at 0:12-0:20).

Webster told Kevin Clark, a civilian motorcyclist, to "hang out with him," ostensibly requesting that Clark monitor Black as he fled on foot. (*Id.* at 0:24-0:26). Webster got back in his patrol vehicle, informed dispatch that Black was schizophrenic, and proceeded to turn the vehicle around to follow Black. (*Id.* at 0:25-0:46). Upon seeing Officer Dennis Lannon, who was off duty and standing outside his own residence, Black reversed direction. (*Id.* 0:46-0:48; ECF 19-11, Lannon Decl., ¶¶ 6-8, 12). Webster exited the car and, along with Lannon, pursued Black on foot into the trailer park where Black's family home was located. (ECF 19-8 at 0:48-2:30; ECF 19-11 ¶¶ 13-17). Chief Gary Manos, who, while off duty, had witnessed Webster's initial confrontation with Black, drove Webster's car into the trailer park and parked near the Black residence. (ECF 19-8 at 2:12-2:29, ECF 19-10 ¶¶ 3-4, 6).

## II. Webster's Use of the Baton and Taser

Upon reaching the lot of his family's home, Black entered a white Honda sedan parked in the driveway through the driver's side, shutting the door behind him. (ECF 19-8 at 2:27-2:30). Webster, following close behind, immediately struck the driver's side window of the car twice with his baton, causing it to shatter. (*Id.* at 2:30-2:39). Manos moved toward the passenger side of

the car as Black moved from the driver's to the passenger's seat. (*Id.* at 2:40-2:44). Manos yelled "Watch his hands" to Webster and told Webster twice to "Tase him." (*Id.*).

Webster unholstered his taser, aimed it at Black, and shot it through the shattered driver's side window of the vehicle. (*Id.*). After pulling the trigger, Webster called out 'Taser! Taser! Taser!" (*Id.* at 2:44-2:46). Because only one of two darts of the taser made contact with Black, in his left buttock, the device failed to incapacitate him. (*Id.*; ECF 19-13, Autopsy Report, at 2-3). Black proceeded to exit the car out the passenger door. (ECF 19-8 at 2:45-2:46).

### III.   Physical Struggle and Initial Restraint of Black

Upon his exit from the vehicle, Black ran directly into Manos. (*Id.* at 2:46-2:48). Black attacked Manos by punching, kicking, and biting while Manos told him he was under arrest. *Id.* at 2:48-3:09). During this struggle, Black and Manos, joined by Webster, moved up the wooden ramp to the Black family's trailer. (*Id.*). Manos told Black to "stop" resisting arrest. (*Id.* at 3:06-3:09). Webster cautioned the other officers that Black was "schizophrenic." (*Id.* at 3:22-3:23). As the three men approached the door, followed closely by Lannon and Clark, the civilian motorcyclist, Webster requested that someone pull Black's legs out from under him. (*Id.* at 3:28-3:31). Once Black was horizontal on the porch, Manos requested that Lannon "prone him out," or place Black flat on the ground on his stomach. (*Id.* at 3:53). The officers and Clark subsequently laid him in the prone position on his stomach. (*Id.* at 3:54-4:00).

Webster's body worn camera shows him to be located somewhere over Black's head, shoulders, and (at times) chest, though the camera angle fails to show the exact placement of Webster's body or depict what−if any−pressure he applied to Black's person during the approximately six minutes he was on top of Black. (*Id.* at 3:45-9:50). Webster claims that he placed only his right knee over the "edge" of Black's left shoulder in the "catcher's mitt" position to

4

isolate and gain control of his arms and secure the handcuffs. (ECF 19-9, Webster Aff., ¶ 27). Webster asserts that he never placed his full body weight on Black at any point during the encounter. (*Id.* ¶ 39). At this time, Manos can be seen wedged between Black and the trailer, lying parallel to and on top of Black's hip and leg. (ECF 19-8 at 3:45-5:03). Officer Lannon assisted in straightening Black's legs and then straddling his left leg, never placing pressure on Black's upper body. (*Id.* at 3:45-5:05). After the officers successfully handcuffed Black, Lannon stood up and moved off the porch. (*Id.* at 5:03-5:07). Webster told the officers to "take a breather," and Manos moved his body off Black to rest temporarily on the trailer. (*Id.* at 5:05-5:12). Webster states that he removed his knee from Black's shoulder approximately one minute or less after it was first placed there. (ECF 19-9 ¶ 30). Webster explained to Black's mother, Jennell Black, who came to the door, that Black had attempted "to abduct a twelve-year-old and then fled from the police." (ECF 19-8 at 5:10-5:14).

With his hands secured, Black began kicking and struck Lannon in the face with his shoe. (*Id.* at 5:27-5:29). Lannon subsequently folded Black's legs above his body. (*Id.* 5:28-5:34). Manos again told Black to stop resisting, and Webster asked for leg shackles to be retrieved from the trunk of his vehicle. (*Id.* at 5:32-5:38). Throughout, Black called out to his mother, "I love you," and "You were always there. Thank you!" (*Id.* at 3:23 and 5:39). Black did not appear to kick the officers again as Lannon, Manos, Webster, and Sergeant Richard Baker, the first Caroline County Deputy Sheriff to arrive,[3] unsuccessfully attempted to place a Velcro restraint on Black's legs. (*Id.* at 5:47-9:34). Someone can be heard on the body worn camera saying, "It will be better if you don't fight, calm down." (*Id.* at 7:00-7:03). During this attempt, Webster assured Jenell Black that

---

[3] The man referred to as "Sgt. Baker" does not identify himself on video. Rather, he is identified as such in the defendants' memorandum.

they were treating the situation as a "mental health emergency, we're not treating this like a crime." (*Id.* at 9:16-9:19). Eventually, approximately five minutes after Black was first handcuffed, the officers secured Black's legs with leg shackles and all officers ceased applying pressure to Black's person. (*Id.* at 9:52). Webster and Manos then positioned Black on his side in the "recovery" position. (*Id.* at 9:55-9:58).

## IV.   Black's Loss of Consciousness and Unsuccessful Emergency Treatment

Seconds after Black was placed on his side, the officers noticed that he appeared unresponsive. (*Id.* at 9:58-10:00). Manos returned to Black and verbally confirmed that he was breathing and had a pulse. (*Id.* at 10:00-10:08). Information about Black was then relayed by someone at the scene out of view of the body worn camera to emergency medical service (EMS) providers en route to the location. (*Id.* at 10:29-10:50, ECF 19-9 ¶ 37). Approximately a minute later, an unidentified voice relayed to EMS that Black was not conscious and asked them to "step it up." (ECF 19-8 at 13:18-13:20).

Baker commenced CPR and began chest compressions shortly thereafter, and Manos assisted with ventilation. (*Id.* at 13:25-17:57). Shawn Starkey, Chief of the Greensboro Fire Department, arrived with an Automated External Defibrillator (AED). (*Id.* at 15:45). The AED advised three times against shocking Black, and CPR was administered again after each use of the AED. (*Id.* at 17:18-17:20, 18:17-18:24, 19:30-19:32). Because Starkey advised that X.B. said Black had ingested laced marijuana, Manos administered two doses of Narcan to no effect. (*Id.* at 16:45-17:10; 17:20-17:45; ECF 19-12, Aff. of Shawn Starkey, ¶ 6; ECF 19-10 ¶¶ 47-49). Black was carried into the paramedics' ambulance approximately twenty-five minutes after the officers noticed that he had become unresponsive. (ECF 19-8 at 34:50-35:20).

## V.   Autopsy and Toxicology Report Results and Criminal Investigation Into the Officers' Conduct

Black was pronounced dead at 8:36 p.m., shortly after his arrival at the University of Maryland Shore Medical Center in Easton, Maryland. (ECF 19-13, Autopsy Report, at 4). Russell Alexander, M.D., Assistant Medical Examiner for the State of Maryland, performed an autopsy the next day, on September 16, 2018. (*Id.*). The autopsy lists Black's death as an "Accident," specifically "Sudden Cardiac Death" caused by an "Anomalous Right Coronary Artery and Myocardial Tunneling of the Left Anterior Descending Coronary Artery." (*Id.*). "Bipolar disorder" is listed as a "significant contributing condition" to the death. (*Id.* at 2, 8). The report concluded that, "[b]ased on a review of the investigation and autopsy findings, it is likely that the stress of his struggle contributed to his death. However, no evidence was found that restraint by law enforcement directly caused or significantly contributed to the decedent's death." (*Id.* at 8).[4] The accompanying toxicology report read negative for the presence of marijuana in Black's system. (*Id.* at 13-14). Black was not tested for synthetic cannabinoids.

The plaintiffs provide two expert declarations disputing the official causes of death listed in the state's autopsy report. Dr. Jon Resar, a cardiologist at Johns Hopkins University, asserts his opinion, based on the body worn camera video and autopsy report, that asphyxiation was the cause of Black's death, and that myocardial bridging[5] and an anomalous right coronary artery were not the causes of death. (ECF 56-4, Resar Decl., ¶¶ 3-13). Francisco Diaz, Chief Medical Examiner for the Office of the Medical Examiner of Washington, D.C., upon review of the same documents and toxicology report, similarly concluded that the "pressure and positioning [of the officers] prevented Black from being able to breathe, depriving him of the oxygen necessary for his brain

---

[4] The autopsy report does note that certain video footage showed "an officer lying across the decedent's back at one point." (*Id.* at 8).
[5] Dr. Resar's preferred term for what Dr. Alexander described as myocardial tunneling. (ECF 56-4 ¶ 5).

and heart to function correctly, which led to Black's death." (ECF 56-2, ¶¶ 3, 10). Dr. Diaz also agreed that Black's death "was not caused by myocardial bridging or anomalous right coronary artery." (*Id.* ¶ 11).

After the State's autopsy was conducted, the Maryland State Police, assigned to investigate the circumstances of Black's death, provided the results of their investigation to the State's Attorney for Caroline County. (ECF 19-14, Doc. Declining Charges). On March 7, 2019, the State's Attorney informed the State Police that the office was declining "to seek charges against any individuals in the matter involving the In-Custody Death of Anton Black." (*Id.*).

The plaintiffs filed suit against the defendant officers, as well as former Greensboro Police Chief Michael Petyo, former Greensboro Town Manager Jeannette Cleveland, the Towns of Greensboro, Ridgely, and Centreville, Assistant Medical Examiner for the State of Maryland Russell Alexander, Chief Medical Examiner for the State of Maryland Victor Weedn, former Chief Medical Examiner for the State of Maryland David Fowler, and the State of Maryland on December 17, 2020, later amending the complaint on February 18, 2021. (ECF 1, Original Compl.; ECF 38, First Amended Compl.).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). In light of the indisputable video evidence, "facts must be viewed in the light most favorable to the nonmoving party only if there is a '*genuine*' dispute as to those facts." *Scott*, 550 U.S. at 380. "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (footnote omitted)).

At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). The relevant inquiry is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

## DISCUSSION

### I.   Excessive Use of Force

Whether the defendant officers engaged in an excessive use of force lies at the heart of all of the plaintiffs' claims against them. If, as the defendant officers contend, there is no genuine dispute of material fact that they did not use excessive force against Anton Black on September 15, 2018, then summary judgment should be entered in their favor as to all claims against them.

Accordingly, the court will begin by examining Count 3 of the First Amended Complaint, a Section 1983 claim for excessive use of force in violation of the Fourth and Fourteenth Amendments.

The Fourth Amendment protects citizens from "unreasonable seizures," and thus prohibits the use of excessive force by police officers "to seize a free citizen." [6] *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). A police officer's use of force against a subject violates that individual's Fourth Amendment right against unreasonable seizure if the officer's actions are not "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal citation omitted). Evaluating the reasonableness of a particular use of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. In *Graham*, the Supreme Court specified three non-exhaustive factors for assessing the reasonableness of a particular application of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. *Id.*; *see also Armstrong*, 810 F.3d at 899. Courts must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Claims brought under Articles 24 and 26 of the Maryland Constitution are interpreted *in pari materia* with their federal analogs, the Fourth and Fourteenth Amendments. *See, e.g. Dent v.*

---

[6] The Fourth Amendment governs whether the officers' use of force against Black during the course of his arrest was excessive. "[A]ll claims that law enforcement officers' have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (analyzing excessive force claim under the Fourth Amendment).

*Montgomery County Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010). Accordingly, analysis of these claims will be conducted under the same federal standard as the plaintiffs' Section 1983 claims.

Considering this standard, the court will assess holistically the sequence of events the evening of Black's arrest and death to determine whether there is a genuine dispute of material fact regarding the objective reasonableness of each instance of force.  Five distinct uses of force occurred, each at least partially captured on body worn camera footage: (1) Webster's initial attempt to arrest and chase Black, (2) Webster's use of his baton to smash the car window, (3) Webster's use of the taser while Black was inside the Honda, (4) Manos and Webster's physical struggle with Black, and (5) Manos, Lannon, and Webster's application of pressure and restraint on Black on the porch. Additionally, the plaintiffs contend that the officers violated Black's constitutional rights by not immediately administering medical aid after he became non-responsive.

### a) The Initial Decision to Arrest and Pursue Black

The first use of force that plaintiffs contend was excessive was Webster's determination to seize Black and Webster's subsequent pursuit of Black after he fled.

The decision to arrest and detain a suspect is reasonable if there is probable cause to believe the individual committed a criminal offense. Probable cause exists where facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that a criminal offense has been committed and that the suspect committed it. *Humbert v. Mayor of Balt. City*, 866 F.3d 546, 555 (4th Cir. 2017). Courts evaluate probable cause under an objective standard, considering the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *U.S. v. Gray*, 137 F.3d 765, 769

(4th Cir. 1998). Probable cause requires more than bare suspicion, but less than the evidence needed to convict. *Gray*, 137 F.3d at 769. At the time Webster turned on his body worn camera and first confronted Black, Webster had substantial information available suggesting that Black was unlawfully forcing X.B. down the road with him. The 911 call, which Webster attested to being informed about by dispatch (ECF 19-9 ¶ 5), provided him credible information that an adult black male was roughly "dragging" a juvenile down the road in a "headlock." (ECF 19-5 at 2:4-10; 4:2-3). It is clear from the body worn camera footage that Black and X.B. were still close together by the time Webster had exited his vehicle and approached them. (ECF 19-8 at 0:00-0:02). Shawn Starkey, who later assisted in efforts to revive Black, also attested to seeing Black dragging X.B. down the street momentarily before Webster arrived. (ECF 19-12 ¶ 3). Further, X.B.'s insistence that Black was not his brother and either mentally dissociated and in need of involuntary assistance or lying about their relationship provided additional reason to believe that Black was acting illegally. (ECF 19-8 at 0:00-0:10).

Webster's knowledge of the situation and his presence at the scene created sufficient probable cause under Maryland law to initiate a warrantless arrest of Black for assault.[7] In Maryland, "Assault" means the crimes of "assault, battery, and assault and battery, which retain their judicially determined meanings." Md. Code Ann., Crim. Law § 3-201. "A battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 600 (1999). "[T]he unlawful application of force to another,

---

[7] In Maryland, "a police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer." Md. Code Ann., Crim. Proc. § 2-202(a). Additionally, a police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime. *Id.* § 2-202(b).

however slight, constitutes a battery." *Claggett* v. *State of Maryland*, 108 Md. App. 32, 47 (1996). An assault is a consummated battery, an attempted battery, or placing a victim in reasonable fear of an imminent battery. *Snyder v. State*, 210 Md. App. 370, 381-82 (2013). The multiple reports of a headlock and dragging, combined with the inconsistent answers given by Black and X.B., provided Webster with a reasonable belief that, at minimum, an ongoing assault was occurring.

Plaintiffs do not dispute the above-mentioned facts, but rather argue that the decision to arrest and pursue Black was disproportionate because Webster knew Black was suffering a mental health crisis. (*See* ECF 19-8 at 0:45 (Webster tells dispatch that Black was "schizophrenic")). The information available to Webster, however, indicated that Black, whether or not he was having a mental health emergency, posed an ongoing danger to X.B., himself, and the community. Each *Graham* factor favors Webster's decision to arrest and pursue Black: assault is a serious crime, Black posed a non-negligible threat to the safety of those around him, and he attempted to flee. 490 U.S. at 396. Thus, there is no genuine dispute that Webster acted objectively reasonably when he sought to detain Black and chose to pursue him when Black failed to comply.

### b) Webster's Use of The Baton to Smash the Car Window

The second use of force plaintiffs allege to be disproportionate is Webster's use of his baton to break the window of the car in which Black locked himself.

The defendant officers analogize Webster's use of his baton to smash the car window to the actions of the defendant officer deemed reasonable in the case of *Kimpel v. Board. of County. Comm'rs of Cecil County*, No. CCB-06-0097, 2009 WL 890092 (D. Md. Mar. 25, 2009). An unpublished decision, *Kimpel* dealt with a materially different situation where officers reasonably believed the suspect to be an armed fugitive who was attempting to violate a protective order and visit his minor children. *Id.* at *2, *10. Moreover, the officer in that case only used his baton after

the suspect refused to comply with repeated orders to step out of the vehicle, which was beginning to move forward. *Id.* The comparison of the present situation to these facts is inapt, as Webster issued no warnings, the vehicle's engine was not running, and there was no indication that Black was armed.

Application of the *Graham* factors demonstrates the difficulty in deciding as a matter of law whether Webster's actions were reasonable under the circumstances. The first and third factors, the severity of the crime and that Black was resisting arrest, had not changed since Webster's initial decision to detain Black. The second *Graham* factor, whether the suspect posed an immediate threat to the safety of others, changed once Black entered the parked vehicle. The defendant officers assert that it was reasonable to suspect Black, who was acting erratically, had entered the car in order to use it as a weapon or to retrieve a weapon stored in the vehicle. The concern that Black could use the car or another weapon and pose a risk to the safety of officers and bystanders weighs in favor of finding Webster's use of his baton reasonable under the rapidly evolving circumstances.[8]

The plaintiffs, however, present evidence to support that Webster's split-second reaction to use force instead of verbal orders was unreasonable, given that Black did not at that point provide any indication of an intent to be violent. (*See, e.g.* ECF 56-3, Powers Decl., at ¶ 11 (stating that Black was "under control" while locked in the vehicle, making Webster's use of force unreasonable)). The Greensboro Police Handbook instructs that "control devices" such as batons should be used only "when a decision has been made to control, restrain, or arrest a person who is violent or demonstrates the intent to be violent." (ECF 56-3C, Greensboro Handbook, at 78). The

---

[8] The plaintiffs note that the car had a flat front right tire, visible in the body worn camera footage. (ECF 19-8 at 4:15). A flat tire, however, would not necessarily prevent a driver from operating a vehicle and posing a danger to those outside. Further, it is not apparent that the officers saw and processed that the vehicle had a flat tire during their pursuit of Black.

Handbook instructs officers to try to de-escalate mental health crises by being "patient, polite, calm, courteous and [not] overreacting," to "speak and move slowly and in a non-threatening manner," and not to "corner a person who is not believed to be armed, violent, or suicidal." (*Id.* at 326). Webster's use of his baton without warning, and without an indication that Black planned to act violently, weighs against a finding that this use of force was reasonable.

In sum, a genuine dispute of material fact exists regarding whether it was reasonable for Webster to resort to immediate use of his baton to break the car window without warning.

### c) Webster's Use of the Taser

The plaintiffs next contend that Webster acted unreasonably by discharging his taser in an attempt to incapacitate Black. Webster fired the less lethal weapon immediately after breaking the car window, also without warning. (ECF 19-8 at 2:44-2:46). Only after the trigger was pulled did he shout "Taser! Taser! Taser!" (*Id.*).

As a general principle, a law enforcement officer may deploy a taser when "confronted with an exigency that created an immediate safety risk and that is reasonably likely to be cured by using the taser." *Estate of Armstrong*, 810 F.3d at 909.

Like Webster's use of his baton, the officer's decision to deploy the taser was made quickly, against the backdrop of uncertainty about what weapons Black may have had access to inside the vehicle.[9] In this instance, again, Webster did not choose to attempt to deescalate, as the Greensboro Police Handbook cautions is the best practice when dealing with mental health emergencies. (ECF 56-3C at 326). As with Webster's use of the baton, there remains a genuine dispute of material fact regarding the reasonableness of Webster's decision to use the taser.

### d) The Struggle with Black Outside the Car and On the Porch

---

[9] Black, by this time in the passenger seat, clearly posed less of a threat of driving the vehicle recklessly or using the car itself as a weapon.

Immediately after Webster unsuccessfully deployed his taser, Black exited the Honda and began to attack Manos, pushing him toward the door of the trailer. (ECF 19-8 at 2:46-2:48). Black escalated his resistance, first by charging Manos and then by punching, biting and kicking the officers as they grappled with him. (*Id.* at 2:48-3:09).

The plaintiffs do not appear to argue in their response to the defendant officers' motion for summary judgment that Manos and Webster's use of force to subdue Black at this point was excessive. (*See* ECF 56 at 17-18). Accordingly, it is undisputed that the officers' initial use of force to subdue Black outside the car, on the ramp, and against the wall of the trailer was reasonable under the circumstances.

### e)  The Application of Pressure and Restraints on Black

The fifth alleged excessive use of force was Webster, Lannon, and Manos's application of pressure on and restraint of Black's person as the officers applied handcuffs and later leg shackles. (EFC 19-8 at 4:00-9:47). Specifically, the plaintiffs, through their expert, assert that the continued placement of unnecessary weight on Black's lower body and torso in the prone position after handcuffs were placed on his wrists was "unreasonable and an excessive use of force that could result in serious injury or death" (ECF 56-3, Powers Decl., ¶¶ 18, 20). The plaintiffs' other medical expert states that Lannon, by positioning Black's legs in the air as though "hog-tying" him "further compromis[ed] his ability to breathe." (ECF 56-2, Diaz Decl., ¶ 9).

The plaintiffs argue that the video evidence shows that Manos's body weight contributed to Black's inability to breathe due to compression on his lungs; the defendants disagree. The body worn camera footage is not sufficiently clear for the court to find as a manner of undisputed fact that Manos never placed weight on Black in a way that could asphyxiate him. *See Scott*, 550 U.S. at 380. Manos can be seen to place his body parallel to Black's, pinning his waist and legs on the

16

porch. (ECF 19-8 at 3:48-5:07). Later, Manos removed most of his weight from Black's body, keeping only his right leg over Black's left leg. (*Id.* at 5:07-5:20). Subsequent footage less clearly depicts Manos's position in the approximately four minutes that followed. (*Id.* at 5:21-9:52). Manos claims in his declaration that he did not reapply pressure, and glimpses of his legs and hips suggest this may be true, but the video does not offer a consistent shot of his position during the time Black is unresponsive before the leg shackles are applied. (ECF 19-10, Manos Decl., ¶ 37). Therefore, a genuine dispute of material fact exists as to whether Manos used excessive force in applying pressure to Black on the porch.

The video evidence, moreover, does not conclusively establish the degree of force used by Webster either before or after Black appears to stop resisting arrest. While the footage from Webster's body worn camera does make clear that the officer who most plausibly could have placed pressure on Black's upper body throughout the confrontation was Webster himself, it fails to capture Webster's position above Black. It is impossible to tell how much weight and what body parts, if any, Webster placed on Black throughout the nearly six minutes of footage. Nor can a viewer discern if or for how long Webster placed his knees on Black's neck, shoulders, or upper torso.

While Webster claims that he only placed his knee on Black's left shoulder for one minute (ECF 19-9 ¶ 30), the plaintiffs allege that Black remained "pinned [] down" by the officers' "collective weight" with his legs positioned in the air throughout the officers' attempts to shackle his legs. (ECF 38 ¶¶ 125, 133, 142, 144). Thus, a genuine dispute exists as to the degree and necessity of the force Webster, Lannon, and Manos used during the time Black was being placed in handcuffs and leg shackles before he was found to be unresponsive.

17

In summary, the video evidence, considered by itself, is not so conclusive as to "clearly contradict" and outweigh the plaintiffs' allegations and their expert opinions. *Scott*, 580 U.S. at 378. As a reasonable jury could reach more than one conclusion regarding whether Manos, Lannon and Webster's use of force was reasonable, summary judgment must be denied.

### f)  Delayed Administration of Medical Aid

In addition to the allegations of excessive use of force detailed above, the plaintiffs allege in their response to the defendant officers' motion for summary judgment that Webster, Manos, and Lannon violated Black's constitutional rights by failing to administer medical aid promptly upon realizing he was nonresponsive. (*See* ECF 56-3 ¶ 22). Unlike excessive use of force claims, pre-detention denial of medical care claims are governed by the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (internal citation omitted) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). The Fourth Circuit has held that, though the precise scope of a pretrial detainee's Fourteenth Amendment rights is "unclear," a violation can be made out when a pretrial detainee "shows [that a state actor demonstrated] deliberate indifference to serious medical needs" under cases interpreting the Eighth Amendment. *Mays v. Sprinkle,* 992 F.3d 295, 300 (4th Cir. 2021).

This denial of medical care claim, however, which is legally distinct from the excessive force claim, was not pled in the plaintiffs' amended complaint. It is well established that a plaintiff may not amend his complaint through a memorandum and is bound by the allegations contained in his complaint. *See Stahlman v. U.S.*, 995 F. Supp. 2d 446, 453 (D. Md. 2014); *Zachair, Ltd. v. Driggs,* 965 F. Supp. 741, 748 n.4 (D. Md. 1997). And even if the plaintiffs had sufficiently pled this additional cause of action, the video evidence does plainly contradict the plaintiffs' version of

events. Immediately after Black's legs have been shackled and he was placed in the "recovery" position on his side (ECF 19-8 at 9:58), Webster confirmed that he was breathing and had a pulse (*Id.* at 10:00-10:08). Someone outside of view of the body worn camera then relayed details about Black to emergency medical service (EMS) providers en route to the location. (*Id.* at 10:29-10:50, ECF 19-9 ¶ 37). Approximately thirty seconds after Black's mother first noticed that Black was "turning dark" (*Id.* at 12:44-12:45), an unidentified voice relayed to EMS that Black was not conscious and asked them to "step it up." (ECF 19-8 at 13:18-13:20). The defendant officers then proceeded to lay Black flat and unshackle his legs; Officers Baker and Manos commenced CPR. (*Id.* at 14:14). At no point in this rapidly evolving sequence of events did any officer deliberately ignore or refuse to assist Black, in fact, the officers worked in coordination to dispatch EMS and provide CPR as soon as it became apparent to his mother and the officers that Black was no longer breathing. Thus, there is no genuine dispute that the "deliberate indifference" to Black's medical needs required for an actionable Fourteenth Amendment violation has not been shown.

### g) Bystander Liability Theory

The plaintiffs assert in Count 3 of the First Amended Complaint that Manos and Lannon also are liable for Webster's excessive uses of force because they failed to intervene to prevent the alleged violations of Black's Constitutional rights. (ECF 38 ¶ 231). The Fourth Circuit addresses a failure to intervene claim as a theory of "bystander liability" wherein there is "an omission to act . . . coupled with a duty to act." *Randall v. Prince George's County,* 302 F.3d 188, 203 (4th Cir. 2002). A "bystander officer" may be liable if he or she: "1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204.

To the extent that the court has found genuine disputes of material fact regarding Webster's use of excessive force against Black while subduing him on the porch, Manos and Lannon, if not directly liable, might be held accountable as bystanders. Lannon was in the immediate vicinity of Webster and Manos and assisted them in incapacitating and shackling Black.[10] Whether either Manos or Lannon had a reasonable opportunity to tell Webster to stop applying pressure to Black's upper body (if Webster did so) cannot be decided as a matter of law based on the current record. Additional discovery including deposition testimony of key witnesses may aid the court in determining whether bystander liability for either Manos or Lannon can be determined as a matter of law upon further summary judgment briefing.

*****

In sum, based on the evidence provided, a jury could conclude that Webster's use of the baton and taser as a first resort, as well as Webster's and Manos's use of their bodies to apply pressure to Black with Lannon's assistance and positioning of Black's legs while he was being cuffed and shackled, were unreasonable and therefore excessive uses of force in violation of Black's constitutional rights. The plaintiffs may not, however, proceed on any claims against the officers for excessive use of force in deciding to arrest and pursue Black, in initially using force to subdue him after he exited the parked car, or for the denial of medical care.[11]

---

[10] Webster's use of his Taser minutes earlier may have involved Manos directly because he can be heard on video encouraging Webster to use the Taser just before he discharged it. (*See* ECF 19-8 at 2:42-2:45). Lannon, however, cannot be held responsible as a bystander for Webster's use of his Taser several yards away, as he did not have an opportunity to prevent it. Similarly, both Manos and Lannon cannot be held liable as bystanders for Webster's unannounced use of his baton to smash the car window.

[11] As the defendant officers' only argument for summary judgment with respect to Counts 9 (Gross Negligence or Recklessness in Retention, Training, and Supervision of Lannon and Manos) and 14 (a Fourteenth Amendment Equal Protection claim) was that no excessive force was used, summary judgment will be denied at this time as to these claims.

## II.     Qualified Immunity

With respect to the plaintiffs' Section 1983 claim, the defendant officers further argue that they are protected from suit under the doctrine of qualified immunity.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages in a Section 1983 suit as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants bear the burden of proving their entitlement to qualified immunity. *Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014). To prevail on a qualified immunity defense, a government official must demonstrate either (1) that the facts, construed in the plaintiff's favor, do not constitute a violation of the plaintiff's constitutional rights, or (2) that the right infringed upon was not clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 231-33, 236.

An officer's conduct violates clearly established law "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. Al-Kidd,* 563 U.S. 731, 741 (2011). Although there need not be a case directly on point for the law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). The Supreme Court has emphasized that the "clearly established law" should not be decided at a "high level of generality" but instead it must be

"particularized" to the facts of the case and the law determined beyond debate. *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 552 (2017) (*per curiam*) (internal citations omitted). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes,* __ U.S. __, 138 S. Ct. 1148, 1152 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*)). When a plaintiff can identify "cases of controlling authority in the jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority" affirming the allegedly violated right, the law may be clearly established. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). "The 'exact conduct at issue need not' previously have been deemed unlawful for the law governing an officer's actions to be clearly established." *Sims v. Labowitz*, 885 F.3d 254, 262 (4th Cir. 2018) (quoting *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001)).

As discussed above, three uses of force, when viewed in the light most favorable to the plaintiffs, may have violated Black's constitutional rights: Webster's use of his baton, the discharge of the taser, and the application of pressure to Black's body while he was being cuffed and shackled. As the baton and taser were deployed immediately in sequence, they will be analyzed together for the purpose of determining whether clearly established law existed at the time of the incident.

### a) Baton and Taser Usage

On at least two occasions, the Fourth Circuit has spoken directly in published opinions as to how baton and taser usage by law enforcement officers may become excessive uses of force. First, in *Meyers v. Baltimore County, Maryland*, the Fourth Circuit found an officer's initial uses of a taser against an agitated man wielding a baseball bat were objectively reasonable, but

subsequent deployments of the taser after the man was subdued were not reasonable and the officer was not entitled to qualified immunity. 713 F.3d 723, 733-34 (4th Cir. 2013). The *Meyers* court held that the Fourth Circuit has "stated in forthright terms that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Id.* at 734 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744-45 (4th Cir. 2003)). Relevantly, such "unnecessary, gratuitous, and disproportionate force" may arise from using a gun, baton, taser, or other weapon. *Id.* at 745.

Second, in *Estate of Armstrong*, the Fourth Circuit clarified that law enforcement officers may only deploy tasers when an officer is "confronted with an exigency that creates an immediate safety risk and that is reasonably likely to be cured by using the taser." 810 F.3d at 909. Put another way, use of a taser is "proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *Id.* at 903.[12] *Armstrong* additionally held that, when a law enforcement official is deciding when and how to use force to subdue an individual known to be suffering from a mental health crisis or disability, "[t]he diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." *Id.* at 900 (quoting *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 904 (6th Cir. 2004).

---

[12] Other Fourth Circuit cases repeat this holding in circumstances where non-resisting and unarmed suspects are Tased or otherwise punished through unnecessary uses of force. *See Orem v. Rephann*, 523 F.3d 442, 449 (4th Cir. 2008) (no qualified immunity for officer who used taser to "punish or intimidate" a pretrial detainee); *Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001) (no qualified immunity for officer who pepper-sprayed suspect's wife twice at close range without waiting to see if the first spray subdued her); *Yates v. Terry*, 817 F.3d 877, 886-87 (4th Cir. 2016) (no qualified immunity for an officer who tased a non-resisting driver three times).

Whether Black was "secured" inside the car is a question of fact that the court cannot resolve at this point in litigation. The vehicle was parked, not turned on, and had a flat front tire. No testimony exists from the defendant officers about whether they believed Black had access to a firearm while inside the vehicle. Affording the plaintiffs the most favorable interpretation of the evidence, as is required for purposes of summary judgment, Black may be assumed to have been secured and no longer actively posing an immediate threat when Webster smashed the window and deployed his taser. Clearly established law in the Fourth Circuit, from *Meyers* and *Armstrong,* provided sufficient particularized and unambiguous notice that Webster's use of his baton and taser, without prior warning or a verbal attempt to obtain compliance, when Black was seated in a parked car and not posing an immediate threat to the officers' safety, would violate Black's Fourth Amendment right to be free from the application of excessive force.

**b) Application of Pressure on Black While He Was Prone**

The defendant officers contend that there is no clearly established law regarding when the use of pressure becomes "positional asphyxia," a disputed medical term for the inability to breathe while restrained. While the Fourth Circuit has not published a decision addressing this term specifically, two cases have denied qualified immunity to law enforcement officers for the gratuitous use of force in analogous situations. First, in *Jones v. Buchanan*, the court held that an officer who knocked a drunk and disorderly, but already handcuffed, individual to the ground in a secured room engaged in excessive use of force. 325 F.3d 520, 532 (4th Cir. 2003). Denying the officer qualified immunity, the court reasoned that "years before 1999, it was clearly established that a police officer was not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others . . ." *Id.* at 534. Second, in *Bailey v. Kennedy*, the Fourth Circuit denied qualified immunity to officers who

24

continued to use force to roughly manipulate the body of an initially resistant suspect who, by that time, had been fully secured. 349 F.3d 731, 745.[13] The court found unreasonable officers' kicks and blows that continued "after Michael was bound hand and foot and lying face down on the floor." *Id.* at 744.

Although there is no Fourth Circuit caselaw precisely on point, the defendant officers were sufficiently on notice of the controlling legal principle: that continued application of unnecessary pressure after an initially-resisting subject has been incapacitated constitutes excessive force in violation of the subject's constitutional rights. It also is clear that an individual's mental health must be factored into the use of force. As with the baton and taser, the factual dispute as to whether Black was secured and did not pose a threat to the officers throughout the time they were subduing him on the porch must be viewed in the light most favorable to the plaintiffs at this stage in litigation. Similarly, considering the plaintiffs' proffered expert opinions, a genuine dispute of material fact exists regarding whether "positional asphyxia" creates risk of serious injury or death

---

[13] The plaintiffs analogize to a number of additional, mostly unpublished cases to support the argument that the defendant officers were on notice that their actions violated Black's constitutional rights. Most notable among the cases the plaintiffs cite is *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409 (D. Md. 2014), *aff'd sub nom. Estate of Saylor v. Rochford*, 698 F. App'x 72 (4th Cir. 2017), an unpublished Fourth Circuit case involving the death of Ethan Saylor, an individual with Downs syndrome, after a police encounter in a movie theater. There, the court determined that the deputies who placed Saylor on the floor of the theater should have been aware of the risks of dragging and restraining an individual with a "mental disability" even if the injury that led to his death (a fractured larynx) was not foreseeable. *Id.* at 418. Other circuits have also ruled precisely on the issue at hand. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d at 903 ("Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." *Saylor* and *Champion*'s conclusions and that of various other unpublished and District Court opinions which concur with the court's present decision, may be considered in determining whether there is a consensus of cases of persuasive authority. *See, e.g. Myers v. City of Charleston*, No. 2:19-CV-00757, 2021 WL 925326 at *12 (S.D.W. Va. Mar. 10, 2021).

in individuals who have pressure applied to them while prone. Clearly established law in *Jones* and *Bailey* existed to provide Webster, Manos, and Lannon sufficiently particularized and unambiguous notice that the continued application of unnecessary pressure on someone after he has stopped resisting and no longer poses a threat to the officers or others constitutes excessive force. Accordingly, summary judgment will be denied as to Count 3 (Excessive force in violation of the Fourth Amendment) of the First Amended Complaint.

## III.   Statutory and Common Law Immunity

Defendant officers next assert that common law and statutory immunity protect them from suit on their state law claims. Maryland grants public officials, including police officers, immunity from suit for negligent acts performed during the course of their discretionary duties. *Houghton v. Forrest*, 412 Md. 578, 585 (2010); *see also* Md. Cts. & Jud. Pro. Code § 5-507 (2015) (codifying common law public official immunity for municipal officials). Such immunity, however, does not protect public officials from suit for grossly negligent or reckless discretionary acts. *Barbre v. Pope*, 402 Md. 157, 187-90 (2007).

As police officers at the time of the incident, Webster, Manos, and Lannon are entitled to statutory immunity as public officials for acts of negligence performed in the course of their discretionary duties. The defendant officers contend that, although plaintiffs allege recklessness or intentionality with respect to each relevant count, the court must view the body worn camera footage as dispositive of gross negligence, recklessness, and malice.

While there is little evidence of malice in the record, there are factual allegations, when viewed in the light most favorable to the plaintiffs, that could support a finding of gross negligence or recklessness on the part of the defendant officers. The record includes expert opinions that the officers' choice to prone and apply pressure to Black while he was restrained face down, with his

legs in the air, was not reasonable under the circumstances due to the risk of asphyxiation and that this placement led to Black's death. (ECF 56-2 ¶¶ 4, 10; ECF 56-3 ¶¶ 18, 20; ECF 56-4 ¶¶ 3-13). Additionally, the Greensboro Police Handbook, to which Webster was supposed to adhere, suggests that by smashing a car window by Black's head and discharging a Taser, Webster did not attempt to de-escalate, and to not overreact, when dealing with a person suffering from a mental health crisis. (ECF 56-3C at 326). Thus, a genuine dispute exists as to the defendant officers' mental states, and sufficient evidence of gross negligence precludes summary judgment on the issue of statutory and common law immunity.

As the defendant officers offer no other reasons for summary judgment with respect to Counts 1 (Wrongful Death), 2 (Survival Action), 5 (Excessive Force in Violation of Article 24 of the Maryland Declaration of Rights), 6 (Excessive Force and Deprivation of Liberty in Violation of Article 26 of the Maryland Declaration of Rights), and 7 (Battery), their motion will be denied as to these claims. Because the case will be proceeding to further discovery it also is not necessary for the court to address the civil conspiracy and intentional infliction of emotional distress claims at this time.

## CONCLUSION

For the reasons stated above, the court will deny the defendant officers' motion for summary judgment at this time, without prejudice to its renewal after additional discovery has been taken.[14] A separate Order follows.

  1/18/22                                             /s/
Date                                        Catherine C. Blake
                                            United States District Judge

---

[14] As the court will deny the defendants' motion for summary judgment, there is no need to address the plaintiffs' argument regarding the need for additional discovery under Federal Rule of Civil Procedure 56(d).